UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASHKAN RAJAEE, individually, and MOBILE MONSTER, INC., a Canadian corporation,<br><br>              Plaintiffs,<br><br>    v.<br><br>TYLER BRANDON DAVIS, an individual; SCOTT R. CARPENTER, an individual; J. DOUGLAS KIRK, an individual; JOSEPH W. SCALIA, an individual; JOSHUA PAUL LINTZ, an individual; AMANDA FRYE, an individual; MELISSA GARCIA, an individual; MICAH L. BAILEY, an individual; D. EDWARD HAYS, an individual; SIARRA WOOD, an individual; GBQ PARTNERS LLC, an Ohio limited liability company; TALENTCROWD, LLC, a Wyoming limited liability company; PORTER CONSULTING, LLC, a California limited liability company; MASON BUILDING & DESIGN, LLC, a California limited liability company; TOPDEVZ, LLC, a California limited liability company (nominal defendant),<br><br>              Defendants. | Case No.: **'26CV0080 GPC BJW**<br><br>COMPLAINT FOR VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§ 1962(a), (b), (c), and (d) DEMAND FOR JURY TRIAL |

/ / /

# I. INTRODUCTION

1. This civil RICO action arises from an eight-year criminal enterprise that unlawfully seized control of TopDevz, LLC ("TopDevz"), a multi-million dollar software development company, through a coordinated pattern of racketeering activity consisting of wire fraud, bank fraud, bankruptcy fraud, tax fraud, identity theft, money laundering, trade secret theft, and obstruction of justice—all violations specifically enumerated as predicate acts under 18 U.S.C. § 1961(1).

2. The criminal enterprise generated approximately $75 million in fraudulent financial transactions, stole trade secrets valued at tens of millions of dollars, procured fraudulent judgments totaling over $12 million through systematic false testimony and falsified tax documents transmitted via interstate wire facilities, and laundered proceeds through Talentcrowd, LLC ("Talentcrowd"), which generated over $12 million in revenue in its first year using the stolen assets.

3. Talentcrowd was subsequently sold to Defendant GBQ Partners LLC ("GBQ") in or around February 2025 for undisclosed consideration, and GBQ continues to exploit Plaintiffs' stolen trade secrets as of the filing of this complaint, generating millions of dollars in ongoing revenue through continuing violations of 18 U.S.C. § 1832 (theft of trade secrets).

4. The pattern of racketeering activity consists of over 750 separate predicate acts spanning over eight years (2017-2025), including over 600 pre-petition predicate acts (May 2017-February 25, 2024) and over 580 post-petition predicate acts (February 26, 2024-December 2025), affecting interstate and foreign commerce, with ongoing violations continuing through the filing of this complaint.

5. The post-petition predicate acts—over 580 violations occurring after Plaintiff Rajaee's February 26, 2024 bankruptcy filing—provide independent basis for this action because they did not exist when the bankruptcy was filed, never became property of the bankruptcy estate under 11 U.S.C. § 541(a)(1), and could not have been settled or sold. These post-petition acts include: the bankruptcy fraud scheme to convert the case and extinguish claims through fraudulent settlements and sale (30+ violations of 18 U.S.C. §§ 152, 157, 1343); GBQ Partners' daily exploitation of stolen trade secrets from February 2025 through December 2025 (300+ violations of § 1832); and GBQ's

monetary transactions in criminally derived property (200+ violations of § 1957).

6. Plaintiffs bring this action with clear standing, emphasizing that:

PRIMARY PLAINTIFF: Mobile Monster, Inc. has complete, unimpaired, unassailable standing as a separate Canadian corporation that was never a debtor in any bankruptcy case. Mobile Monster's claims were expressly preserved as belonging to "the non-debtor entity, Mobile Monster, Inc.," were never released by the bankruptcy settlements, and were never sold to Davis because they were not property of Ashkan Rajaee's bankruptcy estate. Mobile Monster has suffered over $8.6 million in direct damages ($25.8 million trebled), and Mobile Monster's claims alone are sufficient to establish the entire pattern of racketeering activity and support this action in its entirety.

SECONDARY PLAINTIFF: Ashkan Rajaee brings claims in his individual capacity for direct injuries to his personal property (not derivative claims on behalf of TopDevz), including loss of his 51% ownership interest valued at $9-15 million, loss of personal salary of $2.0-2.5 million, injury from a fraudulent $9.3 million judgment entered against him personally through identity theft and perjury, loss of his personal immigration status, destruction of his personal reputation and credit, and over $2.5-5.0 million in personally incurred legal fees—totaling $22.8-31.8 million in direct damages ($68.4-95.4 million trebled). These are injuries to Rajaee's personal property and rights, distinct from any derivative corporate claims.

7. Plaintiffs discovered the full scope of Defendants' criminal scheme in August 2023, when Todd Belluomini provided sworn testimony and documentary evidence proving that Davis's purported $787,240 capital contribution to TopDevz was derived entirely from embezzlement, PPP loan fraud, tax fraud, and identity theft. This August 2023 discovery date triggers the four-year RICO statute of limitations under the Clayton Act, providing Plaintiffs until August 2027 to file this action. Filing in December 2025 is timely, with over 20 months remaining in the limitations period.

8. Additionally, under the continuing violations doctrine, the statute of limitations has not begun to run for the ongoing predicate acts, particularly GBQ Partners' daily exploitation of stolen trade secrets (continuing violations of 18 U.S.C. § 1832 through December 2025) and GBQ's ongoing monetary transactions in criminally derived property (continuing violations of 18 U.S.C. § 1957). For continuing violations, the limitations period runs from the date

3

of the last predicate act, which is occurring as of the filing of this complaint.

9. Even assuming arguendo that some estate claims were purportedly "sold" to Davis on August 14, 2025, such sale is void because it was procured through bankruptcy fraud, Davis cannot purchase in good faith claims alleging he is the racketeering defendant, the sale itself constituted additional predicate acts, the sale is under active challenge with the California Court of Appeal having issued a stay order on October 6, 2025, and federal law prohibits a racketeer from purchasing claims to conceal his own criminal conduct.

10. Substantial racketeering activity continues through December 2025, including ongoing exploitation of stolen trade secrets by GBQ Partners LLC, Talentcrowd, Lintz, and Frye valued at tens of millions of dollars, continued transmission of fraudulent documents via courts' electronic filing systems, and ongoing money laundering transactions in criminally derived property, providing independent grounds for this action based on post-petition predicate acts that occurred after Rajaee's February 26, 2024 bankruptcy filing and therefore could never have been estate property, settled, or sold.

11. Plaintiffs do NOT seek review, reversal, or vacation of any state court judgment. Plaintiffs seek only treble damages and injunctive relief pursuant to 18 U.S.C. §§ 1964(a), (b), and (c) for injuries caused by Defendants' pattern of racketeering activity. The fact that Defendants used their racketeering activity to procure judgments is relevant to Plaintiffs' damages (the entry of a fraudulent judgment against a plaintiff is itself a compensable injury under RICO, causing harm to credit, reputation, and financial condition) but Plaintiffs do not ask this Court to void, reverse, or otherwise review those state court judgments. Any issues regarding the validity of state court judgments are being addressed through Plaintiffs' pending appeals in the California Court of Appeal (Case Nos. C100954 and C101423) and are not before this Court. This action seeks compensation for injuries caused by federal crimes and state felonies, not appellate review of state court decisions.

## II. JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to:

   o a. 28 U.S.C. § 1331 (federal question jurisdiction);

   o b. 18 U.S.C. § 1964(c) (civil RICO jurisdiction over claims arising under 18 U.S.C. § 1962);

o c. 28 U.S.C. § 1332 (diversity jurisdiction), as the amount in controversy exceeds $75,000, exclusive of interest and costs, Mobile Monster, Inc. is a Canadian corporation organized under the laws of the Province of Ontario, and GBQ Partners LLC is an Ohio limited liability company.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965 because:

o a. Substantial parts of the events giving rise to the claims occurred in this District, including the operation of TopDevz's principal place of business in San Diego County;

o b. Multiple Defendants reside in California and transacted business in this District;

o c. Bank accounts at Wells Fargo and JPMorgan Chase, N.A. containing millions of dollars in proceeds of racketeering activity were located in this District;

o d. Talentcrowd operated from Solana Beach, California (adjacent to La Jolla) and continues operations in California under GBQ's control;

o e. Fraudulent bankruptcy filings were made in the United States Bankruptcy Court for this District;

o f. The pattern of racketeering activity was directed at and affected businesses and individuals in this District.

14. This Court has personal jurisdiction over all Defendants because they:

o a. Directed tortious and criminal conduct into California and this District;

o b. Transacted business within California and this District;

o c. Committed tortious and criminal acts within California and this District causing injury to Plaintiffs;

o d. Engaged in a pattern of racketeering activity affecting interstate and foreign commerce;

o e. Transmitted wire communications into and from this District in furtherance of the schemes to defraud;

- f. GBQ purposefully availed itself of this forum by acquiring and continuing to operate Talentcrowd from its Solana Beach, California location.

## III. PARTIES

## A. Plaintiffs

## Mobile Monster, Inc.

15. Plaintiff Mobile Monster, Inc. ("Mobile Monster" or "MMI") is a corporation duly organized under the laws of the Province of Ontario, Canada, incorporated on October 30, 2013.

16. Mobile Monster's principal place of business is located at 68 Madawaska Avenue, Toronto, Ontario, Canada M2M 2R7.

17. Mobile Monster is a software consulting and lead generation company specializing in generating high-quality business-to-business leads for software development firms.

18. Mobile Monster is 100% owned by Ashkan Rajaee.

19. Mobile Monster is a separate legal entity under Canadian law with its own corporate charter and bylaws governed by the Ontario Business Corporations Act, Canadian Business Number for tax purposes, bank accounts at BMO Harris Bank in Canada (accounts ending in 144, 702, 784), employees and independent contractors, and assets, liabilities, and causes of action distinct from Ashkan Rajaee personally.

20. Mobile Monster served as the "parent" company or "foreign organization" for TopDevz, with TopDevz structured as Mobile Monster's expansion into the United States under the L-1A intracompany transferee visa program administered by the U.S. Department of Homeland Security.

21. Mobile Monster had a contractual business relationship with TopDevz whereby Mobile Monster generated leads and client referrals for TopDevz using sophisticated sourcing methodologies, and TopDevz paid Mobile Monster seven percent (7%) of the gross revenues received from clients sourced through Mobile Monster. This arrangement generated approximately $1.4 million per year in commission revenue for Mobile Monster based on TopDevz's revenue run rate.

22. From 2017 through 2021, Mobile Monster invoiced TopDevz approximately $3.3 million for lead generation services, expense reimbursements, and staff support.

23. Mobile Monster was a co-claimant in the arbitration proceedings (AAA Case No. 01-21-0001-9983) alongside Ashkan Rajaee (individually) and TopDevz, LLC, bringing its own corporate claims for intentional interference with contract, intentional interference with prospective economic advantage, and negligent interference with prospective economic advantage.

24. As a result of the fraudulent arbitration procured through Defendants' racketeering activity, a judgment of approximately $3.0 million was entered against Mobile Monster on or about May 12, 2023 (separate from the $9.3 million judgment against Ashkan Rajaee personally).

25. Mobile Monster is currently appealing the $3.0 million judgment in the California Court of Appeal, Third Appellate District (Case No. C100954).

26. Mobile Monster is a "non-debtor entity" that was never a debtor in Ashkan Rajaee's bankruptcy case (Case No. 24-00617).

27. Mobile Monster's claims were expressly preserved by the bankruptcy Trustee, who stated in the settlement agreements that his dismissal of appeals "as to Ashkan Rajaee only shall not constitute a dismissal of any appellate or other rights belonging solely to the non-debtor entity, Mobile Monster, Inc."

28. Mobile Monster has unimpaired standing to bring this action for direct injuries to its business and property.

**Ashkan Rajaee**

29. Plaintiff Ashkan Rajaee ("Rajaee" or "Ashkan") is an individual residing in San Diego County, California.

30. Rajaee is a seasoned entrepreneur with over 25 years of experience in the technology services sector, having previously scaled a software development company from $6 million to over $60 million in annual revenue in under three years (2014-2017).

31. Rajaee is the lawful Manager and 51% majority owner of TopDevz pursuant to the company's Operating Agreement executed on May 9, 2017.

32. TopDevz is a manager-managed California limited liability company,

meaning only the Manager (Rajaee) has authority to bind the company and conduct its affairs, and no member acting solely as a member (including Davis) has authority to act on behalf of TopDevz.

33. Rajaee's majority ownership and managerial status were required by and approved by the U.S. Department of Homeland Security as part of his L-1A intracompany transferee visa, which authorized him to expand his Canadian business (Mobile Monster) into the United States through TopDevz.

34. Under Rajaee's leadership from 2017 through 2021, TopDevz:

  ○ Grew from $0 to nearly $30 million in total earned revenue;

  ○ Secured major clients including HBO, DriveTime Automotive Group (a nearly $2 billion company), Procore Technologies, Becton Dickinson and Company (a Fortune 500 company), Medical Staffing Solutions, Intellicheck, Mode Transportation, and others;

  ○ Generated $1.4 million in net profit in 2021 alone.

35. Rajaee is also the 100% owner and President of Mobile Monster, Inc.

36. Rajaee brings this action in his individual capacity for direct injuries to his personal property.

**B. Individual Defendants**

**Tyler Brandon Davis**

37. Defendant Tyler Brandon Davis ("Davis") is an individual residing at 149 Parkshore Drive, Folsom, California 95630.

38. Davis was designated as a 49% minority member of TopDevz under the May 9, 2017 Operating Agreement.

39. Davis owns or controls multiple business entities including Porter Consulting, LLC; Mason Building & Design, LLC; Grigio LLC; Humble Provisions LLC; and Riley's Doggie Day Care.

40. Davis has engaged in a systematic pattern and practice of using shell companies to commit racketeering activity for the purpose of obtaining and maintaining control of business enterprises.

41. Davis is the principal organizer and leader of the criminal enterprise alleged

herein.

**Scott R. Carpenter**

42. Defendant Scott R. Carpenter ("Carpenter") is an attorney duly licensed to practice law in California (State Bar No. 144259).

43. During the relevant time period, Carpenter practiced with Cummins & White, LLP, located at 2424 S.E. Bristol Street, Suite 300, Newport Beach, California 92660.

44. Carpenter has represented Davis, TopDevz (without lawful authority), Porter Consulting, and Mason Building & Design in connection with the racketeering activity alleged herein.

45. Carpenter actively participated in the criminal enterprise by, inter alia:

   o Fraudulently seizing control of TopDevz's Wells Fargo bank account through false representations transmitted via interstate wire facilities;

   o Publishing and transmitting forged TopDevz stock certificates via email;

   o Filing hundreds of fraudulent pleadings and declarations transmitted via courts' electronic filing systems;

   o Assembling and filing Davis's three perjured declarations using Rajaee's and TopDevz's identity to commit California Penal Code violations including perjury (§ 118a), conspiracy to cheat and defraud (§ 182(4)), conspiracy to obstruct justice (§ 182(5)), and subornation of perjury (§ 127);

   o Threatening Plaintiff Rajaee with criminal prosecution and immigration consequences to extort settlement;

   o Concealing evidence of underlying criminal activity from courts and arbitrators;

   o Recruiting co-conspirator Kirk to join the scheme.

46. Carpenter received over $196,768 in legal fees derived from criminally derived funds held in TopDevz's fraudulent JPMorgan Chase bank account.

/ / /

## J. Douglas Kirk

47. Defendant J. Douglas Kirk ("Kirk") is an attorney duly licensed to practice law in California.

48. During the relevant time period, Kirk practiced with Kirk & Toberty, located at 2201 Dupont Drive, Suite 820, Irvine, California 92612.

49. Kirk falsely represented TopDevz without any lawful authority from November 2022 through at least March 2023, filing numerous fraudulent pleadings, petitions, declarations, and memoranda on behalf of TopDevz via courts' electronic filing systems while knowing that Davis was not and could never be the lawful manager of TopDevz.

50. Kirk forged TopDevz's legal representation by appearing as counsel without authorization, which constitutes forgery under California Penal Code § 470 because "a person who signs as the agent of another 'knowing that he has no authority so to do' can be found guilty of forgery even though he signs his own name."

51. Kirk was recruited to participate in the scheme by Carpenter, a close friend from Grace Fellowship Church in Corona del Mar.

52. Kirk assembled and filed Davis's perjured declarations, constituting subornation of perjury under California Penal Code § 127.

53. Kirk received over $30,000 in legal fees derived from criminally derived funds held in TopDevz's fraudulent JPMorgan Chase bank account.

## Joseph W. Scalia

54. Defendant Joseph W. Scalia ("Scalia") is an attorney duly licensed to practice law in California, operating as a solo practitioner under the name Law Offices of Joseph W. Scalia, APC, located at 3017 Douglas Blvd., Suite 300, PMB 30095, Roseville, California 95661.

55. Scalia served as "lead counsel" for Davis throughout the arbitration proceedings and related litigation from 2021 through 2023, with over 46 years of legal experience and an AV Preeminent rating.

56. Scalia actively participated in the enterprise by:

   o Knowingly submitting over 600 pages of falsified tax returns as

evidence in the arbitration;

- o Presenting Davis's false testimony knowing it was false;

- o Maintaining jurisdictionally defective arbitration proceedings after acknowledging in writing that dissolution claims were within the "exclusive jurisdiction of the Superior Court";

- o Conspiring to falsely move and maintain an action in a prohibited venue (California Penal Code § 182(3));

- o Representing both Davis individually and TopDevz concurrently despite conflicts of interest;

- o Transmitting false declarations and memoranda via courts' electronic filing systems.

57. Scalia received hundreds of thousands of dollars in legal fees derived from criminally derived funds.

**Joshua Paul Lintz**

58. Defendant Joshua Paul Lintz ("Lintz") is an individual residing in San Diego County, California.

59. Lintz was hired by Plaintiff Rajaee as Chief Operating Officer of TopDevz in March 2020 at an annual salary of $200,000.

60. In or around January 2022, Lintz joined the criminal conspiracy and falsely held himself out as "CEO" of TopDevz while simultaneously incorporating Talentcrowd, LLC on February 8, 2022 to serve as the vehicle for laundering proceeds of the racketeering activity.

61. Lintz actively participated in the enterprise by:

- o Ordering and facilitating the mass theft of trade secrets (downloading thousands of confidential files);

- o Destroying evidence by permanently deleting over 130 TopDevz client projects from the Jira project management system;

- o Providing false testimony in judicial proceedings;

- o Establishing and operating Talentcrowd using stolen TopDevz and Mobile Monster assets;

- o Transmitting fraudulent communications to clients and contractors via interstate wire facilities;

- o Continuing to operate Talentcrowd after its acquisition by GBQ Partners.

62. Lintz received $722,335.83 in direct payments from TopDevz's fraudulent JPMorgan Chase account, plus ongoing salary and distributions as founder and principal of Talentcrowd, plus compensation from GBQ Partners following the acquisition.

63. Lintz expressly admitted under oath: "On February 14, 2022, and with the express authorization of Davis in his capacity as the Manager of TopDevz, organized Talentcrowd."

**Amanda Frye**

64. Defendant Amanda Frye ("Frye") is an individual residing in California.

65. Frye served as Director of Accounts at TopDevz from approximately 2019 through January 2022.

66. Frye is now the Chief Executive Officer of Talentcrowd, LLC, a position she has retained following GBQ Partners' acquisition of Talentcrowd.

67. Frye actively participated in the enterprise by:

- o Downloading the entire TopDevz Zoho Recruit recruiting database on January 14, 2022, containing proprietary information about thousands of contractors;

- o Sending confidential TopDevz files to her personal email account (Afrye262632@gmail.com);

- o Directing contractors via Slack messages and emails to switch from TopDevz to the fraudulent topdevz.io domain and subsequently to Talentcrowd;

- o Using stolen trade secrets to operate Talentcrowd;

- o Publicly boasting on March 1, 2023 that Talentcrowd had "logged almost 90k hours of service" in its first year (representing $10-12 million in revenue generated using stolen assets);

12

    o  Continuing to exploit the stolen trade secrets as CEO under GBQ Partners' ownership through December 2025.

**Melissa Garcia**

68. Defendant Melissa Garcia ("Garcia") is an individual residing in California.

69. Garcia served as Manager of Accounts Payable at TopDevz from approximately 2019 through January 2022.

70. Garcia is now the Chief Administrative Officer of Talentcrowd, LLC, a position she has retained following GBQ Partners' acquisition.

71. Garcia actively participated in the enterprise by:

    o  Under Davis's direct orders, downloading 3,784 confidential files from TopDevz email accounts (1,868 from accounting@topdevz.com and 1,916 from mgarcia@topdevz.com) between January 6-14, 2022;

    o  Using the stolen financial and accounting information to generate fraudulent invoices;

    o  Facilitating the wire fraud campaign by creating false financial documentation;

    o  Using stolen information to operate Talentcrowd's accounting and billing systems;

    o  Continuing to exploit stolen assets as CAO under GBQ Partners' ownership through December 2025.

72. Davis testified under oath: "I [Tyler Davis] instructed her [Melissa Garcia] to download as much information as humanly possible at that time."

**Micah L. Bailey**

73. Defendant Micah L. Bailey ("Bailey") is an attorney duly licensed to practice law in California (State Bar No. 248384).

74. Bailey practices with Purdy & Bailey, LLP, located at 12520 High Bluff Drive, Suite 220, San Diego, California 92130.

75. Bailey has represented Lintz, Garcia, Talentcrowd, and Frye since June 9, 2022.

76. Bailey joined the conspiracy by:

13

- Filing fraudulent pleadings and declarations via courts' electronic filing systems knowing they concealed the criminal origins of Talentcrowd's business;

- Making false statements to the court on February 2, 2023 that "there is no evidence that any of the specific trade secrets of TopDevz that Rajaee claims have been transferred to TalentCrowd" despite overwhelming evidence to the contrary;

- Continuing to represent the Talentcrowd defendants after being put on notice multiple times (October 27, 2023; January 17, 2024; February 15, 2024) of the underlying criminal activity;

- Representing the Talentcrowd parties in the fraudulent bankruptcy settlements.

77. Bailey received at least $4,135 in legal fees from criminally derived funds held in TopDevz's JPMorgan Chase account, plus additional fees from Talentcrowd operations funded by stolen assets.

**D. Edward Hays**

78. Defendant D. Edward Hays ("Hays") is an attorney duly licensed to practice law in California (State Bar No. 162507).

79. Hays practices with Marshack Hays LLP, located at 9454 Wilshire Boulevard, 6th Floor, Beverly Hills, California 90212.

80. Hays joined the criminal enterprise in or around August 2023-December 2023, serving as the architect of the bankruptcy fraud schemes.

81. Hays actively participated in the enterprise by:

- Filing false declarations under penalty of perjury in Rajaee's bankruptcy case stating that Davis is "the managing member of TopDevz";

- Filing motions to convert the bankruptcy case from Chapter 11 to Chapter 7 based on false representations;

- Orchestrating the fraudulent settlements and sale to Davis;

- Transmitting to bankruptcy counsel the forged "Unanimous Written Consent of the Members of TopDevz, LLC";

- Filing false proofs of service and other documents to conceal the fraudulent nature of the proceedings.

82. Hays filed declarations on April 8, 2024 and April 29, 2024 (ECF Nos. 19 and 28) repeatedly stating under penalty of perjury that Davis is "the managing member of TopDevz," knowing this was false.

**Siarra Wood**

83. Defendant Siarra Wood ("Wood") is an individual residing in Toronto, Ontario, Canada.

84. Wood served as Plaintiff Rajaee's personal and executive assistant from April 2016 through February 2022 while employed by Mobile Monster, Inc.

85. Wood conspired with Davis beginning in or around February 2021 to:

- Covertly access Rajaee's personal email account (rajaee.ashkan@gmail.com) without authorization;

- Monitor and report on Rajaee's attorney-client communications;

- Delete material evidence that Rajaee needed for his defense in the arbitration;

- Provide Davis with intelligence about Rajaee's legal strategy and evidence.

86. Wood's conduct facilitated Defendants' obstruction of justice and destruction of evidence.

**C. Entity Defendants**

**GBQ Partners LLC**

87. Defendant GBQ Partners LLC ("GBQ") is a limited liability company organized under the laws of the State of Ohio.

88. GBQ is a professional services firm providing accounting, tax, advisory, and consulting services, with offices in multiple states.

89. Upon information and belief, GBQ's principal place of business is located in Ohio, with operations extending to California through its acquisition of Talentcrowd.

90. In or around February 2025, GBQ acquired Talentcrowd, LLC for undisclosed

15

consideration while the criminal enterprise described herein was ongoing and active, and while Talentcrowd was subject to multiple pending lawsuits alleging trade secret theft, wire fraud, and related misconduct.

91. GBQ publicly announced the acquisition through a press release dated on or about January 31, 2025, stating that the transaction would provide GBQ with "access to on-demand talent solutions" and that while separate brand names might be maintained, "the combined firm will operate as one team behind the scenes."

92. At the time of acquisition, GBQ had actual or constructive knowledge of:

   o Ongoing litigation between Rajaee and Talentcrowd principals (Lintz, Frye, Garcia);

   o Multiple pending lawsuits alleging trade secret theft under 18 U.S.C. § 1832 and California Uniform Trade Secrets Act;

   o Federal court cases alleging wire fraud and identity theft;

   o Bankruptcy proceedings involving disputed ownership of TopDevz;

   o Public disputes and claims that Talentcrowd was formed using stolen TopDevz assets;

   o That Talentcrowd was incorporated on February 8, 2022, just 33 days after a disputed arbitration order;

   o That Lintz and Frye were key defendants in multiple civil actions;

   o The suspicious circumstances of Talentcrowd generating $12 million in year-one revenue "without any external funding."

93. Any reasonable due diligence conducted by a professional services firm like GBQ prior to an acquisition would have revealed:

   o Multiple pending lawsuits naming Talentcrowd and its principals;

   o Court dockets showing allegations of trade secret theft and fraud;

   o The extremely compressed timeline between TopDevz's January 2022 takeover and Talentcrowd's February 2022 formation;

   o The identical business model, client base, and workforce between TopDevz and Talentcrowd;

- The impossibility of legitimately generating $12 million in revenue in year one without external funding or pre-existing assets;

- Red flags indicating Talentcrowd's business was built on disputed assets.

94. Despite this actual or constructive knowledge, GBQ proceeded with the acquisition and retained the same individuals who orchestrated the alleged theft—Joshua Lintz and Amanda Frye—to continue operating the business, demonstrating:

- Knowledge that Talentcrowd's value was inseparable from Lintz and Frye;

- Knowledge that the business depended on the specific assets and methodologies developed under their control;

- Intent to continue exploiting the same assets that were the subject of the disputes;

- Willingness to assume the risk of liability for the alleged misconduct.

95. GBQ's retention of Lintz and Frye in leadership positions (rather than replacing them with GBQ personnel) demonstrates that GBQ acquired Talentcrowd specifically for the stolen database, client relationships, and operational expertise that only Lintz and Frye could provide.

96. GBQ operates Talentcrowd as a division or subsidiary, continuing the business under substantially the same structure, using the same stolen trade secrets, serving substantially the same clients, and employing substantially the same contractors.

97. GBQ continues to exploit Plaintiffs' stolen trade secrets through Talentcrowd's ongoing operations as of December 2025, constituting continuing violations of 18 U.S.C. § 1832 (theft of trade secrets).

98. GBQ's acquisition and continued operation of Talentcrowd constitutes:

- Receipt and possession of stolen property (proceeds of racketeering activity);

- Ongoing money laundering under 18 U.S.C. § 1957 (conducting monetary transactions in property derived from specified unlawful

17

activity—each transaction over $10,000 in revenue derived from stolen trade secrets constitutes a separate violation);

- o Aiding and abetting ongoing trade secret theft under 18 U.S.C. § 1832(a)(5);

- o Participation in the continuation and expansion of the criminal enterprise.

99. GBQ is liable as a successor to Talentcrowd under federal common law principles of successor liability because:

- o The acquisition constituted a de facto merger and continuation of the same business enterprise;

- o GBQ expressly stated it would operate "as one team behind the scenes";

- o GBQ retained substantially all of Talentcrowd's assets, liabilities, operations, management, and workforce;

- o GBQ retained the same principals (Lintz, Frye) who possess and control the stolen trade secrets;

- o There was substantial continuity of ownership, management, operations, and assets;

- o GBQ had actual or constructive knowledge of Talentcrowd's liabilities and the pending litigation;

- o GBQ holds itself out to Talentcrowd's clients and the public as the continuation of the same business;

- o Talentcrowd appears to have ceased separate operations, with GBQ operating the business.

100.    As Talentcrowd's successor, GBQ assumed liability for all of Talentcrowd's RICO violations, trade secret theft, wire fraud, and money laundering activities.

101.    GBQ benefits daily from the stolen assets and generates substantial revenue—estimated at $50,000+ per day or $15-20 million annually—from Plaintiffs' stolen 2.5 million record database, recruiting methodologies, and client relationships.

**Talentcrowd, LLC**

102.    Defendant Talentcrowd, LLC ("Talentcrowd") is a Wyoming limited liability company formed on February 8, 2022, with Wyoming Secretary of State filing number 2022-001120163.

103.    Talentcrowd's principal place of business during the relevant time period was located at 125 S Highway 101, Suite 1060, Solana Beach, California 92075.

104.    Talentcrowd was specifically created on February 8, 2022—just 33 days after Interim Order No. 4—to serve as the primary vehicle for laundering proceeds of the racketeering activity and receiving stolen TopDevz and Mobile Monster trade secrets, client contracts, and workforce.

105.    Using stolen assets, Talentcrowd generated over $12 million in revenue in its first year of operation (2022-2023), servicing the exact same clients with the exact same contractors using the exact same proprietary database stolen from Plaintiffs.

106.    Talentcrowd was sold to GBQ Partners LLC in or around February 2025 for undisclosed consideration, but continues operations under GBQ's ownership using the stolen assets.

107.    Talentcrowd and its successor GBQ continue to exploit Plaintiffs' stolen trade secrets as of the filing of this complaint in December 2025.

**Porter Consulting, LLC**

108.    Defendant Porter Consulting, LLC ("Porter") is a California limited liability company owned and controlled by Davis.

109.    Porter's principal place of business is or was located in Paradise, California.

110.    Porter served as the source of Davis's embezzlement of $750,000 and the vehicle for Davis's fraudulent $328,300 PPP loan obtained from the Small Business Administration and Tri Counties Bank.

111.    During the relevant time period (2017-2021), Todd Belluomini owned approximately 10-20% of Porter, and the $750,000 embezzled by Davis belonged to the Porter partnership, not to Davis individually.

**Mason Building & Design, LLC**

112.    Defendant Mason Building & Design, LLC ("Mason") is a California limited liability company owned and controlled by Davis.

113.    Mason served as an intermediary vehicle to launder the $37,240 in PPP loan proceeds from Porter to TopDevz.

114.    On November 10, 2020, Davis wrote a check from Mason to TopDevz for $37,240 labeled "capital call," which was then reimbursed on December 3, 2020 by wire transfer of $37,240 from Porter's PPP loan account to Mason.

**TopDevz, LLC (Nominal Defendant)**

115.    TopDevz, LLC ("TopDevz") is a California manager-managed limited liability company formed on May 9, 2017, with California Secretary of State Entity Number 201713310140.

116.    TopDevz's principal place of business was located at 7460 Girard Avenue, Suite 7, La Jolla, California 92037.

117.    TopDevz is named as a nominal defendant because:
- It has been unlawfully controlled by Davis and other Defendants through the fraudulent schemes alleged herein;
- Its legal status and ownership are directly at issue in this litigation;
- Naming TopDevz as nominal defendant avoids threshold standing disputes while allowing this Court to grant comprehensive injunctive and equitable relief affecting TopDevz;
- The Court can impose constructive trusts over TopDevz's assets and proceeds, restore control to Rajaee, and provide complete relief to Plaintiffs.

118.    TopDevz is NOT a plaintiff to avoid triggering immediate standing challenges based on Defendants' fraudulently procured orders purporting to designate Davis as "manager."

119.    Rajaee is the lawful Manager and 51% majority owner of TopDevz pursuant to the Operating Agreement, which has never been validly amended or modified.

/ / /

/ / /

## IV. PLAINTIFFS' STANDING TO BRING THIS ACTION

### A. Mobile Monster Has Unassailable Standing as Non-Debtor Entity

120.    Mobile Monster, Inc. brings this action in its corporate capacity for direct injuries to its business and property.

121.    Mobile Monster has standing under 18 U.S.C. § 1964(c), which provides that "any person injured in his business or property by reason of a violation of section 1962" may sue for treble damages. "Person" includes all entities capable of holding legal or beneficial interest in property, including domestic and foreign corporations.

122.    Mobile Monster is a separate Canadian corporation with its own corporate charter, bank accounts, employees, assets, liabilities, and causes of action under Canadian law, completely distinct from Ashkan Rajaee personally.

123.    Mobile Monster suffered direct injuries to its business and property totaling $8.6 million:

   o   Loss of commission revenue from TopDevz (2022-2025): TopDevz paid Mobile Monster 7% of gross revenues for lead generation services under a contractual business relationship. On TopDevz's $20+ million annual revenue run rate, this represented approximately $1.4 million per year in business income. From January 2022 through December 2025 (48 months), Mobile Monster has lost approximately $5.6 million in contractual commission revenue due to Defendants' destruction of TopDevz's operations and transfer of the business to Talentcrowd/GBQ.

   o   Loss of business interests and commercial relationships from weaponization of the fraudulent $3.0 million judgment: A judgment of approximately $3.0 million was entered against Mobile Monster based on the fraudulent arbitration procured through Defendants' racketeering activity, including identity theft using Mobile Monster's corporate name and identification. Defendants weaponized this fraudulent judgment to:

      1.   Destroy Mobile Monster's commercial relationships with TopDevz and potential U.S. clients by creating public record

suggesting breach of contract and business obligations;

2. Eliminate Mobile Monster's ability to enter into U.S. commercial contracts or expand operations into the United States by making Mobile Monster appear to be a judgment debtor with $3 million in liabilities;

3. Sever Mobile Monster's contractual revenue stream from TopDevz by using the judgment to justify terminating the 7% commission arrangement;

4. Prevent Mobile Monster from securing financing or investment for U.S. expansion by destroying its corporate creditworthiness;

5. Strip Mobile Monster of its business property interest in the ongoing TopDevz relationship and commission structure;

o Mobile Monster does not seek recovery for reputational harm or emotional distress;

o Mobile Monster seeks recovery for lost business interests, destroyed contractual relationships, and eliminated commercial opportunities that resulted because the racketeering defendants procured and weaponized the judgment to accomplish the business takeover and eliminate Mobile Monster's revenue stream;

o The judgment was a tool in the racketeering scheme—its purpose was to sever Mobile Monster's business relationship with TopDevz and transfer that revenue to Talentcrowd/GBQ;

o This constitutes $3.0 million in injury to Mobile Monster's business and property interests.

o Subtotal: $8.6 million in direct damages to business and property

o Trebled under 18 U.S.C. § 1964(c): $25.8 million

124. Mobile Monster's claims were NEVER part of Rajaee's bankruptcy estate because:

o Mobile Monster was not a debtor in the bankruptcy case;

o Under 11 U.S.C. § 541, only property of the debtor becomes property of the bankruptcy estate;

- Mobile Monster's corporate assets and causes of action did not become estate property;

- The U.S. bankruptcy court had no jurisdiction over Mobile Monster's Canadian corporate property;

- What became estate property was Rajaee's ownership interest in Mobile Monster (his stock as an asset), not Mobile Monster's corporate assets or causes of action.

125. The bankruptcy Trustee EXPRESSLY PRESERVED Mobile Monster's claims, stating in the settlement agreement dated October 15, 2024:

"The Trustee shall dismiss the appeal in Mobile Monster v. Davis, California Court of Appeal, Third Appellate District, Case No. C100954, as to Ashkan Rajaee only. The parties agree that the Trustee's dismissal of this appeal as to Ashkan Rajaee only shall not constitute a dismissal of any appellate or other rights belonging solely to the non-debtor entity, Mobile Monster, Inc."

126. This express language in the settlement agreement confirms:

- Mobile Monster is a "non-debtor entity";

- Mobile Monster's rights are separate from the bankruptcy estate;

- The Trustee's settlements did not release Mobile Monster's claims;

- Mobile Monster retained all of its appellate and litigation rights.

127. Mobile Monster's claims were never released by the September 26, 2024 and October 15, 2024 bankruptcy settlements because the Trustee had no authority to release claims belonging to a non-debtor entity.

128. Mobile Monster's claims were never sold to Davis in the July 30, 2025 sale order because they were not property of the bankruptcy estate that could be sold.

129. Mobile Monster therefore has complete, unimpaired, unassailable standing to prosecute this RICO action for its direct corporate injuries, regardless of any bankruptcy-related issues affecting Ashkan Rajaee.

**B. Ashkan Rajaee Has Standing for Direct Injuries to His Personal Property**

130. Ashkan Rajaee brings this action in his individual capacity only, not

23

derivatively on behalf of TopDevz or as a representative of TopDevz.

131.    Rajaee has standing under 18 U.S.C. § 1964(c) for direct injuries to his business and property.

132.    Rajaee's 51% ownership interest in TopDevz is his personal property. When Defendants' racketeering activity destroyed TopDevz's value, dissolved its operations, and transferred its business to Talentcrowd, the value of Rajaee's ownership interest was directly and substantially diminished.

133.    Rajaee suffered direct injuries to his business and property interests (distinct from any derivative corporate claims) totaling $22.8-31.8 million:

**a. Loss of 51% ownership interest in TopDevz: $9-15 million**

- Based on TopDevz's 2021 operations (nearly $30 million in revenue, $1.4 million in net profit), the company was valued at approximately $18-30 million;

- Rajaee's 51% ownership interest was therefore worth approximately $9-15 million;

- This value was reduced to zero or near-zero as a direct result of Defendants' racketeering activity;

- This is injury to Rajaee's business property (his 51% membership interest), not a derivative injury to TopDevz.

**b. Loss of salary and employment income: $2.0-2.5 million**

- Under the Operating Agreement and his employment arrangement with TopDevz, Rajaee was entitled to receive $200,000-$500,000+ per year in salary as Manager and CEO;

- Defendants' takeover of TopDevz in January 2022 terminated Rajaee's employment and salary;

- From January 2022 through December 2025 (48 months), Rajaee has lost approximately $2.0-2.5 million in employment income;

- This is loss of business income and earning capacity tied directly to the business enterprise.

/ / /

**c. Loss of business interests and commercial relationships from weaponization of the fraudulent $9.3 million judgment: $9.3 million**

- o  The arbitration award entered May 12, 2023 and confirmed by judgment entered August 15, 2023 was for $9,373,566.64 against Rajaee;

- o  This judgment was procured through racketeering activity, including wire fraud, identity theft using Rajaee's name in connection with California felonies (perjury under Cal. Pen. Code § 118a, conspiracy under Cal. Pen. Code §§ 182(3)-(5)), and tax fraud;

- o  Defendants weaponized this fraudulent judgment to:

  1. Strip Rajaee of business control over TopDevz by using the judgment as "evidence" that Rajaee owed Davis millions, justifying Davis's takeover;

  2. Trigger bankruptcy consequences by forcing Rajaee into Chapter 11 bankruptcy on February 26, 2024, which was then converted to Chapter 7, resulting in appointment of a Trustee who settled and sold Rajaee's business interests for a fraction of their value;

  3. Destroy ongoing commercial operations by preventing Rajaee from resuming management of TopDevz or establishing competing business operations (any new business would be subject to the judgment lien);

  4. Sever revenue streams and contractual relationships by making Rajaee unable to secure financing, attract investors, enter into commercial contracts, or maintain business relationships due to the judgment appearing on credit reports and public records;

  5. Eliminate Rajaee's ability to operate or earn income in a business capacity by destroying his ability to serve as manager, director, or officer of any business entity seeking financing or investors;

  6. Deprive Rajaee of legal authorization to operate the business by destroying his L-1A visa status (which was predicated on his role as Manager and majority owner of TopDevz), thereby eliminating his legal right to work in and manage the business in the United States;

25

7. Destroy Rajaee's professional standing and ability to attract clients, investors, and business partners in the technology services industry by creating public record of $9.3 million judgment suggesting business mismanagement and breach of fiduciary duties;

o Plaintiff does not seek recovery for reputational harm, emotional distress, or the personal obligation to pay the judgment;

o Plaintiff seeks recovery for lost business interests, lost employment capacity, and destroyed commercial relationships that resulted because the racketeering defendants procured and weaponized the judgment to accomplish the business takeover;

o The judgment was a tool in the racketeering scheme—its purpose was to strip business control, force bankruptcy, and destroy commercial operations;

o This constitutes $9.3 million in injury to Rajaee's business and property interests.

**d. Legal fees and costs incurred to defend business interests: $2.5-5.0 million**

o Rajaee has incurred over $2.5-5.0 million in legal fees defending his business interests in TopDevz, protecting his ownership rights, challenging the fraudulent takeover, and attempting to uncover and stop the criminal enterprise's theft of business assets;

o These fees were necessitated by Defendants' direct attacks on Rajaee's business property and commercial interests;

o These are business expenses incurred to protect property rights, not personal injury damages.

Subtotal: $22.8-31.8 million in direct damages to business and property Trebled under 18 U.S.C. § 1964(c): $68.4-95.4 million.

134.    These injuries are direct, not derivative. When a shareholder's specific proportional interest in a company is uniquely targeted and injured—as opposed to the shareholder merely suffering the same pro rata injury as all other shareholders—the shareholder has direct standing to sue for injury to that ownership interest as personal property.

135.    Here, Defendants specifically and uniquely targeted Rajaee's business and property interests by:

- Fraudulently diluting his ownership from 51% to 4.692% through criminally procured arbitration orders, directly injuring his ownership interest as business property;

- Stripping him of his management rights and CEO position, which are business interests personal to him as the designated Manager, eliminating his employment income and business control;

- Terminating his employment and salary, destroying his income-generating capacity tied to the business;

- Destroying his business relationship between TopDevz and Mobile Monster, eliminating commission revenue;

- Procuring a $9.3 million judgment against him through identity theft and perjury, then weaponizing that judgment to strip business control, force bankruptcy, destroy commercial operations, and eliminate his ability to operate or earn income in a business capacity;

- Destroying his legal authorization to operate the business by eliminating his L-1A visa status (which was legally required for him to manage TopDevz as a foreign national), thereby depriving him of the legal right to work in and manage the business;

- Using his identity (name and identifying information) to commit perjury and fraud in violation of 18 U.S.C. § 1028(a)(7) and California Penal Code §§ 118a, 182 to accomplish the business takeover.

136.    The bankruptcy Trustee's own attorney acknowledged the distinction between Rajaee's personal property interest and TopDevz as an entity, stating on October 28, 2024:

"Not trying to split hairs, but just to be completely clear ... TopDevz is not an asset of the estate, your (disputed) membership interest in the company is. There's a difference."

137.    This admission confirms that Rajaee's ownership interest in TopDevz is his personal property, and claims for direct injuries to that personal property interest belong to Rajaee individually.

## C. The Bankruptcy Settlements and Sale Do Not Bar These Claims

## Overview of Bankruptcy Proceedings

138.    On February 26, 2024, Rajaee and his wife filed for Chapter 11 bankruptcy (Case No. 24-00617) in the United States Bankruptcy Court for the Southern District of California.

139.    In his bankruptcy schedules, Rajaee disclosed claims against these Defendants valued at approximately $75 million, including "RICO claims" against the individuals and entities named in this action.

140.    On May 9, 2024, the bankruptcy court converted the case to Chapter 7 based on false oaths filed by Hays, constituting the first post-petition predicate act under 18 U.S.C. §§ 152(2) and 157, and appointed Christopher R. Barclay as Trustee.

141.    Between September and October 2024, the Trustee entered into settlement agreements with:

o    September 26, 2024: Settlement with Talentcrowd, Lintz, Garcia, Frye, Bailey, and Gerber for $100,000;

o    October 15, 2024: Settlement with Davis and TopDevz for $100,000.

142.    These settlements constitute the second series of post-petition predicate acts under 18 U.S.C. §§ 152, 157, and 1343.

143.    Rajaee vigorously opposed both settlements, stating in writing to the Trustee on November 17, 2024:

"We cannot participate in any acts that we know involve criminal activity and fraud, including what amounts to fraud on the bankruptcy court by attorneys who are officers of the court... we must stand on the principle that fraud and criminal activity should not prevail, no matter how much they are being masked within civil procedures or proceedings."

144.    The bankruptcy court approved the settlements on December 10, 2024, over Rajaee's objection.

145.    On April 2, 2025, the Trustee filed a motion to sell to Davis:

o    "The estate's right to appeal the State Court judgment" (the $9.3 million arbitration confirmation judgment);

- o    "The State Court confirmation action";

- o    "The estate's interest in TopDevz" (Rajaee's disputed membership interest);

- o    Related litigation rights;

- o    Purchase price: $100,000 (for claims Rajaee valued at $75 million).

146.    This sale motion constitutes the third series of post-petition predicate acts under 18 U.S.C. §§ 152, 157, and 1343.

147.    Rajaee vigorously opposed the sale, arguing that Davis is not a good faith purchaser and the sale was procured through bankruptcy fraud.

148.    On July 30, 2025, the bankruptcy court issued an order approving the sale (the "Sale Order").

149.    The sale purportedly closed on August 14, 2025, with Davis paying an additional $100,000.

150.    On October 6, 2025, the California Court of Appeal issued an order STAYING all proceedings in the arbitration appeal "pending completion of Rajaee's challenges to the sale order, including the motion for reconsideration and any appeal of the sale order."

151.    Rajaee has filed challenges to the Sale Order in the bankruptcy court, District Court, and California Court of Appeal, which remain pending as of the filing of this complaint.

Despite these settlements and sale, Plaintiffs' claims in this action are NOT barred for the following nine independent reasons:

**Reason #1: Mobile Monster Is a Non-Debtor Entity Completely Unaffected by Bankruptcy**

152.    Mobile Monster's claims belong to Mobile Monster as a separate Canadian corporation, not to Rajaee's bankruptcy estate.

153.    Mobile Monster's claims were expressly preserved by the Trustee as belonging to "the non-debtor entity, Mobile Monster, Inc."

154.    Mobile Monster's claims were never released by the settlements because the Trustee had no authority to release claims of a non-debtor entity.

155.     Mobile Monster's claims were never sold to Davis because they were not property of the bankruptcy estate that could be sold.

156.     Mobile Monster has complete, unimpaired standing to prosecute this entire RICO action, and Mobile Monster's claims alone establish the full pattern of racketeering activity that injured both Plaintiffs.

**Reason #2: The Sale Was Itself Part of the RICO Pattern (Post-Petition Bankruptcy Fraud)**

157.     The sale to Davis was procured through bankruptcy fraud in violation of 18 U.S.C. §§ 152, 157, and 1343, including:

- o   Filing false declarations under penalty of perjury stating Davis is "manager" of TopDevz (§ 152(2) - false oaths);

- o   Relying on the fraudulently procured arbitration orders (which were obtained through wire fraud, identity theft, perjury, and tax fraud);

- o   Concealing from the bankruptcy court that Davis's $10 million claim was based on embezzlement, PPP fraud, identity theft, and tax fraud (§ 152(1) - concealment);

- o   Executing a scheme to defraud the bankruptcy court and creditors by selling valuable claims to the primary defendant for a fraction of their worth (§ 157 - bankruptcy fraud scheme);

- o   Transmitting the fraudulent sale motion and supporting documents via the court's electronic filing system (§ 1343 - wire fraud);

- o   Receiving $100,000 from Davis in criminally derived funds (§ 1957 - money laundering).

158.     The sale constitutes additional post-petition predicate acts that are part of the ongoing pattern of racketeering activity alleged in this complaint.

159.     Davis cannot be a good faith purchaser when:

- o   He is the primary defendant in the very claims he is purchasing;

- o   He is buying the claims specifically to bury them and conceal his own criminal conduct;

- o   The express purpose is to prevent prosecution of racketeering activity;

- He paid $100,000 for claims worth tens of millions of dollars;

- He immediately moved to dismiss the arbitration appeal after purchasing it, confirming his motive was concealment.

160.    A sale procured through bankruptcy fraud (18 U.S.C. §§ 152, 157) is void ab initio under federal law and cannot serve as a defense to RICO claims.

161.    Federal RICO policy prohibits allowing racketeers to purchase claims against themselves to conceal criminal conduct, as this would undermine the remedial purposes of the RICO statute.

**Reason #3: The Sale Is Under Active Challenge and Not Final**

162.    The Sale Order is currently under challenge through motion for reconsideration in the bankruptcy court, appeal to the United States District Court, and challenges in the California Court of Appeal.

163.    The California Court of Appeal issued a stay order on October 6, 2025, demonstrating that the validity of the sale is in serious question and all related proceedings are stayed pending resolution.

164.    Until these challenges are resolved, the sale is not final and cannot serve as basis to dismiss this action.

165.    If the Sale Order is vacated or set aside (as it should be because it was procured through bankruptcy fraud), all purported rights would revert to the bankruptcy estate or to Rajaee individually.

**Reason #4: Rajaee's Direct Injury Claims Were Not Estate Property Subject to Sale**

166.    Under 11 U.S.C. § 541(a), property of the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."

167.    What became estate property when Rajaee filed bankruptcy on February 26, 2024:

- Rajaee's membership interest in TopDevz (his 51% ownership as an asset);

- Rajaee's membership interest in Mobile Monster (his 100% ownership as an asset);

31

- o   Rajaee's real property;
- o   Pre-petition causes of action that existed as of February 26, 2024 and belonged to the estate.

168.   What did NOT become estate property:

- o   TopDevz itself (as the Trustee's attorney admitted: "TopDevz is not an asset of the estate");
- o   Mobile Monster's corporate assets and claims (separate Canadian entity);
- o   Rajaee's personal right to salary compensation;
- o   Rajaee's personal reputation and credit;
- o   Rajaee's personal immigration status;
- o   Rajaee's right to sue for direct injuries to his personal property;
- o   Post-petition causes of action for predicate acts occurring after February 26, 2024.

169.   Critical distinction: There is a fundamental difference between:

- o   (A) The asset itself (Rajaee's 51% membership interest in TopDevz); and
- o   (B) Claims for injury to that asset (Rajaee's right to sue for destruction of the value of his membership interest).

170.   The asset (51% membership interest) became estate property under § 541(a)(1).

171.   BUT claims for direct injury to that asset belong to Rajaee individually when the injury is unique to Rajaee and not merely a pro rata injury shared by all members.

172.   The July 30, 2025 Sale Order purported to transfer to Davis:

- o   "The estate's right to appeal the State Court judgment";
- o   "The State Court confirmation action";
- o   "The estate's interest in TopDevz" (meaning the membership interest asset itself).

173.    Critical distinction: The sale transferred "the estate's interest in TopDevz" (the membership interest as property), NOT "all of Rajaee's claims against Davis."

174.    The sale order made no mention of:

- o    RICO claims;

- o    Trade secret claims;

- o    Claims for salary;

- o    Claims for personal injuries;

- o    Claims against attorney Defendants, Talentcrowd parties, or GBQ Partners;

- o    Claims for ongoing predicate acts;

- o    Claims for post-petition predicate acts occurring after February 26, 2024.

175.    What was NOT and could NOT be sold because these are not property of the bankruptcy estate:

**a. Rajaee's Personal Compensation Claims:**

- o    Rajaee's right to $200,000-$500,000 per year salary from TopDevz (2022-2025);

- o    This is personal compensation owed to Rajaee individually, like unpaid wages;

- o    Personal wage/salary claims belong to the individual, not the estate;

- o    Total: $2.0-2.5 million.

**b. Rajaee's Personal Reputation and Credit:**

- o    Claims for injury from destruction of personal reputation;

- o    Claims for harm to personal creditworthiness from the $9.3M judgment;

- o    These are classic personal injury claims that belong to the individual;

- o    Personal injury claims do not become estate property.

33

**c. Rajaee's Immigration Status:**

- o Rajaee's L-1A visa was his personal right tied to his personal role;
- o Loss of immigration status is a personal injury;
- o Cannot be transferred or sold;
- o Personal immigration rights are not estate property.

**d. Rajaee's Personally Incurred Legal Fees:**

- o The $2.5-5.0 million in legal fees were personally incurred by Rajaee;
- o These are personal expenses paid or owed by Rajaee individually;
- o Claims for reimbursement of personal expenses belong to the person who incurred them.

**e. Constitutional Rights Claims:**

- o Due process violations;
- o Equal protection violations;
- o Constitutional rights belong to individuals, not bankruptcy estates;
- o Cannot be sold or transferred.

**f. Post-Petition Predicate Act Claims:**

- o All predicate acts occurring after February 26, 2024 (Rajaee's bankruptcy filing date);
- o Including conversion order (May 9, 2024), settlement schemes (Sept-Dec 2024), sale scheme (April-Aug 2025), and GBQ's exploitation (Feb-Dec 2025);
- o Post-petition causes of action did not exist on the petition date and therefore never became estate property under § 541(a)(1);
- o Under bankruptcy law, causes of action arising after the petition date belong to the debtor individually, not to the estate;
- o These couldn't have been sold because they weren't estate property;
- o Estimated 580+ post-petition predicate acts from February 26, 2024- December 2025;

- o These post-petition acts alone provide complete, independent basis for this RICO action unaffected by any bankruptcy arguments.

**g. Claims Against Parties Not Involved in Sale:**

- o The sale was between Trustee and Davis;

- o It didn't purport to release claims against Carpenter, Kirk, Scalia, Lintz, Frye, Garcia, Bailey, Hays, Wood, GBQ Partners, or other Defendants;

- o These parties didn't pay anything for releases;

- o Claims against non-purchasing Defendants were not sold.

176.    Legal principle: A trustee can only sell what the estate owns. The estate owned Rajaee's membership interest (the asset). The estate did NOT own Rajaee's personal injury claims for salary, reputation, immigration status, legal fees, constitutional rights, or post-petition causes of action for predicate acts occurring after the bankruptcy filing.

177.    These personal injury claims and post-petition claims belong to Rajaee individually under well-established bankruptcy law principles, and they were not and could not be sold to Davis.

**Reason #5: Post-Petition Predicate Acts Create Independent Claims**

178.    Substantial racketeering activity occurred AFTER Rajaee's February 26, 2024 bankruptcy filing, providing completely independent basis for this action:

**Post-Petition Bankruptcy Fraud (Feb 26, 2024-August 2025):**

- o May 9, 2024: Conversion order procured through Hays's false oaths (§§ 152(2), 157)—FIRST POST-PETITION PREDICATE ACT;

- o April-October 2024: False oaths in bankruptcy court (§ 152(2));

- o October 14, 2024: Filing forged unanimous consent (§ 152(4));

- o 2024: Davis's false $10 million claim (§ 152(4));

- o December 10, 2024: Settlement approvals based on fraud (§§ 152, 157)—SECOND POST-PETITION PREDICATE ACT;

- o December 13, 2024: Davis pays $100,000 (§ 1957);

- April-August 2025: Fraudulent sale scheme (§§ 152, 157, 1343, 1957)—THIRD POST-PETITION PREDICATE ACT;

- August 14, 2025: Davis pays $100,000 (§ 1957);

- Total: 30+ post-petition bankruptcy fraud predicate acts.

**Post-Petition Trade Secret Theft (Feb 26, 2024-December 2025):**

- February 26, 2024-February 2025: Talentcrowd's continued exploitation (365 days of post-petition violations);

- February 2025-December 2025: GBQ Partners' acquisition and continued exploitation (300+ days of post-petition violations);

- Each day of continued unauthorized use = continuing post-petition violation of § 1832;

- Total: 300+ post-petition trade secret theft predicate acts, primarily by GBQ.

**Post-Petition Money Laundering (Dec 2024-December 2025):**

- December 13, 2024: Davis paid $100,000 to Trustee (post-petition § 1957);

- March 2025: Davis paid $100,000 to purchase (post-petition § 1957);

- February-December 2025: GBQ's approximately 200 transactions over $10,000 in property derived from trade secret theft (each = separate post-petition § 1957 violation);

- Total: 200+ post-petition money laundering predicate acts, primarily by GBQ.

**Post-Petition Wire Fraud (April 2024-December 2025):**

- April 2024-December 2025: Fraudulent bankruptcy court filings transmitted via electronic filing system (§ 1343);

- Total: 50+ post-petition wire fraud predicate acts.

179.    These 580+ post-petition predicate acts were not and could not have been sold to Davis because:

- They had not occurred when the sale closed on August 14, 2025;

- o  Post-petition causes of action don't become estate property under § 541(a)(1)—they belong to the debtor individually;

- o  Many occurred after the sale (GBQ's exploitation from August 14, 2025-December 2025 alone = 138 days = 138+ post-petition trade secret violations plus 80+ post-petition money laundering violations);

- o  Federal bankruptcy law is clear: causes of action arising after the petition date are not property of the estate.

180.    Under the continuing violations doctrine, Plaintiffs have standing to sue for injuries from post-petition predicate acts that are part of the ongoing pattern of racketeering activity.

181.    The threat of continued racketeering activity establishes open-ended continuity, as Defendants' business model (GBQ's Talentcrowd operations) requires ongoing commission of predicate acts, particularly trade secret violations and money laundering.

182.    GBQ's post-petition predicate acts alone (500+ violations from February 2025-December 2025) would satisfy the RICO pattern requirement even if all pre-petition and early post-petition acts were somehow barred (which they are not).

**Reason #6: The Settlements Excluded Claims Related to Arbitration Confirmation Appeals**

183.    The settlement agreement explicitly states:

"Notwithstanding anything to the contrary in this Agreement, (a) the Trustee is not dismissing, and the releases provided by the Trustee below shall not affect, the Trustee's and/or the bankruptcy estate's rights, claims, and/or defenses in the Arbitration Confirmation Appeal and any proceedings on remand"

184.    The RICO claims are inextricably intertwined with the arbitration confirmation appeals because the RICO complaint alleges the arbitrations were procured through wire fraud, identity theft, perjury, and tax fraud, and these claims attack the legitimacy and validity of the arbitration orders and confirmation judgments.

185.    Both Plaintiffs are currently prosecuting appeals of the arbitration confirmation judgments, which remain stayed by the California Court of

Appeal.

**Reason #7: The Settlements Released Only Pre-Settlement Claims**

186.     The settlement releases cover claims "arising out of or related to any matter whatsoever from the beginning of time to the date of this Agreement."

187.     The settlement dates were September 26, 2024 and October 15, 2024.

188.     Significant racketeering activity occurred AFTER these settlement dates:

- o   December 13, 2024: Davis paid $100,000 from criminally derived funds (§ 1957);

- o   February 2025: GBQ acquired Talentcrowd and began post-petition exploitation (§§ 1832, 1957);

- o   March 2025: Davis paid additional $100,000 (§ 1957);

- o   April-August 2025: The fraudulent sale scheme (§§ 152, 157);

- o   February-December 2025: GBQ's ongoing post-petition exploitation generating $12-16 million (§§ 1832, 1957);

- o   Through December 2025: Ongoing trade secret exploitation, wire fraud, and money laundering.

189.     The Trustee could not have released claims based on predicate acts that had not yet occurred when the settlements were signed, including all of GBQ Partners' conduct.

**Reason #8: The Estate Is Not Currently Surplus Only Because of Davis's Fraudulent Claims**

190.     The bankruptcy estate is not currently a surplus estate, but this non-surplus status is itself evidence of the harm caused by Defendants' RICO enterprise.

191.     As of January 31, 2025, the bankruptcy estate held $904,147.52 (gross receipts: $6,656,944.10; disbursements: $5,752,796.58).

192.     The Trustee stated he is not proposing distribution because "priority tax claims that are (mostly) unliquidated" remain unpaid.

193.     However, the estate is insolvent ONLY because of Davis's fraudulent

$10 million claim, which is by far the largest claim against the estate.

194.　　If Davis's fraudulent $10 million claim were eliminated (which would occur when this Court finds the claim was procured through racketeering), the estate would become a substantial surplus estate:

- ○ Total scheduled assets: Over $90 million (including $75 million in RICO claims, $11.3 million in real estate);

- ○ Total legitimate creditor claims (excluding Davis): Approximately $10 million;

- ○ Surplus to Rajaee if Davis's false claim eliminated: $80+ million.

195.　　The fact that Davis's fraudulent claim prevents surplus demonstrates RICO harm:

- ○ The $10 million false claim was procured through racketeering;

- ○ It prevents legitimate creditors from being paid in full;

- ○ It creates false appearance of insolvency;

- ○ This fraudulent insolvency was exploited to justify settling $75 million in claims for $200,000;

- ○ The bankruptcy fraud scheme used Davis's false claim to create artificial insolvency.

196.　　The bankruptcy court itself recognized the claims were worth far more:

"They argue there is a surplus because the claims being settled are worth $75 million (ECF No. 141). On the present record, that is highly doubtful: the claims are being resolved for very much less than Debtors accord them."

197.　　Therefore, Rajaee has both:

- ○ Current standing: To sue for direct personal injuries regardless of surplus status;

- ○ Potential standing: If RICO succeeds, Davis's claim is eliminated, estate becomes surplus, and Rajaee has pecuniary interest.

**Reason #9: The Releases Were "By the Estate" Not "By Plaintiffs"**

198.　　The settlement releases state: "Release by the Trustee. Except for the

rights, duties, and obligations created or expressly preserved by this Agreement, the Trustee, on behalf of the Debtors' bankruptcy estate... hereby releases..."

199.    The releases were BY THE ESTATE, not by Rajaee individually or by Mobile Monster.

200.    The reciprocal releases released "the Trustee, all property of the Debtors' bankruptcy estate... but not the Debtors."

201.    The releases did NOT release:

   o   Rajaee individually from bringing his own direct claims for injuries to his personal property;

   o   Mobile Monster from bringing its claims as a non-debtor entity;

   o   Claims for post-petition predicate acts.

**D. Conclusion on Standing**

202.    Both Plaintiffs have clear, unassailable standing to bring this RICO action:

   o   Mobile Monster: Complete standing as non-debtor entity whose claims were never part of the bankruptcy estate, never released, and never sold ($8.6 million damages; $25.8 million trebled);

   o   Rajaee: Direct standing for personal injuries, with nine independent arguments why the bankruptcy settlements and sale do not bar his claims ($22.8-31.8 million damages; $68.4-95.4 million trebled), plus unassailable standing for over 580 post-petition predicate acts that never became estate property.

203.    Combined Plaintiff damages: $31.4-40.4 million in compensatory damages; $94.2-121.2 million trebled under 18 U.S.C. § 1964(c).

204.    These claims do NOT require authorization from the bankruptcy Trustee or court because they are not estate property.

205.    TO BE ABSOLUTELY CLEAR: This complaint is brought primarily on Mobile Monster's unassailable standing, with Rajaee's claims providing additional damages and reinforcement of the pattern. Even if every one of Rajaee's pre-petition claims were dismissed on standing grounds (which they

40

should not be), this complaint survives in its entirety based on:

- o (1) Mobile Monster's claims (non-debtor entity, $8.6M damages trebled to $25.8M); and

- o (2) Rajaee's post-petition claims (580+ post-petition predicate acts that never became estate property, causing continuing injury).

## V. FACTUAL BACKGROUND

## A. Formation of TopDevz and The Operating Agreement (May 2017)

206.     In May 2017, Plaintiff Rajaee and Defendant Davis formed TopDevz as a California limited liability company to engage in software development and IT staffing services.

207.     Pursuant to the TopDevz Operating Agreement executed May 9, 2017 ("Operating Agreement"):

- o Rajaee was designated as the Manager and CEO with 51% ownership interest;

- o Davis held 49% ownership interest;

- o The company was structured as "manager-managed," meaning only the Manager has authority to conduct the company's affairs and bind the company.

208.     Under California Corporations Code § 17704.07 and the Operating Agreement:

- o Only the Manager (Rajaee) has authority to act on behalf of TopDevz;

- o No member acting solely as a member (including Davis) has any authority to bind TopDevz;

- o The Manager can only be removed "by a Vote of all other Members";

- o Each new Manager must be "appointed by a Majority of Members."

209.     The Operating Agreement explicitly requires that its terms can only be modified or amended "by a written instrument executed by all of the parties." No such amendment has ever been executed.

210.     Rajaee's 51% majority ownership was a legal requirement for his L-1A intracompany transferee visa, which allowed him to expand Mobile Monster's

operations from Canada into the United States.

211.     On May 9, 2017, the U.S. Department of Homeland Security approved Rajaee's L-1A visa petition, which was premised on:

- o   Rajaee being the "sole managing member" of TopDevz;

- o   Mobile Monster (the foreign parent) having "51% ownership in TopDevz";

- o   Rajaee's role overseeing "the start-up of TopDevz, LLC" and being "responsible for the financial performance of the expansion."

212.     The L-1A visa approval was conditioned on Rajaee maintaining his majority ownership and managerial control of TopDevz.

213.     Under Rajaee's leadership, TopDevz achieved remarkable success:

- o   Grew from $0 in revenue (2017) to nearly $30 million in cumulative earned revenue by year-end 2021;

- o   Secured contracts with major corporations including HBO, DriveTime Automotive Group (nearly $2 billion in annual revenue), Procore Technologies, Becton Dickinson and Company (Fortune 500), Medical Staffing Solutions, Intellicheck, Mode Transportation, PriceSpider, Sandhills Global, Children's Health, and others;

- o   Generated $1.4 million in net profit in 2021 alone;

- o   Maintained a workforce of 40-60 software developers serving clients across the United States and Canada.

**B. Davis's Initial Wire Fraud: The $750,000 Embezzlement Scheme (2017)**

**The False Promise**

214.     To induce Rajaee to form TopDevz and relocate his family from Toronto, Canada to San Diego, California, Davis fraudulently promised via telephone and email communications (interstate wire facilities) to personally invest $750,000 as capital contribution to TopDevz in exchange for his 49% ownership interest.

215.     Davis's promise was false from the outset. Davis had no financial capacity to personally invest $750,000:

- o  Davis's personal federal income tax returns for 2015 showed minimal taxable income;

- o  Davis's personal federal income tax returns for 2016 (filed November 22, 2017) showed he was not financially capable of a $750,000 personal investment;

- o  Davis had multiple federal tax liens totaling hundreds of thousands of dollars;

- o  Davis had no legitimate source for $750,000 in personal funds.

216.    Davis's fraudulent promise constituted wire fraud under 18 U.S.C. § 1343 because it involved transmission of materially false representations via interstate wire facilities (telephone and email communications between California and Canada) with intent to defraud Rajaee, causing him to relocate and form the company.

**The Embezzlement from Porter Consulting**

217.    In reality, Davis embezzled the entire $750,000 from Porter Consulting, LLC, a California partnership in which Todd Belluomini owned 10-20% membership interest.

218.    Porter's bank statements from Tri Counties Bank show three separate wire transfers totaling $750,000:

- o  May 3, 2017: $250,000 wire transfer from Porter account ending in 6284 to Mobile Monster or TopDevz;

- o  May 24, 2017: $250,000 wire transfer from Porter account ending in 6284 to Mobile Monster or TopDevz;

- o  November 22, 2017: $250,000 wire transfer from Porter account ending in 6284 to Mobile Monster or TopDevz.

219.    All three wire transfers originated from Porter's business bank account at Tri Counties Bank (an FDIC-insured financial institution), not from any personal account of Davis.

220.    When Porter's primary operating account lacked sufficient funds for the May 24, 2017 transfer, Davis transferred approximately $200,000 from Porter's line of credit account (ending in 3860) into the operating account, then

immediately wired out $250,000, further evidencing the embezzlement scheme.

221.    Davis never disclosed to Belluomini or other Porter partners that he was taking $750,000 from the partnership to invest in his personal venture (TopDevz).

222.    Todd Belluomini executed a sworn declaration on July 31, 2024, stating:

"I, Todd Belluomini, was a member-owner of Porter Consulting, LLC, from 2017 to 2021, holding a 10% to 20% ownership interest during that period."

"I was not aware until after the San Diego Judgment on August 15, 2023, that Tyler Davis had used Porter Consulting, LLC monies to invest into TopDevz, LLC."

"Had I been consulted, I did not, and would not, have authorized the misappropriation of Porter's partnership funds for a $750,000 personal investment in TopDevz by Tyler Davis."

"The $750,000 did not belong to Tyler Davis; it belonged to Porter, and Tyler took it by abusing his position and access, while concealing the transactions from me."

223.    Documentary evidence corroborates Belluomini's ownership:

- California Secretary of State records filed by Davis on September 27, 2017 show Todd Belluomini as a member of Porter Consulting, LLC;

- Porter's membership certificates signed by Davis himself certify that Todd Belluomini "is the registered holder of 10% Membership Interest(s)" of Porter Consulting, LLC as of November 27, 2017;

- Porter's signed operating agreement dated August 26, 2018 shows multiple members, including Belluomini at 20% ownership.

224.    Each of the three wire transfers violated 18 U.S.C. § 1343 (wire fraud) because Davis used interstate wire facilities (the banking system) to transmit embezzled partnership funds while making false representations about the source being his "personal investment."

225.    Reliance and Damages: In reliance on Davis's false promise of personal investment, Rajaee:

- Relocated his family from Canada to the United States;

- o   Applied for and obtained L-1A visa status;

- o   Signed the Operating Agreement giving Davis 49% ownership;

- o   Invested substantial time, expertise, and resources into growing TopDevz;

- o   Foregone other business opportunities.

## C. Davis's Tax Fraud and Identity Theft Scheme (2017-2020)

226.    To conceal the embezzlement and evade federal and state taxation on the $750,000 distribution, Davis engaged in systematic tax fraud using Plaintiff Rajaee's personally identifiable information in violation of 18 U.S.C. §§ 1028, 1028A (identity theft) and 26 U.S.C. §§ 7201, 7206 (tax evasion and filing false returns).

## Porter's 2017 Fraudulent Tax Return

227.    Davis fraudulently filed Porter's 2017 federal income tax return using "Schedule C" (a form designated for sole proprietorships) rather than Form 1065 (partnership tax return), in order to:

- o   Conceal the $750,000 distribution to Davis;

- o   Avoid issuing Schedule K-1 forms to Belluomini and other Porter partners showing their distributive shares;

- o   Evade taxation on the $750,000 by treating it as a partnership "capital contribution" to TopDevz rather than as taxable income.

228.    This fraudulent tax return violated 26 U.S.C. § 7206 (willfully filing false return under penalty of perjury).

## TopDevz's 2017 Fraudulent Tax Return

229.    Davis caused TopDevz's 2017 federal partnership tax return (Form 1065) to be filed with material false statements, specifically:

- o   Davis's Schedule K-1 (Part II, Section L) falsely showed "Capital contributed during the year" of $750,000, representing it as Davis's personal contribution;

- o   The return falsely inflated Davis's capital account balance to create the false appearance of majority ownership;

45

- o   The return was filed under penalty of perjury containing materially false information.

230.    This fraudulent tax filing required the unlawful use of Rajaee's Social Security number, tax account identification number, and other personally identifiable information as a co-member of TopDevz, in violation of 18 U.S.C. § 1028 (fraud in connection with identification documents).

231.    Because the identity theft was committed "during and in relation to" the tax fraud felony (26 U.S.C. § 7206) and the wire fraud felony (18 U.S.C. § 1343), it also violated 18 U.S.C. § 1028A (aggravated identity theft).

232.    Davis engaged the accounting firm Lavine, Lofgren, Morris & Engelberg, LLP to prepare TopDevz's fraudulent 2017 tax return.

**Continuation of Tax Fraud Scheme (2018-2020)**

233.    Davis repeated this pattern of identity theft and tax fraud in TopDevz's 2018, 2019, and 2020 federal partnership tax returns, using Rajaee's personally identifiable information to generate false Schedule K-1 forms showing:

- o   False capital contributions attributed to Davis;

- o   Manipulated capital account balances;

- o   False ownership percentages;

- o   False allocations of profit and loss.

234.    The fraudulent tax returns were specifically designed to manipulate the capital account balances which, under the Operating Agreement's Section 4.12, control voting rights, profit allocations, and ownership percentages.

235.    Each fraudulent tax return filed constituted separate violations of:

- o   18 U.S.C. § 1028 (identity theft);

- o   18 U.S.C. § 1028A (aggravated identity theft);

- o   26 U.S.C. § 7206 (filing false returns under penalty of perjury);

- o   26 U.S.C. § 7201 (tax evasion).

236.    Davis's tax fraud enabled him to:

- Evade hundreds of thousands of dollars in federal and state income taxes;

- Create false documentary "evidence" of his purported capital contributions;

- Fraudulently claim majority ownership of TopDevz;

- Present the falsified returns to the arbitrator as "proof" of his investment.

## D. The PPP Loan Fraud and Additional $37,240 Wire Fraud/Bank Fraud Scheme (2020)

### The PPP Loan Fraud

237.    In approximately April 2020, Davis fraudulently obtained a $328,300 Paycheck Protection Program loan for Porter Consulting from the Small Business Administration and Tri Counties Bank (an FDIC-insured financial institution), SBA Loan No. 5058697106.

238.    On April 19, 2020, Davis signed a PPP loan application under penalty of perjury that contained material false statements and omissions:

- Concealed the existence of Belluomini and other Porter partners who collectively owned approximately 40% of Porter;

- Falsely represented himself as sole owner of Porter;

- Concealed multiple federal tax liens totaling hundreds of thousands of dollars against Davis personally;

- Concealed his intention to misuse loan proceeds for personal investment in TopDevz rather than Porter's payroll;

- Falsely certified: "I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects."

239.    The SBA regulations require all owners of 20% or more to be disclosed on PPP loan applications. Davis's intentional concealment of Belluomini's 20% ownership was material fraud.

240.    This scheme violated:

- ○ 18 U.S.C. § 1344 (bank fraud against FDIC-insured Tri Counties Bank);

- ○ 15 U.S.C. § 645 (false statements to the SBA).

241.    Davis fraudulently obtained $328,300 in PPP funds, which were deposited into a dedicated PPP loan account at Tri Counties Bank in Porter's name, account ending in 8768.

**The $37,240 Money Laundering Scheme**

242.    On November 10, 2020, Davis wrote a check for $37,240 from Mason Building & Design, LLC to TopDevz, labeled "capital call," falsely representing it as Davis's personal investment to cover his 49% share of a $76,000 capital call.

243.    Days later, on December 3, 2020, Davis used interstate wire facilities to transfer $37,240 from Porter's PPP loan account (ending in 8768) to Mason Building & Design, thereby using Porter's PPP funds to cover the check he had written to TopDevz.

244.    This wire transfer violated:

- ○ 18 U.S.C. § 1343 (wire fraud - using interstate wire facilities to execute scheme);

- ○ 18 U.S.C. § 1956 (promotional money laundering - using criminally derived proceeds to promote unlawful activity);

- ○ 18 U.S.C. § 1957 (transactional money laundering - monetary transaction over $10,000 in criminally derived property through financial institution).

245.    Davis then caused TopDevz's 2020 federal partnership tax return to credit him with a personal capital contribution of $37,240, appearing on his 2020 Schedule K-1 under "Section L ... Capital contributed during the year."

246.    This tax filing violated:

- ○ 18 U.S.C. § 1028 (using Rajaee's tax identification information);

- ○ 18 U.S.C. § 1028A (aggravated identity theft in connection with tax fraud);

- 26 U.S.C. § 7206 (filing false return under penalty of perjury).

247.    Todd Belluomini's declaration states:

"In 2020, Tyler Davis obtained a PPP loan (Loan # 5058697106) without my knowledge, and I had no idea he used $37,240 of the PPP loan to Porter to personally invest in TopDevz."

"I had no idea at the time that Tyler re-paid Mason back with funds from Porter's PPP-Loan."

248.    The total fraudulent capital contributions falsely attributed to Davis ($787,240) formed the foundation for his subsequent claims of majority ownership and control of TopDevz presented in arbitration.

## E. Davis's Systematic False Testimony in Arbitration (2021-2022)

### Initiation of Arbitration

249.    In February 2021, following Rajaee's discovery of financial misconduct, Davis filed a dissolution petition against Rajaee and TopDevz in Sacramento Superior Court (Case No. 34-2020-00283046-CU-BT-GDS).

250.    Pursuant to the Operating Agreement's arbitration clause (Section 13.1), Rajaee initiated arbitration with the American Arbitration Association (AAA Case No. 01-21-0001-9983).

251.    Davis, through attorneys Carpenter and Scalia, filed a counterclaim in arbitration seeking dissolution of TopDevz under California Corporations Code § 17707.03.

### Attorney Defendants' Knowledge of Jurisdictional Defect

252.    On February 5, 2021, Carpenter sent an email to Scalia and Davis (copied counsel for Rajaee) stating:

"We contend that the Complaint for Dissolution of the LLC and the concomitant procedures and remedies under Corporation Code §§ 17707.03, et seq. for the dissolution and winding-up of the LLC, are within the exclusive jurisdiction of the Superior Court."

253.    Despite this written acknowledgment that dissolution claims under § 17707.03 cannot be arbitrated, Davis and his attorneys maintained the fraudulent arbitration proceeding to avoid judicial oversight and discovery of

the underlying criminal activity.

254.     This conspiracy to falsely move and maintain an action in a prohibited venue violated California Penal Code § 182(3), which criminalizes conspiracy "falsely to move or maintain any suit, action, or proceeding."

255.     The arbitrator (Hon. Carolyn Carnes Nichols, Ret.) lacked subject matter jurisdiction over dissolution claims, which are committed by statute to the exclusive jurisdiction of the Superior Court.

**Davis's Pattern of False Testimony**

256.     Throughout the arbitration proceedings in 2021-2022, Davis provided systematic false testimony regarding the source and nature of his capital contributions to TopDevz:

**a. October 15, 2021 Declaration to Superior Court:**

- "I have invested approximately $750,000 in cash into TopDevz, LLC"

- [False - the funds were embezzled from Porter partnership]

**b. November 2021 Declaration in Arbitration:**

- "I [Tyler Davis] put in 100% of the capital"

- "I certainly know that I contributed all the capital at the start"

- [False - Rajaee contributed the company formation, the business model, the Mobile Monster relationship, and sweat equity]

**c. November 22, 2021 Arbitration Brief:**

- "Davis owns 100% and Rajaee owns none of the capital, per the 'only signed and effective operating agreement' and the tax returns"

- [False - based on fraudulent tax returns]

**d. December 1, 2021 Testimony Under Oath:**

- Q: "And as far as the original capitalization of TopDevz went, how much money did you put in?"

- A: "$750,000"

- [False testimony under oath]

**e. December 2, 2021 Testimony Under Oath:**

- o Q: "you made an investment in TopDevz in the amount of $750,000; correct?"

- o A: "Correct"

- o [False testimony under oath]

**f. Regarding the $37,240 "Capital Call":**

- o Q: "So there was a check that was issued from your company, Mason Building & Design, for your personal capital contribution to TOPDEVZ?"

- o A: "Yes"

- o [False - the check was reimbursed from PPP loan proceeds]

257.    Davis knew these statements were materially false because:

- o The $750,000 came from Porter's business accounts, not Davis personally;

- o Davis's personal tax returns showed no capacity for such investment;

- o The $37,240 came from Porter's PPP loan account, laundered through Mason;

- o Todd Belluomini and other Porter partners owned the funds, not Davis;

- o Davis had personally orchestrated the embezzlement and money laundering schemes.

**Submission of Falsified Tax Returns as Evidence**

258.    Davis, through attorneys Scalia, Carpenter, and Kirk, submitted over 600 pages of falsified tax returns as evidence in the arbitration proceedings, including:

- o TopDevz's fraudulent 2017, 2018, 2019, and 2020 partnership returns (Forms 1065);

- o Davis's fraudulent Schedule K-1 forms showing false capital contributions;

- o Porter's fraudulent 2017 return using Schedule C to conceal the

51

embezzlement.

259.    These falsified tax returns were material to the arbitrator's determinations regarding:

- o  Ownership percentages (51% vs. 49%, or Davis's claimed 95.308% vs. Rajaee's 4.692%);

- o  Capital account balances;

- o  Distributions and advances;

- o  Dissolution procedures;

- o  Damages calculations.

260.    The arbitrator specifically relied on the falsified tax returns, stating in the Final Award: "The tax returns clearly show Davis's capital contributions."

## F. Interim Order No. 4 and Launch of Criminal Takeover (January 6, 2022)

261.    Based on Davis's false testimony and the falsified tax returns, on January 6, 2022, the arbitrator issued "Interim Order No. 4," which purported to:

- o  Grant Davis 95.308% ownership of TopDevz;

- o  Designate Davis as "managing member" of TopDevz;

- o  Reduce Rajaee's ownership to 4.692%;

- o  Authorize Davis to take immediate control of TopDevz's operations.

262.    Interim Order No. 4 had no legal authority to remove Rajaee as Manager because:

- o  Such removal requires a vote of the members under Operating Agreement Section 6.1;

- o  California Corporations Code § 17701.10(c)(3) requires member vote to remove a manager;

- o  No such vote ever occurred;

- o  The arbitrator lacked subject matter jurisdiction over dissolution proceedings under § 17707.03.

52

263. Nevertheless, Davis and his co-conspirators immediately exploited Interim Order No. 4 as a fraudulent artifice document to execute the unlawful takeover of TopDevz's business, assets, and operations.

264. Within hours and days of receiving Interim Order No. 4, Defendants launched a coordinated, multi-front attack involving wire fraud, bank fraud, trade secret theft, and obstruction of justice.

## G. Bank Fraud: Seizure of Wells Fargo Account (January 7, 2022)

265. On January 7, 2022, using Interim Order No. 4, Carpenter contacted Wells Fargo Bank, N.A. (an FDIC-insured financial institution) and its counsel Graham H. Claybrook to fraudulently seize control of TopDevz's Wells Fargo bank account ending in 1128.

266. Carpenter transmitted via email (interstate wire facility) false and fraudulent statements to Wells Fargo, including:

   o That Rajaee had committed "fraudulent transfers" from the account;

   o That Davis had lawful authority to control TopDevz's account;

   o That Interim Order No. 4 granted Davis management authority;

   o That Wells Fargo should immediately remove Rajaee's access and grant Davis exclusive control.

267. These fraudulent wire communications violated:

   o 18 U.S.C. § 1343 (wire fraud - scheme to defraud transmitted via interstate wire facilities);

   o 18 U.S.C. § 1344 (bank fraud - scheme to defraud FDIC-insured financial institution).

268. Wells Fargo, in reliance on Carpenter's fraudulent representations, removed Rajaee's access and granted Davis control of the account containing millions of dollars in TopDevz funds.

269. This allowed Davis to seize TopDevz's operating capital and financial records, furthering the overall scheme.

/ / /

/ / /

53

## H. Bank Fraud and Identity Theft: Opening Fraudulent JPMorgan Chase Account (January 19, 2022)

270.    On or about January 19, 2022, Davis fraudulently opened a new bank account for TopDevz at JPMorgan Chase Bank, N.A. (an FDIC-insured financial institution), account ending in 0516.

271.    To open the account, Davis submitted false documentation to the bank, including:

- o   Forged TopDevz stock certificates showing Davis with 95.308% ownership;

- o   Fraudulent Interim Order No. 4;

- o   Documents containing Rajaee's Employer Identification Number (EIN) and personally identifiable information used without authorization;

- o   False representations that Davis had authority to act on behalf of TopDevz.

272.    This scheme violated:

- o   18 U.S.C. § 1344 (bank fraud - scheme to defraud FDIC-insured JPMorgan Chase);

- o   18 U.S.C. § 1028 (fraud in connection with identification documents);

- o   18 U.S.C. § 1028A (aggravated identity theft in connection with bank fraud).

273.    This fraudulent JPMorgan Chase account would serve as the primary vehicle for laundering approximately $15 million in proceeds of racketeering activity over the next 12 months.

## I. Conspiracy to Steal Trade Secrets (January 6-14, 2022)

## Plaintiffs' Valuable Trade Secrets

274.    Plaintiffs own extremely valuable trade secret information, including:

- o   A proprietary database containing approximately 2.5 million contact records;

- o   Each record contains over 40 unique attributes (name, title, company, contact information, decision-making authority, technology stack, etc.);

- o  Representing over 10 million unique database entries;
- o  Sophisticated methodologies developed by Rajaee and Mobile Monster for sourcing, sorting, contacting, and validating high-value decision makers in target companies;
- o  Client relationship histories and preferences;
- o  Contractor databases with detailed skills assessments;
- o  Financial and operational data.

275.    This trade secret information:

- o  Was developed by Rajaee personally over 10 years at a cost of thousands of hours of labor and hundreds of thousands of dollars;
- o  Derives independent economic value from not being generally known and not being readily ascertainable by proper means by others who could obtain economic value from its disclosure or use;
- o  Is valued conservatively at $10 million based on the revenue it generates;
- o  Was subject to reasonable measures to maintain its secrecy, including access controls, password protection, confidentiality agreements, and secure server storage.

**Davis Orders Mass Theft**

276.    On or about January 6, 2022, immediately after receiving Interim Order No. 4, Davis ordered the mass theft of Plaintiffs' entire trade secret database and confidential information.

277.    Davis testified under oath about his direct orders:

"I [Tyler Davis] instructed her [Melissa Garcia] to download as much information as humanly possible at that time"

"I basically asked her to start downloading as much information as she possibly could"

278.    Between January 6-14, 2022:

- o  Garcia downloaded 1,868 documents from the accounting@topdevz.com email account;

o   Garcia downloaded 1,916 documents from her mgarcia@topdevz.com email account;

o   Total: 3,784 confidential files downloaded by Garcia alone.

279.    On January 14, 2022, Frye downloaded the entire TopDevz Zoho Recruit recruiting database, which contained:

o   Detailed profiles of thousands of software developers and contractors;

o   Skills assessments, hourly rates, availability, performance ratings;

o   Contact information and employment histories;

o   Client placement histories;

o   Proprietary recruiting methodologies.

280.    Frye sent confidential TopDevz files to her personal email account (Afrye262632@gmail.com) to exfiltrate them from TopDevz's systems.

281.    Google's enterprise administrator audit logs for the topdevz.com domain registered 7,675 administrative actions between January 6-18, 2022, showing astronomical downloading and account modification activity compared to normal usage patterns.

282.    The downloaded materials included:

o   Customer lists and contact databases (2.5 million records);

o   Banking account numbers and financial information;

o   Detailed work invoices and time logs for all clients;

o   Bills, receipts, and expense documentation;

o   Legal contracts, non-disclosure agreements, and client agreements;

o   Statements of work and project specifications;

o   Personal and corporate tax documents;

o   Detailed client project information and source code;

o   Employee and contractor databases with 40+ unique data fields per record;

o   Lead generation methodologies developed by Mobile Monster;

- o   Financial projections and business plans.

283.    The stolen trade secrets included proprietary information belonging to both Plaintiffs:

- o   The 2.5 million record database was developed by Rajaee personally over 10 years;

- o   The sophisticated sourcing methodologies were developed by Mobile Monster;

- o   The lead generation work product was created by Mobile Monster personnel;

- o   Client relationships were developed through Mobile Monster's services to TopDevz.

284.    These thefts violated 18 U.S.C. § 1832 (theft of trade secrets), which criminalizes:

- o   Intentionally stealing or knowingly obtaining trade secrets by fraud;

- o   Intending or knowing the offense will injure the owner;

- o   Intending to convert the trade secrets to the economic benefit of someone other than the owner;

- o   Conduct occurring in or affecting interstate or foreign commerce.

285.    Defendants knew the information was proprietary and confidential because:

- o   They had signed non-disclosure agreements;

- o   The information was password-protected and access-controlled;

- o   Rajaee had repeatedly emphasized the proprietary nature of the database;

- o   The extraordinary value of the information was self-evident from the business it generated.

286.    Defendants knew the theft would injure Plaintiffs and intended to convert the trade secrets to benefit Talentcrowd.

/ / /

**Setup of Fraudulent "topdevz.io" Domain**

287.    To facilitate the theft and exploitation of the stolen trade secrets, Defendants created a look-alike domain "topdevz.io" (distinct from the legitimate "topdevz.com" owned by Rajaee and TopDevz).

288.    On January 15, 2022, Vincil Bishop (Lintz's business partner) used his administrative credentials for TopDevz's Amazon Web Services account to change ownership of the "topdevz.io" domain to Porter Consulting (tyler.davis@porterllc.com).

289.    Frye sent Slack messages to TopDevz contractors on January 14-15, 2022:

- o    "No .com is going away, so download anything you need"

- o    "Hey! Can you please check your personal email for a new TopDevz email and password? I need everyone over to the new domain as soon as possible"

290.    The fraudulent "topdevz.io" domain was then used to upload the stolen trade secrets and impersonate TopDevz in communications with clients and contractors.

**J. Obstruction of Justice: Destruction of Evidence (January-May 2022)**

291.    On January 15, 2022, Davis and Lintz physically raided TopDevz's offices located at 7460 Girard Ave., Suite 7, La Jolla, California 92037.

292.    During the raid, Davis and Lintz seized or destroyed:

- o    Desktop computers containing thousands of gigabytes of evidence;

- o    Server equipment containing backup data;

- o    Hard drives and storage devices;

- o    Physical files and documents.

293.    Lintz admitted under oath:

"I was present on January 15, 2022 at the office and stood outside ... The computer servers and other assets and property that Rajaee is referring to belong to TopDevz, not Rajaee, and were seized by Davis."

294.    The seizure and destruction of evidence violated 18 U.S.C. § 1512,

which criminalizes knowingly altering, destroying, mutilating, or concealing documents or tangible objects with intent to impair their availability for use in an official proceeding.

295.    On May 26, 2022, Lintz permanently deleted over 130 TopDevz client projects from the Jira project management system, which contained:

- o    Complete project histories;
- o    Client communications and requirements;
- o    Source code and technical documentation;
- o    Time tracking and billing records;
- o    Thousands of attachments and documents.

296.    Automated Jira notifications stated:

"Joshua Lintz moved this project to trash ... The project, including all its issues, components, attachments, and versions will be available in the trash for 60 days after which it will be permanently deleted."

297.    This systematic destruction of evidence violated 18 U.S.C. § 1512 because:

- o    Lintz knowingly deleted the documents;
- o    The documents were relevant to official proceedings (arbitration, state court, federal court);
- o    The intent was to impair availability of evidence;
- o    The timing (May 2022, after the takeover was complete) shows deliberate destruction to conceal the theft.

298.    Additionally, Defendant Wood engaged in obstruction by:

- o    Accessing Rajaee's personal email account (rajaee.ashkan@gmail.com) without authorization beginning in February 2021;
- o    Monitoring Rajaee's attorney-client communications;
- o    Deleting exculpatory emails and evidence Rajaee needed for his defense;

    o  Reporting to Davis about Rajaee's legal strategy.

## K. The National Wire Fraud Campaign Against Clients (January-March 2022)

299.    On January 20, 2022, Davis launched a nationwide wire fraud campaign targeting all of TopDevz's clients located across the United States and Canada.

300.    Davis transmitted fraudulent emails via interstate wire facilities from the stolen "topdevz.io" domain containing materially false and misleading statements designed to induce clients to:

    o  Accept Davis's purported authority over TopDevz;

    o  Wire payments to the fraudulent JPMorgan Chase account;

    o  Terminate their relationship with Rajaee;

    o  Transition their business to Talentcrowd.

## The Fraudulent January 20, 2022 Email

301.    The January 20, 2022 mass email stated:

"I'm happy to officially announce a major change to TopDevz's ownership... Ashkan Rajaee was relieved as managing member, effective immediately... We're also announcing a few other changes, which includes a rebrand from TopDevz.com to TopDevz.io... We're moving over to new emails (immediately)... In addition, we changed our corporate address and ACH information - attached is information for your files and AP team."

302.    The email included attachments directing clients to wire funds to the fraudulent JPMorgan Chase account ending in 0516.

303.    Every statement in this email was materially false:

    o  Rajaee was not "relieved" through any lawful process;

    o  Davis had no authority to act as managing member;

    o  The "rebrand" to topdevz.io was a fraudulent domain;

    o  The new email addresses were operated by Davis without authority;

    o  The new bank account was fraudulently opened using Rajaee's identity.

304.    These fraudulent communications were transmitted via interstate wire

facilities (email systems, internet infrastructure) to clients located in multiple states including California, Arizona, Texas, New York, Nebraska, and others.

305.     Each fraudulent email transmitted to each client constituted a separate violation of 18 U.S.C. § 1343 (wire fraud).

306.     The wire fraud campaign targeted dozens of major companies, including:

   o  DriveTime Car Sales Company, LLC (Arizona) - nearly $2 billion in annual revenue;

   o  Medical Staffing Solutions, Inc. (California);

   o  Intellicheck, Inc. (New York) - publicly traded company;

   o  Mode Transportation, LLC;

   o  Procore Technologies, Inc. (California) - publicly traded company;

   o  PriceSpider (California);

   o  Sandhills Global, Inc. (Nebraska);

   o  Children's Health (Texas);

   o  Alchemer (Colorado);

   o  Tokyo Electron U.S. Holdings, Inc. (Texas);

   o  Becton Dickinson and Company (Fortune 500).

307.     Despite client concerns, Defendants persisted with the wire fraud scheme, transmitting additional fraudulent emails throughout January and February 2022.

308.     As a direct result of the wire fraud scheme, clients transferred millions of dollars via interstate wire facilities to the fraudulent JPMorgan Chase account, believing they were paying TopDevz when in fact they were paying into an account controlled by Davis without authority.

**Forged Termination Letters (Additional Wire Fraud)**

309.     In February and March 2022, Davis transmitted forged termination letters via email to multiple TopDevz clients, including DriveTime, falsely representing that:

- "TopDevz is dissolving";

- Davis had authority as "Managing Member, Founder & Chairman TopDevz, LLC" to terminate contracts;

- Contracts would be terminated effective end of March 2022.

310.    Example: The March 8, 2022 termination letter to DriveTime stated:

"The purpose of this letter is to inform you that TOPDEVZ is dissolving. As a result, we are terminating the governing Master Consulting Agreement and its associated Statement of Work as of the end of March 2022."

311.    Immediately after sending termination letters, Defendants solicited the same clients to enter into identical contracts with Talentcrowd using the same workforce, technology, and project structures.

312.    Aaron McIver, Director of Software Engineering at DriveTime, declared under oath:

"DriveTime accepted termination of the TopDevz Agreement by TopDevz ... Once the TopDevz Agreement was terminated, TopDevz directed DriveTime to TalentCrowd ... At TalentCrowd's solicitation, DriveTime entered into a Master Services Agreement with TalentCrowd on or about March 21, 2022."

313.    Each termination letter transmitted via email (interstate wire facility) constituted a separate violation of 18 U.S.C. § 1343 (wire fraud).

314.    These wire communications were part of the scheme to:

- Destroy TopDevz's business and client relationships;

- Eliminate Mobile Monster's commission revenue;

- Transfer the business to Talentcrowd;

- Conceal the theft of trade secrets by making it appear as a "business transition."

**L. Formation of Talentcrowd as Money Laundering Vehicle (February 2022)**

315.    On February 8, 2022—just 33 days after Interim Order No. 4—Lintz incorporated Talentcrowd, LLC in Wyoming while simultaneously holding himself out as "CEO" of TopDevz.

316.    Lintz later admitted under oath:

"On February 14, 2022, and with the express authorization of Davis in his capacity as the Manager of TopDevz, organized Talentcrowd and entered into a Services Agreement with TopDevz."

317.    This admission is a judicial acknowledgment of the conspiracy, though the underlying premise (Davis's authority as Manager) was fraudulent.

318.    Talentcrowd was specifically designed to serve as the vehicle for:

- o Laundering proceeds of the trade secret theft, wire fraud, and bank fraud;

- o Operating using the stolen TopDevz and Mobile Monster trade secrets;

- o Servicing the stolen TopDevz clients;

- o Employing the TopDevz workforce;

- o Generating revenue from the stolen business while distancing it from TopDevz's name.

319.    Talentcrowd had the identical business model as TopDevz:

- o Same clients (DriveTime, Medical Staffing Solutions, Alchemer, etc.);

- o Same contractors (Lintz admitted most TopDevz contractors transitioned to Talentcrowd);

- o Same technology stack and project management systems;

- o Same proprietary database for sourcing and managing contractors;

- o Same business processes and methodologies;

- o Located in the same geographic area (Solana Beach, adjacent to La Jolla).

320.    The only difference was the name—Talentcrowd was simply TopDevz's stolen business operated under a new corporate identity.

321.    Lintz stated in a 2023 podcast interview: "We didn't go raise any money externally," confirming that Talentcrowd's entire operation was funded by the proceeds of the TopDevz theft rather than legitimate investment.

322.    By March 1, 2023, Frye publicly boasted that Talentcrowd had "logged almost 90k hours of service" in its first year of operation.

323. At an average billing rate of $115-$135 per hour, 90,000 hours represents approximately $10-12 million in revenue, confirming that Talentcrowd generated massive proceeds by exploiting the stolen assets in year one alone.

324. This rapid growth was only possible through the theft of Plaintiffs' established client relationships, workforce, and proprietary database—it would be impossible to generate $10-12 million in year-one revenue for a legitimate startup without external funding.

## M. Money Laundering: The $15 Million Flow Through JPMorgan Chase Account (2022-2023)

325. Between January 2022 and January 2023, approximately $15 million in proceeds of specified unlawful activity (wire fraud, bank fraud, trade secret theft) flowed through TopDevz's fraudulent JPMorgan Chase account ending in 0516.

326. Defendants engaged in promotional money laundering under 18 U.S.C. § 1956(a)(1)(A)(i) by conducting financial transactions involving proceeds of specified unlawful activity with intent to promote the carrying on of that unlawful activity, specifically:

- o Using proceeds of the trade secret theft to establish and fund Talentcrowd;

- o Wiring stolen TopDevz client payments to Talentcrowd to promote continued exploitation of trade secrets;

- o Paying contractors through Talentcrowd using funds derived from wire fraud;

- o Establishing Talentcrowd's infrastructure using criminally derived funds.

327. Major promotional money laundering transactions included:

- o March 2022 through January 2023: Wire transfers totaling $838,554.30 from TopDevz JPMorgan account to Talentcrowd, LLC—these funds were used to establish and promote Talentcrowd's operations exploiting the stolen trade secrets.

328. Defendants engaged in transactional money laundering under 18 U.S.C.

§ 1957 by conducting monetary transactions in criminally derived property of a value greater than $10,000, by, through, or to a financial institution affecting interstate commerce, knowing the property involved represented proceeds of specified unlawful activity.

329.    Examples of transactional money laundering (§ 1957) include:

o    February 28, 2022: $43,768 wire from TopDevz JPMorgan account to Cummins & White, LLP (Carpenter's law firm);

o    June 12, 2022: $70,000 wire to Cummins & White, LLP;

o    July 7, 2022: $83,000 wire to Cummins & White, LLP;

o    March 2023: $30,000 wire to Kirk & Toberty (Kirk's law firm);

o    March-May 2022: Multiple wires totaling $722,335.83 to Joshua Lintz personally;

o    March 2022-January 2023: Multiple wires totaling $838,554.30 to Talentcrowd, LLC;

o    Various dates 2022: $4,135 to Purdy & Bailey, LLP (Bailey's law firm);

o    Various dates: Hundreds of other transactions over $10,000 to contractors, vendors, and co-conspirators, totaling approximately $15 million.

330.    Each transaction over $10,000 involving criminally derived property through a financial institution constitutes a separate violation of 18 U.S.C. § 1957.

331.    These transactions involved property derived from specified unlawful activity:

o    Wire fraud (§ 1343) - the client payments were obtained through the January 2022 wire fraud campaign;

o    Trade secret theft (§ 1832) - the payments were for work performed using stolen trade secrets;

o    Bank fraud (§ 1344) - the account itself was fraudulently opened.

**N. Attorney Defendants' Wire Fraud Through Court Filings (2021-2025)**

332.    Throughout 2021 through 2025, attorney Defendants transmitted

65

hundreds of fraudulent pleadings, motions, declarations, petitions, memoranda, and other documents via the courts' electronic filing systems (interstate wire facilities) containing materially false statements designed to advance the racketeering scheme.

333.    The use of courts' electronic filing systems (Case Management/Electronic Case Files system in federal courts, TrueFiling and other systems in state courts) constitutes use of interstate wire facilities for purposes of wire fraud under 18 U.S.C. § 1343, as these systems transmit electronic data across state lines using interstate telecommunications infrastructure.

334.    Attorney Defendants knew their representations were false because:

   o   No majority vote ever occurred to remove Rajaee or install Davis as Manager;

   o   They had acknowledged in writing (February 5, 2021) that dissolution was within exclusive Superior Court jurisdiction, not arbitrable;

   o   Interim Order No. 4 had no legal authority to effectuate removal of the Manager;

   o   They knew Davis's "ownership" was based on embezzled funds and PPP fraud;

   o   They knew the tax returns were fraudulent;

   o   By August 2023, they had been provided detailed evidence of the underlying crimes.

**Examples of Wire Fraud Through Court Filings (Non-Exhaustive):**

335.    November 2, 2022: Joint Memorandum of Points and Authorities filed in San Diego Superior Court by Carpenter and Kirk (transmitted via court's electronic filing system) falsely representing Davis's authority over TopDevz—Wire Fraud Violation.

336.    December 2, 2022: Kirk's Notice of Appearance on behalf of TopDevz in arbitration (transmitted via AAA's electronic system)—Wire Fraud Violation.

337.    December 15, 2022: Kirk's filing dismissing TopDevz's breach of

fiduciary duty claim against Davis (transmitted electronically), executed without authority—Wire Fraud Violation.

338.     December 29, 2022: Joint Memorandum in San Diego Superior Court by Carpenter and Kirk—Wire Fraud Violation.

339.     January 22, 2024: Carpenter declaration filed in federal court stating under penalty of perjury:

"Tyler Davis, as the adjudicated managing member of TOPDEVZ, LLC, has absolute authority to hire and engage with any counsel, including me, Mr. Scalia or Mr. Kirk, who represents TOPDEVZ."

**Wire Fraud Violation.**

340.     Numerous additional fraudulent filings in:

- Arbitration proceedings (2021-2022);

- Sacramento Superior Court dissolution case (2021-2022);

- San Diego Superior Court confirmation case (2022-2023);

- Federal court cases (2022-2025);

- California Courts of Appeal (2023-2025);

- Bankruptcy court (2024-2025) - post-petition wire fraud.

341.     Each fraudulent document transmitted via court electronic filing systems constituted a separate violation of 18 U.S.C. § 1343.

342.     In January 2022, Carpenter transmitted via email (interstate wire facility) forged TopDevz stock certificates showing Davis with 95.308% ownership, bearing Davis's signature, with the message: "Please see attached Mr. Rajaee's new membership certificate. Scott R. Carpenter"—Wire Fraud Violation.

343.     These forged certificates were then used to:

- Open the fraudulent JPMorgan Chase bank account (bank fraud under § 1344);

- Represent Davis's purported authority to third parties (wire fraud);

- File with courts as purported evidence of ownership (wire fraud).

## O. Fraudulent 1099-NEC Filing to IRS (February 2022)

344.    In or around February 2022, Davis and Lintz used Plaintiff Rajaee's Social Security number to electronically file a fraudulent IRS Form 1099-NEC with the Internal Revenue Service showing $2,880,979.26 in "nonemployee compensation" purportedly paid to Rajaee.

345.    This filing violated:

- 18 U.S.C. § 1343 (wire fraud - electronic transmission to IRS via interstate wire facilities);

- 18 U.S.C. § 1028 (fraud in connection with identification documents);

- 18 U.S.C. § 1028A (aggravated identity theft in connection with wire fraud).

346.    The fraudulent 1099-NEC was materially false because:

- Rajaee was a member (partner) of TopDevz, not a nonemployee contractor;

- Members receive Schedule K-1 forms, not 1099 forms;

- The amount reported was false;

- Rajaee never consented to or authorized this filing.

347.    The fraudulent filing was intended to:

- Create false tax liability for Rajaee;

- Conceal Davis's income from TopDevz;

- Further the identity theft and tax fraud scheme;

- Harm Rajaee's standing with the IRS.

348.    The 1099-NEC listed Lintz's personal cell phone number (480-747-4469) as the contact, evidencing Lintz's participation in the scheme.

349.    On August 18, 2023, Rajaee filed an Identity Theft Report with the Federal Trade Commission (Report No. 166273872), stating:

"Over $20 million has been taken through a complex criminal scheme involving the misuse of my identity and without my consent. My identity was used, unknown to me at the time, for a massive tax evasion scheme, money laundering, bank fraud,

PPP-loan fraud, and numerous other federal crimes."

"Date that I discovered it: 8/2023"

**P. Procurement of the Fraudulent Arbitration Awards (May 2023)**

350.    On May 12, 2023, the arbitrator issued a Final Award based entirely on the false testimony, falsified tax returns, and fraudulent documentary evidence presented by Davis and his attorneys.

351.    The Final Award ordered:

○  Against Rajaee: $7,670,151 owed to TopDevz, LLC; $866,567 in compensatory damages to Davis; $717,498.64 in attorney fees to Davis; $119,350 in arbitration fees; Total: $9,373,566.64

○  Against Mobile Monster: Approximately $3,000,000 (comprising amounts owed to TopDevz and Davis)

○  Combined: Over $12 million in fraudulent judgments

352.    The arbitrator's findings were based on:

○  Davis's false testimony that he personally invested $787,240;

○  Fraudulent tax returns falsely crediting Davis with capital contributions (obtained through identity theft and tax fraud);

○  False premise that Davis was entitled to majority ownership based on his purported contributions;

○  Allegations that Rajaee made "excess distributions" that were actually legitimate business payments.

353.    The arbitrator had no knowledge of the underlying criminal activity because attorney Defendants concealed it through selective presentation of falsified evidence and false testimony.

**Q. Identity Theft and Perjury Conspiracy to Procure Confirmation Judgment (2022-2023)**

**18 U.S.C. § 1028(a)(7) Connected to California State Felonies**

354.    Shortly after obtaining the May 12, 2023 arbitration awards, Defendants knowingly used, without lawful authority, means of identification of Rajaee, Mobile Monster, and TopDevz with the intent to commit, aid, or

abet felonies under California law, in violation of 18 U.S.C. § 1028(a)(7).

355.     18 U.S.C. § 1028(a)(7) criminalizes identity theft committed "in connection with any unlawful activity that constitutes... a felony under any applicable State or local law."

356.     The California state felonies committed using Rajaee's, Mobile Monster's, and TopDevz's identification include:

- o   California Penal Code § 182(3): Conspiracy to falsely move or maintain an action (filing for judicial dissolution in prohibited arbitration venue);

- o   California Penal Code § 182(4): Conspiracy to cheat and defraud any person of property by means which are in themselves criminal;

- o   California Penal Code § 182(5): Conspiracy to commit acts injurious to public morals, or to pervert or obstruct justice, or the due administration of laws;

- o   California Penal Code § 118a: Perjury by declaration (false statements under penalty of perjury);

- o   California Penal Code § 470: Forgery (forged TopDevz signatures and documents);

- o   California Penal Code § 127: Subornation of perjury (by attorneys);

- o   California Penal Code § 530.5: Identity theft under California law.

**Davis's Three Perjured Declarations Using Rajaee's, Mobile Monster's, and TopDevz's Identity**

357.     Between November 2, 2022 and June 26, 2023, Davis filed three separate declarations under penalty of perjury in the San Diego Superior Court (Case No. 37-2022-00026691-CU-PA-CTL), each transmitted via the court's electronic filing system (interstate wire facility), using Rajaee's, Mobile Monster's, and TopDevz's identifying information to commit perjury and conspiracy.

358.     November 2, 2022 Declaration (filed by attorneys Carpenter and Kirk), Davis stated under penalty of perjury:

"After Order No. 4 was issued on January 6, 2022, I became the managing member of TopDevz, LLC."

This statement used Rajaee's and TopDevz's identity and was materially false.

359.    December 29, 2022 Declaration (filed by attorneys Carpenter and Kirk), Davis repeated under penalty of perjury:

"After Order No. 4 was issued on January 6, 2022, I became the managing member of TopDevz, LLC."

This statement used Rajaee's and TopDevz's identity and was materially false.

360.    June 26, 2023 Declaration (filed by attorneys Carpenter and Kirk), Davis repeated for the third time under penalty of perjury:

"After Order No. 4 was issued on January 6, 2022, I became the managing member of TopDevz, LLC."

This statement used Rajaee's and TopDevz's identity and was materially false.

361.    In these three declarations, Davis used Rajaee's, Mobile Monster's, and TopDevz's identifying information nearly 60 times, including:

- o   Rajaee's name (first and last);

- o   TopDevz's name and legal identity;

- o   Rajaee's position as Manager;

- o   TopDevz's structure and operating agreement;

- o   References to Rajaee's actions and decisions;

- o   TopDevz's assets, accounts, and business operations;

- o   Mobile Monster's relationship with TopDevz;

- o   Mobile Monster's commission payments.

**The "Crux" Element: Identity Theft Was Essential to the Crime**

362.    The use of Rajaee's, Mobile Monster's, and TopDevz's names was at the "crux" of what makes the conduct criminal because Davis used this identifying information to deceive the San Diego Superior Court, and others, that he was "the managing member of TopDevz."

363.    Davis attempted and succeeded in passing himself off as someone he was not—"the managing member of TopDevz"—by deliberately using Rajaee's and TopDevz's identifying information.

71

364.    Without using TopDevz's identity and Rajaee's former position, Davis could not have:

- o    Claimed authority to act on behalf of TopDevz;

- o    Retained attorney Kirk as counsel for TopDevz (TopDevz never authorized Kirk's representation);

- o    Caused TopDevz to "join" Davis's petition during confirmation proceedings (TopDevz never authorized this);

- o    Pursued TopDevz's purported $7.6 million claim (TopDevz had filed no such claim);

- o    Pursued a "manager removal" claim on TopDevz's behalf (TopDevz never filed this claim);

- o    Agreed to judicial dissolution by way of arbitration on TopDevz's behalf (TopDevz never agreed to this);

- o    Obtained the $9.3 million judgment against Rajaee;

- o    Obtained the $3.0 million judgment against Mobile Monster.

365.    Each of these six actions taken by Davis using TopDevz's identity constitutes a separate wrongful act facilitated by the identity theft, demonstrating that the identity information was the "crux" of the criminal scheme.

**Connection to California State Felonies**

366.    Davis's use of Rajaee's, Mobile Monster's, and TopDevz's identification violated 18 U.S.C. § 1028(a)(7) because it was committed "in connection with" the following California felonies:

**a. Perjury by Declaration (California Penal Code § 118a):**

- o    Davis willfully stated as true under penalty of perjury material matters he knew to be false;

- o    The three declarations were made in judicial proceedings;

- o    The statements ("I became the managing member") were material to the court's determination;

- o    Perjury by declaration is a felony under California law;

- o   Davis used Rajaee's and TopDevz's identity to commit the perjury;

- o   The identity theft was "in connection with" the perjury felony.

## b. Conspiracy to Cheat and Defraud (California Penal Code § 182(4)):

- o   Davis, Carpenter, and Kirk conspired "to cheat and defraud any person of any property, by any means which are in themselves criminal, or to obtain money or property by false pretenses";

- o   The means were criminal (perjury under § 118a, forgery under § 470, wire fraud under federal law);

- o   They obtained money ($9.3 million judgment against Rajaee, $3.0 million judgment against Mobile Monster) and property (TopDevz's assets);

- o   This conspiracy is a felony under California Penal Code § 182(4);

- o   Davis used Rajaee's, Mobile Monster's, and TopDevz's identity to execute the conspiracy.

## c. Conspiracy to Obstruct Justice (California Penal Code § 182(5)):

- o   Davis, Carpenter, and Kirk conspired "to commit any act injurious to the public health, to public morals, or to pervert or obstruct justice, or the due administration of the laws";

- o   Falsely representing Davis as manager perverted justice;

- o   Filing false declarations under oath obstructed justice;

- o   Obtaining judgments through perjury obstructed the due administration of laws;

- o   This conspiracy is a felony under California Penal Code § 182(5);

- o   Davis used Rajaee's and TopDevz's identity to obstruct justice.

## d. Conspiracy to Falsely Move in Prohibited Venue (California Penal Code § 182(3)):

- o   Davis, Carpenter, and Scalia conspired "falsely to move or maintain any suit, action, or proceeding";

- o   They maintained the judicial dissolution claim in arbitration knowing

73

it was within exclusive Superior Court jurisdiction;

o  Carpenter admitted in writing (February 5, 2021) that dissolution was in exclusive Superior Court jurisdiction;

o  They proceeded anyway, maintaining the false action for over 18 months;

o  This conspiracy is a felony under California Penal Code § 182(3);

o  They used TopDevz's identity to maintain the false action.

**e. Forgery (California Penal Code § 470):**

o  Kirk forged TopDevz's legal representation by appearing as counsel and signing documents on TopDevz's behalf without any authority;

o  Under California law, "a person who signs as the agent of another 'knowing that he has no authority so to do' can be found guilty of forgery even though he signs his own name" (*Lewis v. Superior Court*, 217 Cal.App.3d 379);

o  Kirk signed his name as "Attorney for TopDevz, LLC" knowing he had no such authority;

o  Forgery is a felony under California Penal Code § 470;

o  Required using TopDevz's identity.

**f. Subornation of Perjury (California Penal Code § 127):**

o  Attorney defendants Carpenter and Kirk suborned Davis's perjury by procuring Davis to make the false statements and by presenting them to the court knowing they were false;

o  They drafted, reviewed, or approved the three perjured declarations;

o  They filed the declarations with the court under their State Bar numbers;

o  They vouched for Davis's false statements by submitting them under penalty of perjury;

o  Subornation of perjury is a felony under California Penal Code § 127;

o  Required using Rajaee's and TopDevz's identity.

74

367.    These lies told by Davis concurrently served as a means to suppress evidence that Davis used TopDevz to facilitate money laundering offenses (18 U.S.C. §§ 1956, 1957) in obtaining his TopDevz ownership interest through the fraudulent $787,240 derived from embezzlement and PPP fraud.

368.    The perjury was also used to forge TopDevz's legal counsel before the court as falsely being Kirk, which constitutes a felony under California Penal Code § 182(1), (3), (4), and (5).

**The Attorney Conspiracy**

369.    Crucially, there is substantial evidence that the complicit attorneys assembled the fraudulent and false declarations for Davis to sign, demonstrating conspiracy under both federal and California law.

370.    Carpenter and Kirk conspired with Davis to commit the perjury and identity theft scheme, evidenced by:

   o   Carpenter and Kirk drafted or reviewed the declarations before Davis signed them;

   o   They signed the court filings authenticating Davis's false declarations;

   o   They used their State Bar numbers to give legitimacy to the perjured statements;

   o   They knew the statements were false (they had written in February 2021 that dissolution was in exclusive Superior Court jurisdiction);

   o   They knew Rajaee was the lawful Manager under the Operating Agreement;

   o   They suborned Davis's perjury by filing the false declarations;

   o   They committed overt acts (filing documents, appearing in court) to accomplish Davis's perjury.

371.    This attorney conspiracy violated:

   o   California Penal Code § 127 (subornation of perjury);

   o   California Penal Code § 182(1), (3), (4), (5) (conspiracy to commit felonies);

   o   California Rules of Professional Conduct (presenting false evidence);

o    Their duties as officers of the court.

## Confirmation of Fraudulent Judgments in Superior Court (June–August 2023)

372.    On June 6, 2023, Davis and TopDevz (purportedly represented by Kirk without authority) filed a Joint Petition to Confirm the arbitration awards in San Diego Superior Court (Case No. 37-2022-00026691-CU-PA-CTL).

373.    The petition transmitted via the court's electronic filing system contained the false arbitration awards and false representations about Davis's authority, constituting wire fraud under § 1343.

374.    On August 15, 2023, San Diego Superior Court Judge Joel R. Wohlfeil entered judgment confirming the arbitration awards in the amount of $9,384,405.83 against Rajaee and approximately $3,000,000 against Mobile Monster (the "VSDJ Judgment").

375.    Judge Wohlfeil was never presented with evidence of the underlying criminal activity because attorney Defendants:

o    Filed fraudulent declarations concealing the crimes;

o    Presented only the falsified arbitration record;

o    Did not disclose that Davis's capital contributions were derived from embezzlement and PPP fraud;

o    Did not disclose the identity theft and tax fraud;

o    Did not disclose the jurisdictional defects in the arbitration;

o    Did not disclose that Davis had committed perjury in his three declarations.

## The Identity Theft Was Essential to Obtaining the $12 Million Judgments

376.    Without committing identity theft using Rajaee's, Mobile Monster's, and TopDevz's identity, Davis could not have:

o    Appeared to have authority over TopDevz;

o    Hired unauthorized attorneys (Kirk) to represent TopDevz;

o    Caused TopDevz to "join" his petition (TopDevz never authorized this);

o    Obtained a $7.6 million "award" purportedly owed to TopDevz

(TopDevz filed no claim for this);

o  Procured the $9.3 million judgment against Rajaee;

o  Procured the $3.0 million judgment against Mobile Monster.

377.  The identity theft was the essential mechanism that enabled the entire confirmation fraud scheme.

**Summary of Identity Theft Predicate Acts Connected to State Felonies:**

378.  Identity Theft Predicate Act #7: November 2, 2022 declaration using Rajaee's, Mobile Monster's, and TopDevz's identity to commit:

o  Perjury (Cal. Pen. Code § 118a)

o  Conspiracy to cheat and defraud (§ 182(4))

o  Conspiracy to obstruct justice (§ 182(5))

o  Forgery through unauthorized representation (§ 470)

o  Transmitted via interstate wire facility (§ 1343)

o  Violations: 18 U.S.C. § 1028(a)(7) and § 1028A (aggravated identity theft in connection with wire fraud)

379.  Identity Theft Predicate Act #8: December 29, 2022 declaration using Rajaee's, Mobile Monster's, and TopDevz's identity to commit the same California felonies, transmitted via wire facility.

380.  Identity Theft Predicate Act #9: June 26, 2023 declaration using Rajaee's, Mobile Monster's, and TopDevz's identity to commit the same California felonies, transmitted via wire facility.

381.  The identity theft directly injured both Plaintiffs:

o  Rajaee: The $9.3 million judgment procured through identity theft is direct injury to his personal credit, reputation, immigration status, and financial condition;

o  Mobile Monster: The $3.0 million judgment procured through identity theft (Davis using Mobile Monster's identity to claim it owed money to Davis and TopDevz) is direct injury to Mobile Monster's corporate standing, creditworthiness, and assets.

**Discovery of the Full Criminal Scheme (August 2023)**

382.     Rajaee did not discover the full evidentiary basis to challenge the judgment until August 2023, when Todd Belluomini provided:

o   Sworn declaration about Davis's embezzlement of $750,000;

o   Porter's bank statements showing the wire transfers;

o   PPP loan documentation showing the $37,240 scheme;

o   Documentary proof of Belluomini's ownership interest in Porter.

383.     This was three years after the predicate acts (2017-2020 tax fraud) and six years after the initial wire fraud (2017 embezzlement), demonstrating sophisticated concealment.

384.     On August 18, 2023, Rajaee filed his FTC Identity Theft Report (Report No. 166273872), which states: "Date that I discovered it: 8/2023."

385.     This August 2023 discovery date triggers the four-year statute of limitations for Plaintiffs' RICO claims under the Clayton Act, providing Plaintiffs until August 2027 to file this action. Filing in December 2025 is timely, with over 20 months remaining in the limitations period.

386.     Additionally, for the continuing violations (GBQ's daily trade secret theft through December 2025), the statute of limitations has not begun to run because the last predicate act is occurring as of the filing of this complaint.

**R. POST-PETITION Bankruptcy Fraud Schemes (2024-2025)**

**The Critical Date: February 26, 2024**

387.     On February 26, 2024, Rajaee and his wife filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of California (Case No. 24-00617-CL11).

388.     February 26, 2024 is the critical date that separates pre-petition predicate acts (which existed on the petition date) from post-petition predicate acts (which occurred after the petition date and therefore never became estate property under 11 U.S.C. § 541(a)(1)).

389.     In his bankruptcy schedules, Rajaee disclosed:

o   RICO claims against these Defendants;

- o The $9.3 million fraudulent judgment;
- o Mobile Monster's claims and the $3 million judgment against it;
- o Combined value: Approximately $75 million.

**Phase 1: False Oaths to Procure Conversion (April-May 2024) - POST-PETITION**

390.     On April 8, 2024, Davis and TopDevz (purportedly represented by Hays) filed a motion to appoint a Chapter 11 Trustee or convert the case to Chapter 7 (ECF No. 19).

391.     Hays filed declarations under penalty of perjury transmitted via the bankruptcy court's electronic filing system (CM/ECF), containing materially false statements including:

- o That Davis is "the managing member of TopDevz, LLC";
- o That Rajaee was "removed as managing member" through the arbitration;
- o That TopDevz and Davis are legitimate creditors;
- o That the arbitration and judgments were validly obtained.

392.     These declarations violated:

- o 18 U.S.C. § 152(2) (making false oaths and accounts in bankruptcy proceedings);
- o 18 U.S.C. § 1343 (wire fraud - transmitting false statements via court's electronic filing system).

393.     These are POST-PETITION predicate acts because they occurred on April 8, 2024, which is after the February 26, 2024 petition date.

394.     Hays filed a supplemental reply brief on April 29, 2024 (ECF No. 28) repeating the same false statements under penalty of perjury.

395.     This is an additional POST-PETITION predicate act occurring April 29, 2024.

396.     Hays knew these statements were materially false because:

- o No vote of the members had removed Rajaee or installed Davis as

Manager;

- o The arbitration had no legal authority to remove Rajaee;

- o Carpenter had admitted in writing in February 2021 that dissolution was within exclusive Superior Court jurisdiction;

- o Davis's purported ownership was based on embezzlement, PPP fraud, identity theft, perjury, and tax fraud.

397.    The bankruptcy court, misled by these false oaths transmitted via interstate wire facilities, converted the case to Chapter 7 and appointed Christopher R. Barclay as Trustee on May 9, 2024.

398.    The May 9, 2024 conversion order constitutes the FIRST POST-PETITION PREDICATE ACT in the bankruptcy fraud series because:

- o The conversion was the objective of Hays's post-petition false oaths (§ 152(2));

- o The conversion was procured through a post-petition bankruptcy fraud scheme (§ 157);

- o The conversion enabled appointment of Trustee Barclay;

- o The conversion set the stage for the fraudulent settlements and sale;

- o This act occurred after February 26, 2024 and therefore never became estate property under § 541(a)(1);

- o POST-PETITION Bankruptcy Fraud Predicate Act #1.

**Phase 2: False Claims in Bankruptcy - POST-PETITION**

399.    Davis filed a proof of claim in Rajaee's bankruptcy case for approximately $10 million based on the fraudulently procured VSDJ Judgment.

400.    Davis knew the claim was materially false because:

- o The judgment was based on his own false testimony under oath;

- o His purported $787,240 capital contribution was derived entirely from embezzlement ($750,000) and PPP loan fraud ($37,240);

- o The tax returns he submitted as evidence were fraudulent;

80

- The arbitration was jurisdictionally defective;

- He had committed wire fraud, identity theft, perjury, and tax fraud to obtain the judgment;

- He had committed perjury in three declarations using Plaintiffs' identities in connection with California felonies.

401.    18 U.S.C. § 152(4) explicitly criminalizes "presenting under oath... a false claim for proof against the estate of a debtor."

402.    Filing a false proof of claim knowing it is based on criminal activity violated 18 U.S.C. § 152(4).

403.    This is a POST-PETITION predicate act because the claim was filed after February 26, 2024.

404.    POST-PETITION Bankruptcy Fraud Predicate Act #2.

**Phase 3: The Fraudulent Settlement Scheme (September-December 2024) - POST-PETITION**

405.    On October 23, 2024, the Trustee filed motions to approve settlement agreements with:

- Davis and TopDevz for $100,000 (agreement dated October 15, 2024);

- Talentcrowd, Lintz, Garcia, Frye, Bailey, and Gerber for $100,000 (agreement dated September 26, 2024).

406.    The settlement motions contained materially false statements, including:

- That Davis has legitimate authority over TopDevz;

- That the arbitration proceedings were valid;

- That the claims being settled have minimal value;

- That the settlements are in the best interest of the estate and creditors.

407.    The Trustee, Davis, and their attorneys filed a forged "Unanimous Written Consent of the Members of TopDevz, LLC" dated October 14, 2024, purporting to show that TopDevz's members (including Rajaee) unanimously consented to the settlement agreements.

81

408. This document was fabricated because:

- Rajaee never consented to the settlements;

- Rajaee had no authority to bind TopDevz as a 4.692% minority member even if he had consented;

- The document was created to deceive the bankruptcy court;

- Davis had no authority to sign on behalf of TopDevz.

409. Rajaee filed extensive objections to the settlements on November 18, 2024 (ECF No. 141), arguing:

- The settlements constitute fraud on the bankruptcy court;

- Davis's claims are based on criminal activity;

- The Trustee is extinguishing $75 million in legitimate claims for $200,000;

- The unanimous consent is forged;

- The settlements would irreparably harm the estate and creditors.

410. On December 10, 2024, the bankruptcy court approved the settlements over Rajaee's objections (ECF No. 159).

411. The settlement scheme constitutes the SECOND SERIES OF POST-PETITION PREDICATE ACTS:

- Filing false declarations in settlement motions (§ 152(2));

- Filing forged unanimous consent dated October 14, 2024 (§ 152(4));

- Concealing the criminal basis of Davis's claims (§ 152(1));

- Executing bankruptcy fraud scheme to extinguish $75 million claims for $200,000 (§ 157);

- Transmitting false settlement motions via electronic filing system (§ 1343);

- These are POST-PETITION predicate acts because they occurred September-December 2024, after the February 26, 2024 petition date;

- POST-PETITION Bankruptcy Fraud Predicate Acts #3-15.

412.     On or about December 13, 2024, Davis paid $100,000 to the Trustee as the settlement payment for the Davis/TopDevz settlement.

413.     This $100,000 payment violated 18 U.S.C. § 1957 because:

- It was a monetary transaction of a value greater than $10,000;

- The property involved represented proceeds of specified unlawful activity (wire fraud, bank fraud, trade secret theft generating the funds Davis used);

- The transaction was conducted through a financial institution;

- Davis knew the property was criminally derived.

414.     This is a POST-PETITION money laundering predicate act occurring December 13, 2024.

415.     POST-PETITION Money Laundering Predicate Act #1.

**Phase 4: The Fraudulent Sale to Davis (April-August 2025) - POST-PETITION**

416.     On April 2, 2025, the Trustee filed a motion to sell certain estate property to Davis for $100,000, specifically:

- "The estate's right to appeal the State Court judgment confirming the arbitration award" (referring to the $9.3 million VSDJ Judgment);

- "The State Court confirmation action";

- "The estate's interest in TopDevz, LLC";

- Related litigation rights.

417.     The sale motion was transmitted via the bankruptcy court's electronic filing system (interstate wire facility), constituting wire fraud under 18 U.S.C. § 1343.

418.     The sale motion contained materially false statements:

- That Davis has legitimate authority over TopDevz;

- That the arbitration judgments were validly obtained;

- That Davis is a good faith purchaser;

- That the estate's claims against Davis have minimal value (proposing

to sell claims worth $75 million for $100,000);

- o    That the sale is in the best interest of the estate and creditors.

419.    The Trustee concealed from the bankruptcy court:

- o    That Davis is the primary defendant in the very claims being sold;

- o    That Davis's express purpose in purchasing the claims is to dismiss them and conceal his criminal conduct;

- o    That the claims are based on Davis's wire fraud, bank fraud, identity theft, perjury, tax fraud, and trade secret theft;

- o    That Rajaee had provided extensive evidence of the criminal activity;

- o    That selling claims to the defendant accused of crimes would ensure the claims are never prosecuted.

420.    Rajaee filed vigorous opposition to the sale motion, arguing:

- o    Davis is not a good faith purchaser;

- o    Davis is buying the claims specifically to bury them;

- o    The sale is unconscionably below fair market value;

- o    The sale is procured through fraud;

- o    Davis lacks authority to act on behalf of TopDevz, rendering the transaction void.

421.    On July 30, 2025, the bankruptcy court issued an order approving the sale (the "Sale Order").

422.    The sale purportedly closed on August 14, 2025, with Davis paying an additional $100,000.

423.    Davis's $100,000 payment violated 18 U.S.C. § 1957 (monetary transaction in criminally derived property over $10,000).

424.    This is a POST-PETITION money laundering predicate act occurring in March 2025 (when paid).

425.    POST-PETITION Money Laundering Predicate Act #2.

426.    The California Court of Appeal acknowledged the sale, stating in its

October 6, 2025 order:

"This court has received the trustee's notice of assignment of the estate's appellate rights to respondent Tyler Davis based on the bankruptcy court's order approving the sale of the estate's rights in this appeal to Davis."

427.    Immediately after purchasing the appellate rights, Davis filed a stipulated request for dismissal, confirming that his purpose in purchasing the claims was to extinguish them, not to prosecute them.

428.    On October 6, 2025, the California Court of Appeal issued an order stating:

"The court STAYS this appeal pending completion of Rajaee's challenges to the sale order, including the motion for reconsideration and any appeal of the sale order."

429.    The stay order demonstrates the California appellate court's recognition that the validity of the sale is seriously questionable.

430.    The sale scheme constitutes the THIRD SERIES OF POST-PETITION PREDICATE ACTS:

- o   Filing false declarations in sale motion (§ 152(2));

- o   Concealing Davis's criminal conduct from court (§ 152(1));

- o   Executing bankruptcy fraud scheme to sell claims to defendant (§ 157);

- o   Transmitting false sale motion via electronic filing system (§ 1343);

- o   Davis's payment of $100,000 from criminally derived funds (§ 1957);

- o   These are POST-PETITION predicate acts because they occurred April-August 2025, after the February 26, 2024 petition date;

- o   POST-PETITION Bankruptcy Fraud Predicate Acts #16-30.

431.    The sale was specifically designed to:

- o   Transfer ownership of the RICO claims to the primary defendant;

- o   Ensure the claims would never be prosecuted;

- o   Legitimize Davis's criminal conduct through bankruptcy court approval;

- o   Conceal the eight-year pattern of racketeering activity;

    o   Complete the transfer of TopDevz to Davis.

## S. GBQ Partners' Acquisition and Continued Exploitation (February 2025-Present) - POST-PETITION PREDICATE ACTS

### The Acquisition

432.    In or around February 2025, Defendant GBQ Partners LLC acquired Talentcrowd, LLC for undisclosed consideration while:

- Multiple lawsuits were pending alleging trade secret theft, wire fraud, and related misconduct;

- Talentcrowd was identified as a defendant in federal and state court actions;

- Public disputes existed regarding Talentcrowd's formation and use of stolen TopDevz assets;

- Rajaee's bankruptcy case was active with scheduled RICO claims against Talentcrowd worth tens of millions of dollars.

433.    GBQ publicly announced the acquisition in a press release dated approximately January 31, 2025, stating that the transaction would provide GBQ with "access to on-demand talent solutions."

434.    The press release stated that while separate brand names might be maintained, "the combined firm will operate as one team behind the scenes," constituting a de facto merger.

435.    GBQ's due diligence prior to acquisition necessarily revealed:

- Court dockets showing Talentcrowd named as defendant in multiple cases;

- Allegations that Talentcrowd was formed using stolen TopDevz assets;

- That Lintz and Frye were defendants in trade secret theft litigation;

- The suspicious timeline (Talentcrowd formed February 8, 2022, just 33 days after disputed arbitration order);

- The identical business model between TopDevz and Talentcrowd;

- Lintz's admission that Talentcrowd had "no external funding";

- The impossibility of legitimately generating $12 million in year-one revenue without pre-existing assets or substantial external investment.

436.  Despite actual or constructive knowledge of these red flags, GBQ proceeded with the acquisition and:

- Retained Joshua Lintz as a principal operator of the Talentcrowd business;

- Retained Amanda Frye as Chief Executive Officer to continue leading operations;

- Retained Melissa Garcia as Chief Administrative Officer;

- Continued operating Talentcrowd from substantially the same location (125 S Highway 101, Suite 1060, Solana Beach, California);

- Continued servicing substantially the same clients using the same contractors;

- Continued using the same business systems, processes, and methodologies.

437.  GBQ's retention of Lintz, Frye, and Garcia in leadership positions demonstrates:

- Knowledge that Talentcrowd's value was inseparable from these specific individuals;

- Knowledge that the business depended on the stolen database and methodologies that only these individuals could access and operate;

- Intent to continue exploiting the same assets that were the subject of litigation;

- Willingness to assume successor liability for the alleged misconduct.

**Continuing POST-PETITION Exploitation of Stolen Trade Secrets**

438.  From February 2025 through December 2025 and continuing, GBQ has operated Talentcrowd using Plaintiffs' stolen trade secrets, including:

- The 2.5 million record proprietary database stolen in January 2022;

- Mobile Monster's sophisticated sourcing and recruiting methodologies;

- Client relationships established through TopDevz;

- Contractor databases and performance assessments;

- Operational systems and business processes developed by Plaintiffs.

439. GBQ's continued exploitation constitutes ongoing POST-PETITION violations of 18 U.S.C. § 1832 (theft of trade secrets) because:

- Each day of use after February 26, 2024 is a continuing POST-PETITION violation;

- GBQ knowingly uses trade secrets obtained through theft;

- GBQ intends to convert the trade secrets to its economic benefit;

- GBQ knows or should know the use injures Plaintiffs;

- The conduct affects interstate commerce;

- These violations occurred after February 26, 2024 and therefore are not estate property under § 541(a)(1).

440. GBQ generates substantial revenue from the stolen assets:

- Estimated at $50,000+ per day in billable services;

- Approximately $15-20 million annually based on continued operations;

- From February 2025 through December 2025 (approximately 10 months): $12-16 million in revenue derived from stolen trade secrets;

- Each transaction over $10,000 derived from stolen assets constitutes POST-PETITION money laundering under 18 U.S.C. § 1957.

441. GBQ's ongoing POST-PETITION conduct constitutes:

- Trade secret theft (§ 1832): Continuing daily violations from February 2025 through December 2025;

- February 2025-December 2025 = 300+ days = 300+ continuing POST-PETITION violations;

- These are separate and distinct POST-PETITION predicate acts that never became estate property;

- POST-PETITION Trade Secret Theft Predicate Acts #101-400.

- Money laundering (§ 1957): Estimated 200 monetary transactions over $10,000 in property derived from trade secret theft;

- Based on $15-20 million annual revenue and typical IT staffing billing (contracts $20,000-$500,000), GBQ conducts approximately 50-100 transactions over $10,000 monthly;

- February-December 2025 (10 months) = approximately 200 transactions over $10,000;

- Each transaction is a separate POST-PETITION violation occurring after February 26, 2024;

- POST-PETITION Money Laundering Predicate Acts #3-202.

- Aiding and abetting: Under 18 U.S.C. § 1832(a)(5), conspiracy to commit trade secret theft;

- Receipt of stolen property: Proceeds of racketeering activity;

- Successor liability: For all of Talentcrowd's prior RICO violations.

442.    GBQ's liability under § 1832 for POST-PETITION violations is established because:

- GBQ knowingly uses the stolen trade secrets (had actual or constructive knowledge through due diligence);

- GBQ intends to convert them to its economic benefit (generates $15-20 million annually);

- GBQ knows or should know the use injures Plaintiffs (pending litigation at time of acquisition);

- The conduct affects interstate commerce (multi-state operations);

- All of GBQ's violations occurred after February 26, 2024 and therefore provide independent basis for RICO liability unaffected by any bankruptcy arguments.

**GBQ's Integration Into the Enterprise**

443.    GBQ became a participant in the criminal enterprise upon acquiring Talentcrowd because:

- GBQ knew or should have known about the pending litigation and

criminal allegations;

- GBQ chose to retain the same individuals accused of the theft;

- GBQ benefits from and perpetuates the pattern of racketeering activity;

- GBQ's business model (operating Talentcrowd) requires ongoing commission of POST-PETITION predicate acts (trade secret theft, money laundering);

- GBQ conducts transactions in criminally derived property through financial institutions;

- All of GBQ's conduct is POST-PETITION, occurring after February 26, 2024.

444. GBQ's liability extends to all of Talentcrowd's conduct under successor liability principles because the acquisition was a de facto merger with substantial continuity of operations, management, and assets.

**T. Continuing POST-PETITION Violations (February 26, 2024-Present)**

445. As of the filing of this complaint in December 2025, Defendants continue to engage in POST-PETITION racketeering activity, including:

**a. Ongoing POST-PETITION Trade Secret Violations by GBQ and Talentcrowd (18 U.S.C. § 1832):**

- GBQ, through its Talentcrowd operations, continues to use Plaintiffs' stolen 2.5 million record database daily;

- GBQ continues to service clients using Plaintiffs' stolen methodologies;

- GBQ continues to employ contractors sourced through Plaintiffs' stolen recruiting database;

- Lintz and Frye continue to exploit their knowledge of the stolen systems under GBQ's ownership;

- Each day of continued use after February 26, 2024 constitutes a continuing POST-PETITION violation of § 1832;

- Estimated POST-PETITION violations: February 26, 2024-December 2025 = 650+ days of exploitation;

- These are POST-PETITION predicate acts that never became estate

property and provide independent basis for this action.

**b. Ongoing POST-PETITION Money Laundering by GBQ (18 U.S.C. § 1957):**

- o  GBQ conducts hundreds of monetary transactions over $10,000 in property derived from trade secret theft;

- o  Each transaction after February 26, 2024 is a separate POST-PETITION violation of § 1957;

- o  Estimated 200+ POST-PETITION transactions from February 2025-December 2025;

- o  These are POST-PETITION predicate acts that never became estate property.

**c. Ongoing POST-PETITION Wire Fraud (18 U.S.C. § 1343):**

- o  Defendants continue to transmit fraudulent documents via courts' electronic filing systems relying on the criminally procured orders;

- o  Each fraudulent court filing after February 26, 2024 is a separate POST-PETITION wire fraud violation;

- o  Estimated 50+ POST-PETITION court filings from April 2024-December 2025;

- o  These are POST-PETITION predicate acts that never became estate property.

446.    The pattern of racketeering activity is ongoing and continuous, with no indication that Defendants intend to cease their illegal conduct.

447.    GBQ's business model depends entirely on continued POST-PETITION exploitation of the stolen assets, as evidenced by its retention of Lintz and Frye (the only individuals with access to and knowledge of the stolen database and systems).

448.    These POST-PETITION predicate acts provide completely independent basis for this RICO action because they:

- o  Did not exist on February 26, 2024 when Rajaee filed bankruptcy;

- o  Never became property of the bankruptcy estate under 11 U.S.C. § 541(a)(1);

- o Could not have been settled (many occurred after the September-October 2024 settlements);

- o Could not have been sold (many occurred after the August 14, 2025 sale closing);

- o Belong to Rajaee individually under federal bankruptcy law (post-petition causes of action belong to the debtor) and to Mobile Monster (non-debtor entity);

- o Over 580 POST-PETITION predicate acts establish a complete RICO pattern independent of any pre-petition acts.

449. Even if every pre-petition act were somehow barred by bankruptcy (which they are not for the nine reasons stated above), the POST-PETITION acts alone—over 580 violations occurring after February 26, 2024—would satisfy RICO's pattern requirement and support this entire action.

## VI. THE CRIMINAL ENTERPRISE

450. At all times relevant herein, Defendants constituted an "enterprise" as defined by 18 U.S.C. § 1961(4), which includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

451. The enterprise is an ongoing association-in-fact consisting of the individual and corporate Defendants who functioned as a continuing unit for common purposes, including:

- o Unlawfully seizing control of TopDevz, LLC;

- o Stripping Rajaee of his 51% ownership interest and management rights;

- o Destroying Mobile Monster's business relationship with TopDevz;

- o Stealing and exploiting Plaintiffs' trade secrets valued at tens of millions of dollars;

- o Laundering criminal proceeds through TopDevz, Talentcrowd, and other entities;

- o Obstructing justice and defrauding government agencies (IRS, Small Business Administration, bankruptcy court);

- o  Enriching themselves through proceeds of specified unlawful activity;

- o  Perpetuating and expanding the criminal operations through GBQ's acquisition and continued exploitation.

452.    The enterprise is separate and distinct from the pattern of racketeering activity. The enterprise is the structure through which Defendants operated; the pattern of racketeering activity is what Defendants did through that structure.

453.    The enterprise operated through a defined organizational structure with distinct roles:

**a. Tyler Brandon Davis (Principal Organizer and Leader):**

- o  Orchestrated the overall scheme;

- o  Committed the initial predicate acts (embezzlement, PPP fraud, tax fraud, identity theft);

- o  Directed the theft of trade secrets;

- o  Launched the wire fraud campaign targeting clients;

- o  Coordinated with all other Defendants;

- o  Recruited attorney Defendants and compensated them with criminally derived funds;

- o  Orchestrated the post-petition bankruptcy fraud schemes;

- o  Personally profited tens of millions of dollars from the racketeering activity.

**b. Attorney Defendants - Carpenter, Kirk, Scalia (Legal Cover / Wire Fraud Executors):**

- o  Provided legitimacy through their status as licensed attorneys and officers of the court;

- o  Transmitted hundreds of fraudulent documents via interstate wire facilities (court electronic filing systems), each constituting wire fraud under § 1343;

- o  Presented falsified evidence (tax returns) to arbitrators and courts;

- o Assembled and filed Davis's three perjured declarations using Rajaee's, Mobile Monster's, and TopDevz's identity in connection with California state felonies;

- o Suborned perjury in violation of California Penal Code § 127;

- o Forged TopDevz's legal representation in violation of California Penal Code § 470;

- o Threatened Plaintiffs with criminal prosecution and adverse immigration consequences to coerce settlement and conceal crimes;

- o Concealed evidence of the underlying crimes from arbitrators and judges;

- o Received millions of dollars in legal fees from criminally derived funds held in the fraudulent JPMorgan Chase account, constituting money laundering under § 1957;

- o Recruited additional attorneys (Kirk recruited by Carpenter) to expand the enterprise.

**c. Corporate Insiders - Lintz, Frye, Garcia (Operational Executors):**

- o Executed the theft of trade secrets under Davis's direct orders, violating 18 U.S.C. § 1832;

- o Operated the fraudulent "topdevz.io" domain to facilitate wire fraud;

- o Transmitted fraudulent communications to clients via interstate wire facilities, violating § 1343;

- o Established and operated Talentcrowd as the primary money laundering vehicle;

- o Destroyed evidence (servers, Jira projects) to obstruct justice, violating § 1512;

- o Received hundreds of thousands of dollars in payments from criminally derived funds, violating § 1957;

- o Continue to operate Talentcrowd under GBQ's ownership using stolen trade secrets through December 2025, committing continuing POST-PETITION violations of § 1832;

- Facilitate GBQ's ongoing commission of POST-PETITION predicate acts.

**d. Bailey (Post-Theft Legal Support):**

- Joined the enterprise in June 2022 to provide legal representation for Talentcrowd parties;

- Made false statements to courts concealing the theft of trade secrets, violating § 1343;

- Continued representation after being put on notice multiple times of the criminal origins of Talentcrowd;

- Represented the Talentcrowd parties in the POST-PETITION fraudulent bankruptcy settlements;

- Received fees from criminally derived funds, violating § 1957.

**e. Hays (POST-PETITION Bankruptcy Fraud Architect):**

- Joined the enterprise in 2023-2024 to execute the POST-PETITION bankruptcy fraud schemes;

- Filed false declarations under penalty of perjury in bankruptcy court, violating § 152(2);

- Orchestrated the conversion (POST-PETITION Predicate Act #1), settlements (POST-PETITION Acts #3-15), and sale (POST-PETITION Acts #16-30);

- Transmitted fraudulent documents via court's electronic filing system, violating § 1343;

- Hays's role was entirely POST-PETITION.

**f. Wood (Intelligence and Evidence Destruction):**

- Provided Davis with intelligence by accessing Rajaee's personal email;

- Deleted exculpatory evidence Rajaee needed for his defense, violating § 1512;

- Monitored attorney-client communications to assist Davis's legal strategy.

**g. GBQ Partners LLC (Successor and Continuing POST-PETITION Participant):**

- o  Joined the enterprise in February 2025 by acquiring Talentcrowd with knowledge of pending litigation;

- o  Continued the exploitation of stolen trade secrets, committing ongoing POST-PETITION violations of § 1832;

- o  Conducts hundreds of POST-PETITION monetary transactions over $10,000 in criminally derived property, violating § 1957;

- o  Retained the original thieves (Lintz, Frye, Garcia) to operate the stolen business;

- o  Generates $15-20 million annually from stolen assets (all POST-PETITION);

- o  Expanded the criminal enterprise geographically and financially;

- o  Provides additional resources and legitimacy to perpetuate the scheme;

- o  All of GBQ's conduct constitutes POST-PETITION predicate acts occurring after February 26, 2024;

- o  GBQ's role is to continue the enterprise through POST-PETITION racketeering.

**h. Corporate Entities - Talentcrowd, Porter, Mason (Instrumentalities):**

- o  Served as vehicles for laundering proceeds, violating §§ 1956 and 1957;

- o  Facilitated wire transfers and monetary transactions;

- o  Concealed beneficial ownership and control;

- o  Allowed Defendants to operate through corporate forms to obscure criminal activity;

- o  Talentcrowd continues operations under GBQ ownership committing POST-PETITION violations.

454.    The enterprise engaged in, and its activities affected, interstate and foreign commerce through:

- o  Wire communications transmitted across state lines and international

borders (United States to Canada);

- o Transactions involving FDIC-insured banks operating in interstate commerce (Wells Fargo, JPMorgan Chase, Tri Counties Bank);

- o Contracts with clients and contractors located throughout the United States and Canada;

- o Theft and exploitation of TopDevz's nationwide and international business operations generating $30 million in revenue;

- o Fraudulent transmissions to federal agencies (IRS, SBA) via interstate wire facilities;

- o Use of courts' interstate electronic filing systems (CM/ECF and state equivalents);

- o Operation of Talentcrowd servicing clients in multiple states using stolen trade secrets;

- o GBQ's multi-state operations spanning Ohio, California, and other jurisdictions.

455.    The enterprise has operated continuously from at least May 2017 through December 2025 (over 8 years), evolving in sophistication and expanding to include additional participants as circumstances required, with GBQ's acquisition in 2025 representing the latest expansion and perpetuation of the enterprise.

456.    The enterprise functions through:

- o Regular communications among co-conspirators (emails, telephone calls, meetings, coordinated legal filings);

- o Coordination of criminal activities (simultaneous incorporation of Talentcrowd, coordinated trade secret theft, synchronized wire fraud campaign, coordinated bankruptcy fraud scheme, GBQ's strategic acquisition);

- o Common goal of profiting from and concealing the pattern of racketeering activity;

- o Shared financial benefits (attorney fees, Talentcrowd revenues, payments from fraudulent JPMorgan account, GBQ's ongoing revenues

from stolen assets);

o  Hierarchical structure with Davis as principal organizer, other Defendants performing specialized roles, and GBQ now serving as the continuing operational entity.

457.  Evidence of the enterprise's coordinated nature includes:

o  Synchronized timing: Talentcrowd incorporated 33 days after Interim Order No. 4; trade secret theft, wire fraud campaign, Talentcrowd formation occurring in 8-week window; GBQ's acquisition strategically timed after bankruptcy settlements;

o  Financial connections: Money flowed from TopDevz JPMorgan to attorneys ($230,000+), to Talentcrowd ($838,554), to Lintz ($722,335), and now to GBQ (millions in ongoing revenue);

o  Express admissions: Lintz stated he formed Talentcrowd "with express authorization of Davis"; Davis admitted ordering Garcia to download files; GBQ announced it will operate "as one team";

o  Recruitment pattern: Kirk recruited by Carpenter; Hays recruited for bankruptcy expertise; GBQ recruited by acquiring Talentcrowd and retaining the thieves;

o  Unified approach: GBQ's retention of Lintz/Frye demonstrates agreement to continue exploitation.

# VII. THE PATTERN OF RACKETEERING ACTIVITY

## A. Pattern Definition and Requirements

458.  Defendants have engaged in a "pattern of racketeering activity" as defined by 18 U.S.C. §§ 1961(1) and (5).

459.  18 U.S.C. § 1961(1) defines "racketeering activity" to include any act indictable under enumerated federal statutes, including: 18 U.S.C. § 1343 (wire fraud), § 1344 (bank fraud), §§ 1028 and 1028A (identity theft), §§ 1831-1832 (trade secret theft), §§ 1956-1957 (money laundering), § 1512 (obstruction), § 152 (bankruptcy fraud), § 157 (bankruptcy fraud scheme), and 26 U.S.C. §§ 7201 and 7206 (tax crimes).

460.  18 U.S.C. § 1961(5) defines "pattern of racketeering activity" as

98

requiring at least two acts of racketeering activity within ten years of each other.

461.    Here, Defendants committed over 750 separate acts of racketeering activity spanning over eight years (May 2017 through December 2025), far exceeding the statutory minimum.

462.    For purposes of analyzing bankruptcy-related standing issues and demonstrating the timeliness and scope of Plaintiffs' claims, the pattern is divided into:

- o  PRE-PETITION PREDICATE ACTS: May 2017 - February 25, 2024 (over 600 acts)

- o  POST-PETITION PREDICATE ACTS: February 26, 2024 - December 2025 (over 580 acts)

463.    The POST-PETITION predicate acts are critical because:

- o  They occurred after Rajaee filed bankruptcy on February 26, 2024;

- o  They did not exist on the petition date and therefore never became estate property under 11 U.S.C. § 541(a)(1);

- o  Post-petition causes of action belong to the debtor individually under federal bankruptcy law, not to the estate;

- o  They could not have been settled (many occurred after the September-October 2024 settlements);

- o  They could not have been sold to Davis (many occurred after the August 14, 2025 sale closing);

- o  Rajaee has unassailable standing for injuries from POST-PETITION predicate acts;

- o  Mobile Monster (non-debtor) has standing for all pre-petition and POST-PETITION acts;

- o  The POST-PETITION acts alone (over 580 violations) satisfy RICO's pattern requirement and provide independent basis for this action.

464.    The pattern demonstrates both "relationship" and "continuity" as required by federal case law.

## B. PRE-PETITION PREDICATE ACTS (May 2017 - February 25, 2024)

### Overview of Pre-Petition Pattern

465.    From May 2017 through February 25, 2024 (the day before Rajaee filed bankruptcy), Defendants committed over 600 predicate acts to seize TopDevz, destroy Mobile Monster's business, steal trade secrets, and procure fraudulent judgments.

466.    These pre-petition predicate acts established the foundation for the POST-PETITION bankruptcy fraud schemes that followed.

### Wire Fraud (18 U.S.C. § 1343) - Over 250 Pre-Petition Violations

467.    18 U.S.C. § 1343 criminalizes: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."

468.    Elements: (1) a scheme to defraud; (2) use of interstate wire communications; (3) intent to defraud; (4) materiality of the misrepresentations.

### Pre-Petition Wire Fraud Predicate Acts:

469.    May 3, 2017: Wire transfer of $250,000 embezzled from Porter partnership to Mobile Monster/TopDevz via interstate banking system, transmitted in furtherance of scheme to defraud Rajaee about Davis's "personal investment"—Pre-Petition Wire Fraud Predicate Act #1.

470.    May 24, 2017: Wire transfer of $250,000 embezzled from Porter to Mobile Monster/TopDevz—Pre-Petition Wire Fraud Predicate Act #2.

471.    November 22, 2017: Wire transfer of $250,000 embezzled from Porter to Mobile Monster/TopDevz—Pre-Petition Wire Fraud Predicate Act #3.

472.    December 3, 2020: Wire transfer of $37,240 from Porter's PPP loan account (ending in 8768) to Mason Building & Design to launder loan proceeds—Pre-Petition Wire Fraud Predicate Act #4.

473.    January 7, 2022: Email transmission from Carpenter to Wells Fargo

Bank and its counsel containing false statements to fraudulently seize TopDevz's Wells Fargo account—Pre-Petition Wire Fraud Predicate Act #5.

474.    January 20-31, 2022: Transmission of hundreds of fraudulent mass emails to TopDevz clients nationwide via the fake topdevz.io domain, each directing clients to wire payments to the fraudulent JPMorgan Chase account—Pre-Petition Wire Fraud Predicate Acts #6-100 (each separate email to each separate client constitutes a separate violation).

475.    January 21, 2022: Email transmission of forged TopDevz stock certificates from Carpenter showing Davis with 95.308% ownership—Pre-Petition Wire Fraud Predicate Act #101.

476.    February-March 2022: Email transmissions of forged termination letters to TopDevz clients (including DriveTime, Origin63, and others)—Pre-Petition Wire Fraud Predicate Acts #102-120.

477.    February 2022: Electronic transmission of fraudulent IRS Form 1099-NEC to the Internal Revenue Service using Rajaee's identity—Pre-Petition Wire Fraud Predicate Act #121.

478.    Throughout 2021-February 25, 2024: Transmission of over 130 fraudulent pleadings, declarations, petitions, memoranda, and motions via courts' interstate electronic filing systems (CM/ECF in federal courts; TrueFiling and similar systems in state courts) falsely representing Davis's authority, TopDevz's status, and the validity of the arbitration proceedings—Pre-Petition Wire Fraud Predicate Acts #122-250 (each separate court filing transmitted electronically constitutes a separate violation).

479.    Examples include:

- o   November 2, 2022: Joint Memorandum (Carpenter & Kirk);

- o   December 2, 2022: Kirk's Notice of Appearance;

- o   December 15, 2022: Kirk's dismissal of TopDevz's claims;

- o   December 29, 2022: Joint Memorandum (Carpenter & Kirk);

- o   January 22, 2024: Carpenter declaration;

- o   Numerous arbitration, state court, and federal court filings through February 25, 2024.

**Total Pre-Petition Wire Fraud Violations: 250+**

**Bank Fraud (18 U.S.C. § 1344) - 4 Pre-Petition Violations**

480.    18 U.S.C. § 1344 criminalizes: "Whoever knowingly executes, or attempts to execute, a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises."

481.    Elements: (1) scheme to defraud a financial institution; (2) the institution is federally insured; (3) knowing execution or attempt.

**Pre-Petition Bank Fraud Predicate Acts:**

482.    April 19, 2020: Davis submitted false PPP loan application to the Small Business Administration and Tri Counties Bank (FDIC-insured), concealing Belluomini's 20% ownership of Porter, concealing tax liens, and falsely certifying accuracy under penalty of perjury, fraudulently obtaining $328,300 in loan proceeds—Pre-Petition Bank Fraud Predicate Act #1.

483.    January 7, 2022: Carpenter transmitted false communications to Wells Fargo Bank, N.A. (FDIC-insured) and its counsel to fraudulently seize control of TopDevz's Wells Fargo account ending in 1128—Pre-Petition Bank Fraud Predicate Act #2.

484.    January 19, 2022: Davis fraudulently opened a new bank account for TopDevz at JPMorgan Chase Bank, N.A. (FDIC-insured) using false documentation, forged stock certificates, and Rajaee's personally identifiable information without authorization—Pre-Petition Bank Fraud Predicate Act #3.

485.    January-March 2022: Inducing TopDevz clients to wire funds to the fraudulent JPMorgan Chase account through the coordinated wire fraud campaign described above—Pre-Petition Bank Fraud Predicate Act #4 (scheme to obtain property under custody of FDIC-insured bank through false pretenses).

**Total Pre-Petition Bank Fraud Violations: 4**

**Identity Theft (18 U.S.C. §§ 1028 and 1028A) - 18 Pre-Petition Violations**

486.    18 U.S.C. § 1028(a)(7) criminalizes: "knowingly transfers, possesses,

or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law."

487.     18 U.S.C. § 1028A criminalizes aggravated identity theft: "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person... during and in relation to" enumerated felonies including wire fraud, bank fraud, and tax fraud.

488.     "Means of identification" includes: name, Social Security number, tax identification number, company name, and other personally identifiable information.

**Pre-Petition Identity Theft Predicate Acts:**

489.     October 2017 (filed 2018): Using Rajaee's Social Security number and tax identification information to file TopDevz's fraudulent 2017 federal partnership tax return (Form 1065) showing Davis's false $750,000 capital contribution—Pre-Petition Identity Theft Predicate Acts #1 (§ 1028) and #1A (§ 1028A - aggravated identity theft in connection with tax fraud under 26 U.S.C. § 7206).

490.     2018 (filed 2019): Using Rajaee's identification to file TopDevz's fraudulent 2018 tax return—Pre-Petition Identity Theft Predicate Acts #2 (§ 1028) and #2A (§ 1028A).

491.     2019 (filed 2020): Using Rajaee's identification to file TopDevz's fraudulent 2019 tax return—Pre-Petition Identity Theft Predicate Acts #3 (§ 1028) and #3A (§ 1028A).

492.     2020 (filed 2021): Using Rajaee's identification to file TopDevz's fraudulent 2020 tax return showing Davis's false $37,240 capital contribution—Pre-Petition Identity Theft Predicate Acts #4 (§ 1028) and #4A (§ 1028A).

493.     January 19, 2022: Using Rajaee's Employer Identification Number (EIN) and personally identifiable information to fraudulently open the JPMorgan Chase bank account—Pre-Petition Identity Theft Predicate Acts #5 (§ 1028) and #5A (§ 1028A - aggravated identity theft in connection with bank fraud under § 1344).

494.    February 2022: Using Rajaee's Social Security number to file fraudulent IRS Form 1099-NEC showing $2,880,979.26 in false income—Pre-Petition Identity Theft Predicate Acts #6 (§ 1028) and #6A (§ 1028A - aggravated identity theft in connection with wire fraud under § 1343).

**Identity Theft Connected to California State Felonies:**

495.    November 2, 2022: Davis, aided and abetted by attorneys Carpenter and Kirk, knowingly used without lawful authority means of identification of Rajaee, Mobile Monster, and TopDevz (names, legal identities, positions, relationships) in a declaration filed under penalty of perjury stating "After Order No. 4 was issued on January 6, 2022, I became the managing member of TopDevz, LLC," with the intent to commit and in connection with California state felonies including:

- Perjury by declaration (Cal. Pen. Code § 118a) - willfully stating as true under oath material matters known to be false;

- Conspiracy to cheat and defraud (Cal. Pen. Code § 182(4)) - conspiracy to obtain money and property by means which are in themselves criminal;

- Conspiracy to obstruct justice (Cal. Pen. Code § 182(5)) - conspiracy to pervert or obstruct justice or the due administration of laws;

- Conspiracy to falsely move action (Cal. Pen. Code § 182(3)) - conspiracy to falsely move or maintain the prohibited dissolution proceeding in arbitration;

- Forgery (Cal. Pen. Code § 470) - Kirk forging TopDevz's legal representation by signing as attorney without authority;

- Subornation of perjury (Cal. Pen. Code § 127) - Carpenter and Kirk procuring Davis to commit perjury and presenting his false declarations to court;

- The use of Rajaee's, Mobile Monster's, and TopDevz's names was at the "crux" of the crime because without this identifying information, Davis could not deceive the court that he had authority to act on TopDevz's behalf or that TopDevz was joining his petition;

- The declaration was transmitted via interstate wire facility (court's

electronic filing system), also violating § 1343;

- o Pre-Petition Identity Theft Predicate Acts #7 (§ 1028(a)(7) - in connection with California state felonies) and #7A (§ 1028A - aggravated identity theft in connection with wire fraud § 1343).

496.    December 29, 2022: Davis, aided and abetted by Carpenter and Kirk, filed a second declaration under penalty of perjury repeating the same false statement ("After Order No. 4 was issued on January 6, 2022, I became the managing member of TopDevz, LLC"), using Rajaee's, Mobile Monster's, and TopDevz's identity in connection with the same California state felonies (§§ 118a, 182(3), 182(4), 182(5), 470, 127), transmitted via interstate wire facility—Pre-Petition Identity Theft Predicate Acts #8 (§ 1028(a)(7)) and #8A (§ 1028A).

497.    June 26, 2023: Davis, aided and abetted by Carpenter and Kirk, filed a third declaration under penalty of perjury repeating the same false statement for the third time, using Rajaee's, Mobile Monster's, and TopDevz's identity in connection with the same California state felonies, transmitted via interstate wire facility—Pre-Petition Identity Theft Predicate Acts #9 (§ 1028(a)(7)) and #9A (§ 1028A).

498.    In these three declarations, Davis used Rajaee's, Mobile Monster's, and TopDevz's identifying information nearly 60 times to perpetrate the following specific criminal acts using their identities:

- o Granting Davis rights as manager of TopDevz (Rajaee/TopDevz never authorized);

- o Retaining attorney Kirk as counsel for TopDevz (TopDevz never authorized);

- o TopDevz "joining" Davis's petition during confirmation proceedings (TopDevz never authorized);

- o TopDevz pursuing a "manager removal" claim (TopDevz never filed such claim);

- o TopDevz pursuing a $7.6 million judgment from a non-existent claim (TopDevz filed no claim);

- o TopDevz agreeing to judicial dissolution by way of arbitration

(TopDevz never agreed).

499.    The identity theft was the essential mechanism that enabled Davis to obtain the $12+ million in fraudulent judgments, and the identity information was the "crux" of the criminal scheme.

500.    The attorney conspiracy to assemble and file these perjured declarations violated:

- o   California Penal Code § 127 (subornation of perjury);
- o   California Penal Code § 182(1), (3), (4), (5) (conspiracy);
- o   18 U.S.C. § 1343 (wire fraud through filing);
- o   18 U.S.C. § 2 (aiding and abetting).

**Total Pre-Petition Identity Theft Violations: 9 under § 1028(a)(7), plus 9 aggravated identity theft enhancements under § 1028A = 18 total pre-petition identity theft violations**

**Theft of Trade Secrets (18 U.S.C. § 1832) - 100 Pre-Petition Violations**

501.    18 U.S.C. § 1832(a) criminalizes: "Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly... (1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information."

502.    Elements: (1) trade secret exists; (2) related to product/service in interstate commerce; (3) defendant knowingly stole or obtained by fraud; (4) intent to convert to economic benefit of another; (5) intent or knowledge it would injure owner.

**Pre-Petition Trade Secret Theft Predicate Acts:**

503.    January 6-14, 2022: Garcia downloaded 3,784 confidential files under Davis's direct orders—Pre-Petition Trade Secret Theft Predicate Acts #1-10 (alleged collectively for pleading purposes).

504.    January 14, 2022: Frye downloaded the entire TopDevz Zoho Recruit recruiting database containing thousands of contractor records—Pre-Petition

Trade Secret Theft Predicate Act #11.

505.    January 15, 2022: Transfer of stolen database and files to the fraudulent topdevz.io domain—Pre-Petition Trade Secret Theft Predicate Act #12.

506.    February 2022-February 25, 2024: Ongoing use and exploitation of stolen trade secrets by Talentcrowd (under Lintz, Frye, and Garcia) to service clients, manage contractors, and generate over $40 million in revenue during this pre-petition period (approximately 730 days of daily exploitation)—Pre-Petition Trade Secret Theft Predicate Acts #13-100 (alleged collectively, representing continuous daily violations).

**Total Pre-Petition Trade Secret Theft Violations: 100**

**Money Laundering (18 U.S.C. §§ 1956 and 1957) - 150 Pre-Petition Violations**

**Promotional Money Laundering (§ 1956):**

507.    18 U.S.C. § 1956(a)(1)(A)(i) criminalizes: conducting financial transactions involving proceeds of specified unlawful activity with intent to promote the carrying on of specified unlawful activity.

508.    March 2022-January 2023: Wire transfers totaling $838,554.30 from TopDevz's JPMorgan Chase account to Talentcrowd, LLC, using proceeds of wire fraud, bank fraud, and trade secret theft to establish and promote Talentcrowd's ongoing exploitation of the stolen assets—Pre-Petition Promotional Money Laundering Predicate Acts #1-20 (multiple transactions aggregated for pleading purposes).

509.    March-May 2022: Wire transfers totaling $722,335.83 to Lintz personally to compensate him for organizing and operating Talentcrowd—Pre-Petition Promotional Money Laundering Predicate Acts #21-40.

**Transactional Money Laundering (§ 1957):**

510.    18 U.S.C. § 1957(a) criminalizes: "Whoever... knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity."

511.    Elements: (1) monetary transaction; (2) in criminally derived property; (3) property value over $10,000; (4) derived from specified unlawful activity; (5) affecting interstate commerce; (6) defendant knew property was criminally derived.

512.    "Specified unlawful activity" includes wire fraud (§ 1343), bank fraud (§ 1344), trade secret theft (§ 1832), and any offense involving fraud in connection with identification documents (§ 1028).

**Pre-Petition Transactional Money Laundering Predicate Acts:**

513.    Throughout 2022-February 25, 2024: Hundreds of monetary transactions over $10,000 from the TopDevz JPMorgan Chase account involving criminally derived property, including:

- o  February 28, 2022: $43,768 to Cummins & White, LLP (Carpenter);

- o  June 12, 2022: $70,000 to Cummins & White, LLP;

- o  July 7, 2022: $83,000 to Cummins & White, LLP;

- o  March 2023: $30,000 to Kirk & Toberty (Kirk);

- o  2022: $4,135 to Purdy & Bailey, LLP (Bailey);

- o  March-May 2022: Multiple transactions totaling $722,335.83 to Lintz;

- o  March 2022-January 2023: Multiple transactions totaling $838,554.30 to Talentcrowd;

- o  Throughout 2022-February 2024: Hundreds of other transactions over $10,000 to contractors, vendors, and co-conspirators, totaling approximately $15 million;

- o  Pre-Petition Transactional Money Laundering Predicate Acts #41-150 (representing the major transactions, with hundreds of additional smaller transactions aggregated).

**Total Pre-Petition Money Laundering Violations: 150**

**Tax Crimes (26 U.S.C. §§ 7201 and 7206) - 10 Pre-Petition Violations**

514.    18 U.S.C. § 1961(1) explicitly includes as racketeering activity: "any act which is indictable under title 26, United States Code, section 7201 (relating to income tax evasion), section 7206 (relating to false tax returns)."

515.    26 U.S.C. § 7201 criminalizes tax evasion: "Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall... be guilty of a felony."

516.    26 U.S.C. § 7206 criminalizes filing false returns: "Any person who...

(1) Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter... shall be guilty of a felony."

**Pre-Petition Tax Fraud Predicate Acts:**

517.     2017 (filed 2018): Davis caused TopDevz's 2017 federal partnership tax return to be filed under penalty of perjury with material false statements crediting Davis with a personal $750,000 capital contribution (when it actually came from Porter partnership)—Pre-Petition Tax Fraud Predicate Acts #1 (§ 7206 - false return) and #1A (§ 7201 - tax evasion).

518.     2018 (filed 2019): Fraudulent TopDevz 2018 tax return—Pre-Petition Tax Fraud Predicate Acts #2 (§ 7206) and #2A (§ 7201).

519.     2019 (filed 2020): Fraudulent TopDevz 2019 tax return—Pre-Petition Tax Fraud Predicate Acts #3 (§ 7206) and #3A (§ 7201).

520.     2020 (filed 2021): Fraudulent TopDevz 2020 tax return crediting Davis with false $37,240 capital contribution—Pre-Petition Tax Fraud Predicate Acts #4 (§ 7206) and #4A (§ 7201).

521.     2017 (filed 2018): Davis filed Porter's 2017 federal tax return using Schedule C (sole proprietorship) instead of Form 1065 (partnership) to conceal the $750,000 distribution to Davis—Pre-Petition Tax Fraud Predicate Acts #5 (§ 7206) and #5A (§ 7201).

522.     The tax fraud resulted in:

   o   Davis evading hundreds of thousands of dollars in federal income taxes;

   o   Creation of false documentary evidence used to defraud the arbitrator and courts;

   o   False K-1 forms showing Davis's purported ownership interests;

   o   Harm to the U.S. Treasury through unpaid taxes;

   o   Harm to Rajaee through use of his identity in the fraud.

/ / /

/ / /

**Total Pre-Petition Tax Fraud Violations: 10 (5 false returns under § 7206 + 5 tax evasion acts under § 7201)**

**Obstruction of Justice (18 U.S.C. § 1512) - 12 Pre-Petition Violations**

523.    18 U.S.C. § 1512(c)(1) criminalizes: "Whoever corruptly... alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding."

524.    Elements: (1) knowingly destroying/concealing documents or tangible objects; (2) with intent to impair availability in official proceeding; (3) in proceeding before court or federal agency.

**Pre-Petition Obstruction Predicate Acts:**

525.    January 15, 2022: Davis and Lintz physically seized and destroyed or concealed TopDevz's computer servers, hard drives, and storage devices from the La Jolla office, containing thousands of gigabytes of evidence relevant to the arbitration, state court proceedings, and anticipated federal proceedings—Pre-Petition Obstruction Predicate Act #1 (§ 1512(c)(1)).

526.    May 26, 2022: Lintz permanently deleted over 130 TopDevz client projects from the Jira project management system, which contained complete project histories, client communications, source code, time tracking records, and thousands of attachments—Pre-Petition Obstruction Predicate Act #2 (§ 1512(c)(1)).

527.    February 2021-February 2022: Wood accessed Rajaee's personal email account (rajaee.ashkan@gmail.com) without authorization and deleted exculpatory emails and evidence, with intent to impair availability of evidence in the arbitration and related proceedings—Pre-Petition Obstruction Predicate Acts #3-12 (§ 1512(c)(1)) (multiple deletions over extended period).

**Total Pre-Petition Obstruction Violations: 12**

**Summary of Pre-Petition Pattern:**

528.    Total Pre-Petition Predicate Acts (May 2017 - February 25, 2024):

- o   Wire Fraud (§ 1343): 250+ violations

- o   Bank Fraud (§ 1344): 4 violations

- Identity Theft (§§ 1028, 1028A): 18 violations (9 basic + 9 aggravated)

- Trade Secret Theft (§ 1832): 100 violations

- Money Laundering (§§ 1956, 1957): 150 violations

- Tax Crimes (§§ 7201, 7206): 10 violations

- Obstruction (§ 1512): 12 violations

- TOTAL PRE-PETITION: Over 600 predicate acts

## C. POST-PETITION PREDICATE ACTS (February 26, 2024 - December 2025)

### Overview of Post-Petition Pattern

529.    After Rajaee filed bankruptcy on February 26, 2024, Defendants committed over 580 additional predicate acts to extinguish the RICO claims, complete the transfer of ownership to Davis, and continue exploiting the stolen assets through GBQ.

530.    These POST-PETITION predicate acts are CRITICAL because:

- They occurred after February 26, 2024 and therefore did not exist when the bankruptcy was filed;

- They never became estate property under 11 U.S.C. § 541(a)(1) because causes of action arising after the petition date are not property of the estate;

- Post-petition causes of action belong to the debtor individually under federal bankruptcy law, not to the bankruptcy estate;

- They could not have been settled by the Trustee (settlements signed September-October 2024, but many POST-PETITION acts occurred after these dates);

- They could not have been sold to Davis (sale closed August 14, 2025, but many POST-PETITION acts occurred after this date, particularly GBQ's exploitation from August 14-December 31, 2025);

- Rajaee has unassailable standing for POST-PETITION claims regardless of any bankruptcy issues;

- Mobile Monster (non-debtor) has standing for all pre-petition and

POST-PETITION acts;

- o  The POST-PETITION acts alone (over 580 violations) satisfy RICO's pattern requirement (far exceeding the minimum two acts) and provide complete, independent basis for this action.

531.    Over 580 POST-PETITION acts demonstrate the continuing nature of the enterprise and provide independent grounds unaffected by bankruptcy:

**POST-PETITION Bankruptcy Fraud (18 U.S.C. §§ 152 and 157) - 30 Violations**

532.    18 U.S.C. § 1961(1)(F) explicitly includes as racketeering activity: "any act which is indictable under section 152 (relating to concealment of assets; false oaths and claims; bribery)."

533.    18 U.S.C. § 152 criminalizes multiple bankruptcy-related offenses:

- o  (1) Concealment of assets or property belonging to the estate;

- o  (2) Making a false oath or account;

- o  (4) Withholding, falsifying, or making false entries in documents; presenting false claims.

534.    18 U.S.C. § 157 criminalizes bankruptcy fraud schemes: devising or intending to devise a scheme or artifice to defraud in connection with a bankruptcy case, or to obtain money or property of the estate by false pretenses, representations, or promises.

**POST-PETITION Bankruptcy Fraud Predicate Acts:**

**FIRST POST-PETITION PREDICATE ACT: The Conversion Order (May 9, 2024)**

535.    April 8, 2024: Hays filed declaration under penalty of perjury in motion to convert (ECF No. 19) stating "Tyler Davis, the managing member of TopDevz, LLC" and similar false statements, transmitted via bankruptcy court's electronic filing system—POST-PETITION Bankruptcy Fraud Predicate Act #1 (§ 152(2) - false oaths) occurring after February 26, 2024 and POST-PETITION Wire Fraud Predicate Act #1 (§ 1343).

536.    April 29, 2024: Hays filed supplemental declaration under penalty of perjury in reply brief (ECF No. 28) repeating false statements about Davis being "managing member"—POST-PETITION Bankruptcy Fraud Predicate

Act #2 (§ 152(2)) occurring after February 26, 2024 and POST-PETITION Wire Fraud Predicate Act #2 (§ 1343).

537.    May 9, 2024: The bankruptcy court issued conversion order based on Hays's false oaths, completing the bankruptcy fraud scheme to convert the case—POST-PETITION Bankruptcy Fraud Predicate Act #3 (§ 157 - scheme to defraud) occurring after February 26, 2024.

538.    The conversion order is the FIRST POST-PETITION PREDICATE ACT in the bankruptcy fraud series because:

- It was the objective of Hays's POST-PETITION false oaths (filed April 8 and April 29, 2024);

- It was procured through POST-PETITION violations of §§ 152(2) and 157;

- It enabled appointment of Trustee;

- It set the stage for the settlements and sale;

- This act occurred on May 9, 2024, which is after February 26, 2024, and therefore never became estate property under § 541(a)(1);

- This cause of action for this POST-PETITION predicate act belongs to Rajaee individually.

## SECOND POST-PETITION PREDICATE ACT SERIES: The Settlement Scheme (Sept-Dec 2024)

539.    2024: Davis filed proof of claim for approximately $10 million based on the fraudulently procured VSDJ Judgment, knowing the judgment was obtained through embezzlement, PPP fraud, identity theft, perjury, and tax fraud—POST-PETITION Bankruptcy Fraud Predicate Act #4 (§ 152(4) - false claims) occurring after February 26, 2024.

540.    October 14, 2024: The Trustee, Davis, and Hays filed a forged "Unanimous Written Consent of the Members of TopDevz, LLC" purporting to show unanimous consent to settlements—POST-PETITION Bankruptcy Fraud Predicate Act #5 (§ 152(4) - falsifying documents) occurring after February 26, 2024.

541.    October 23, 2024: Trustee filed declarations under penalty of perjury in

settlement motion (ECF No. 124) containing false or misleading statements about validity of Davis's claims—POST-PETITION Bankruptcy Fraud Predicate Acts #6-8 (§ 152(2)) occurring after February 26, 2024 and POST-PETITION Wire Fraud Predicate Acts #3-5 (§ 1343).

542.    Throughout April-December 2024: Defendants concealed from bankruptcy court material facts about the criminal basis of Davis's claims (that they were procured through embezzlement, PPP fraud, identity theft, perjury, tax fraud)—POST-PETITION Bankruptcy Fraud Predicate Acts #9-13 (§ 152(1) - concealment) occurring after February 26, 2024.

543.    September-December 2024: The overall settlement scheme to extinguish $75 million in claims for $200,000—POST-PETITION Bankruptcy Fraud Predicate Acts #14-20 (§ 157 - bankruptcy fraud scheme) occurring after February 26, 2024.

544.    December 10, 2024: Bankruptcy court approves settlements based on the false oaths, forged documents, and concealment—completing this POST-PETITION bankruptcy fraud scheme.

545.    December 13, 2024: Davis paid $100,000 to Trustee from criminally derived funds—POST-PETITION Money Laundering Predicate Act #1 (§ 1957) occurring after February 26, 2024.

546.    The settlement scheme is the SECOND POST-PETITION PREDICATE ACT SERIES because:

- The settlements were negotiated, drafted, executed, and filed after February 26, 2024;

- They constitute POST-PETITION bankruptcy fraud under §§ 152 and 157;

- These acts occurred after February 26, 2024 and therefore never became estate property;

- The causes of action for these POST-PETITION predicate acts belong to Rajaee individually.

**THIRD POST-PETITION PREDICATE ACT SERIES: The Sale Scheme (April-Aug 2025)**

547.    April 2, 2025: Trustee filed declarations under penalty of perjury in sale

motion containing false statements about Davis's authority and value of claims—POST-PETITION Bankruptcy Fraud Predicate Acts #21-23 (§ 152(2)) occurring after February 26, 2024 and POST-PETITION Wire Fraud Predicate Acts #6-8 (§ 1343).

548.    April-July 2025: Concealing from bankruptcy court that Davis is buying claims to bury them and that sale serves no legitimate estate purpose—POST-PETITION Bankruptcy Fraud Predicate Acts #24-26 (§ 152(1)) occurring after February 26, 2024.

549.    April-August 2025: The overall sale scheme to sell estate interests to the primary defendant for $100,000 to ensure RICO claims are never prosecuted—POST-PETITION Bankruptcy Fraud Predicate Acts #27-30 (§ 157) occurring after February 26, 2024.

550.    July 30, 2025: Bankruptcy court approves sale based on false oaths and concealment.

551.    August 14, 2025: Sale closes; Davis pays $100,000 from criminally derived funds—POST-PETITION Money Laundering Predicate Act #2 (§ 1957) occurring after February 26, 2024.

552.    The sale scheme is the THIRD POST-PETITION PREDICATE ACT SERIES because:

   ○ The sale was negotiated, approved, and closed after February 26, 2024;

   ○ The sale itself is a POST-PETITION bankruptcy fraud scheme under § 157;

   ○ These acts occurred after February 26, 2024 and therefore never became estate property;

   ○ The causes of action for these POST-PETITION predicate acts belong to Rajaee individually.

**Total POST-PETITION Bankruptcy Fraud Violations: 30**

**POST-PETITION Trade Secret Theft by GBQ (18 U.S.C. § 1832) - 300+ Violations**

553.    February 2025: GBQ acquired Talentcrowd and began its own POST-PETITION exploitation of Plaintiffs' stolen trade secrets.

115

554.    February 2025-December 2025: GBQ Partners' ongoing use and exploitation of stolen trade secrets through its acquired Talentcrowd operations to service clients, manage contractors, and generate approximately $12-16 million in revenue during this 10-month POST-PETITION period.

555.    Each day of GBQ's exploitation after February 26, 2024 constitutes a continuing POST-PETITION violation of 18 U.S.C. § 1832:

- o   GBQ uses the 2.5 million record database daily to source and manage contractors;

- o   GBQ uses Mobile Monster's proprietary methodologies daily to generate leads and close clients;

- o   GBQ services clients daily using the stolen assets;

- o   GBQ generates approximately $50,000+ in daily revenue from the stolen trade secrets;

- o   Each day = separate continuing violation.

556.    February 2025-December 2025 = approximately 300+ days (exact number depends on acquisition closing date in February 2025).

557.    POST-PETITION Trade Secret Theft Predicate Acts #101-400 (representing 300+ days of continuing violations, all occurring after February 26, 2024).

558.    These are POST-PETITION predicate acts that:

- o   Did not exist on February 26, 2024;

- o   Never became estate property under § 541(a)(1);

- o   Could not have been settled (occurred after September-October 2024 settlements);

- o   Many occurred after the August 14, 2025 sale closing (approximately 138 days from August 14-December 31, 2025 = 138+ POST-PETITION violations occurring after the sale);

- o   Belong to Rajaee individually and to Mobile Monster (non-debtor).

559.    GBQ's POST-PETITION liability under § 1832 is established because:

- o   GBQ knowingly uses the stolen trade secrets (had actual or constructive

116

knowledge through due diligence revealing pending § 1832 litigation);

- o GBQ intends to convert them to its economic benefit (generates $15-20 million annually);

- o GBQ knows or should know the use injures Plaintiffs (pending litigation at time of acquisition);

- o The conduct affects interstate commerce (multi-state operations);

- o All of GBQ's violations are POST-PETITION, occurring after February 26, 2024.

**Total POST-PETITION Trade Secret Theft by GBQ: 300+**

**POST-PETITION Money Laundering by GBQ (18 U.S.C. § 1957) - 200 Violations**

560.    December 13, 2024: Davis paid $100,000 to Trustee as settlement payment from criminally derived funds—POST-PETITION Money Laundering Predicate Act #1 (§ 1957) occurring after February 26, 2024.

561.    March 2025: Davis paid $100,000 to Trustee to purchase estate interests from criminally derived funds—POST-PETITION Money Laundering Predicate Act #2 (§ 1957) occurring after February 26, 2024.

562.    February 2025-December 2025: GBQ Partners' ongoing monetary transactions in criminally derived property through its operation of Talentcrowd:

- o Every client payment over $10,000 received by GBQ through Talentcrowd operations constitutes a POST-PETITION § 1957 violation because the revenue is derived from exploitation of stolen trade secrets (specified unlawful activity under § 1832);

- o The property (client payments) is "criminally derived" because it results from GBQ's commission of trade secret theft under § 1832;

- o Estimated transactions: Based on $15-20 million in annual revenue and typical IT staffing billing patterns (contracts typically $20,000-$500,000 per client), GBQ conducts approximately 50-100 transactions over $10,000 per month;

- o February-December 2025 (10 months): Approximately 200

transactions over $10,000;

○ POST-PETITION Money Laundering Predicate Acts #3-202 (§ 1957), each occurring after February 26, 2024.

563.    Each transaction satisfies the elements of § 1957:

○ (1) Monetary transaction: Client payment through financial institution (wire transfer or ACH);

○ (2) In criminally derived property: The payment is for services rendered using stolen trade secrets (derived from § 1832 violations);

○ (3) Value greater than $10,000: Typical contracts are $20,000-$500,000;

○ (4) Derived from specified unlawful activity: Trade secret theft under § 1832 is specified unlawful activity;

○ (5) Affecting interstate commerce: Multi-state banking and business operations;

○ (6) Knowledge: GBQ knows property is criminally derived (acquired Talentcrowd with knowledge of theft allegations, retained the accused thieves, due diligence revealed litigation; willful blindness constitutes knowledge).

564.    GBQ knows the property is criminally derived because:

○ Due diligence revealed pending trade secret litigation against Talentcrowd;

○ The revenue is generated using the same stolen database and methodologies that are the subject of litigation;

○ GBQ retained Lintz and Frye who personally stole the assets and are named defendants in theft litigation;

○ The business model is identical to the business accused of being stolen;

○ Willful blindness constitutes knowledge under § 1957;

○ All of GBQ's transactions are POST-PETITION, occurring after February 26, 2024.

565.    These POST-PETITION money laundering violations:

- o   Did not exist on February 26, 2024;

- o   Never became estate property under § 541(a)(1);

- o   Many occurred after the August 14, 2025 sale closing (estimated 80+ transactions from August 14-December 31, 2025 at approximately 8-10 transactions per month);

- o   Belong to Rajaee individually and Mobile Monster.

**Total POST-PETITION Money Laundering by GBQ and Davis: 202 (Acts #1-202)**

**POST-PETITION Wire Fraud (18 U.S.C. § 1343) - 50 Violations**

566.    April 2024-December 2025: Defendants continued to transmit fraudulent documents via courts' electronic filing systems in bankruptcy court, California Court of Appeal, and other tribunals, relying on the criminally procured orders and repeating the false narrative that Davis has legitimate authority—POST-PETITION Wire Fraud Predicate Acts #1-50, all occurring after February 26, 2024.

567.    Examples include:

- o   Hays's bankruptcy court filings (April 8, April 29, 2024);

- o   Trustee's settlement motions (October 23, 2024);

- o   Trustee's sale motion (April 2, 2025);

- o   Davis's post-sale filings in California Court of Appeal;

- o   Ongoing fraudulent filings through December 2025.

568.    These POST-PETITION wire fraud violations:

- o   Occurred after February 26, 2024;

- o   Never became estate property;

- o   Belong to Rajaee individually and Mobile Monster.

**Total POST-PETITION Wire Fraud Violations: 50**

**Summary of Post-Petition Pattern:**

569.    Total POST-PETITION Predicate Acts (February 26, 2024 - December

2025):

- o Bankruptcy Fraud (§§ 152, 157): 30 violations

- o Wire Fraud (§ 1343): 50 violations

- o Trade Secret Theft by GBQ (§ 1832): 300+ violations

- o Money Laundering by GBQ and Davis (§ 1957): 202 violations

- o TOTAL POST-PETITION: Over 580 predicate acts

570.    These POST-PETITION predicate acts:

- o Occurred entirely after February 26, 2024;

- o Were not estate property when Rajaee filed bankruptcy;

- o Many occurred after the settlements (September-October 2024);

- o Many occurred after the sale (August 14, 2025);

- o Provide complete, independent basis for this RICO action unaffected by any bankruptcy arguments;

- o Even standing alone, the POST-PETITION acts (over 580 violations) far exceed RICO's minimum requirement of two predicate acts and establish a complete pattern demonstrating relationship and continuity.

571.    CRITICAL FOR TIMELINESS: The POST-PETITION predicate acts are ongoing through December 2025, particularly:

- o GBQ's daily trade secret theft (continuing through December 31, 2025 and beyond);

- o GBQ's ongoing money laundering transactions (continuing through December 31, 2025 and beyond);

- o For these continuing violations, the statute of limitations runs from the date of the LAST predicate act;

- o As of the filing of this complaint, the last predicate act is occurring in December 2025;

- o Therefore, the statute of limitations has not even begun to run for the continuing POST-PETITION violations;

    o    This action is timely regardless of the August 2023 discovery date.

## D. CONVERGENCE: Unified Scheme with Same Victims and Single Purpose

572.    The predicate acts—both pre-petition and POST-PETITION—demonstrate "convergence" as required by the Ninth Circuit because they consistently target the same victims through a unified false narrative directed at accomplishing the same criminal objective across an eight-year period.

573.    "Convergence" means:

    o    The same victims are targeted across multiple predicate acts;

    o    The same false representation is repeated to multiple persons;

    o    All acts serve the single purpose of the criminal enterprise;

    o    The scheme has internal coherence and logical progression.

574.    Here, perfect convergence exists:

## a. Same Victims Across All Predicate Acts (Pre-Petition and POST-PETITION):

    o    Primary victims: Rajaee, Mobile Monster, TopDevz (nominal defendant)

    o    Secondary victims: U.S. Government (IRS, SBA, bankruptcy court), Porter partnership, Belluomini

    o    Every predicate act—both pre-petition (May 2017-Feb 25, 2024) and POST-PETITION (Feb 26, 2024-Dec 2025)—targeted these same victims

    o    The convergence persists seamlessly across the petition date and throughout the eight-year period

## b. Same False Narrative Repeated Throughout Both Periods:

    o    "Davis is the managing member of TopDevz" - this central lie was transmitted via interstate wire facilities to:

        ▪    Pre-petition targets: Wells Fargo Bank (January 7, 2022), JPMorgan Chase Bank (January 19, 2022), TopDevz clients nationwide (January 20-31, 2022), Arbitrator (2021-2022), San Diego Superior Court (November 2, 2022; December 29, 2022;

June 26, 2023)

- POST-PETITION targets: Bankruptcy court (April 8, 2024; April 29, 2024; October 23, 2024; April 2, 2025), California Court of Appeal (2024-2025), other tribunals

- California Secretary of State, Department of Justice, U.S. Trustee

○ Same lie, same victims (Rajaee/Mobile Monster/TopDevz), same purpose (steal TopDevz), spanning eight years across both pre-petition and POST-PETITION periods

○ The lie was repeated in over 300 separate wire transmissions to dozens of different entities, but always targeting the same victims for the same purpose

**c. Single Unified Criminal Objective Across Both Periods:**

○ Pre-petition objective: Seize Rajaee's 51% ownership, steal trade secrets, procure fraudulent judgments, establish Talentcrowd

○ POST-PETITION objective: Use bankruptcy system to extinguish challenges, complete transfer to Davis, continue exploiting stolen assets through GBQ

○ Same ultimate goal throughout: Transfer TopDevz's $30 million business and Mobile Monster's commission revenue to Davis and co-conspirators

○ Seamless progression from pre-petition acts to POST-PETITION acts demonstrates single unified scheme

**d. Logical Progression Spanning Pre-Petition to POST-PETITION:**

○ PRE-PETITION PHASE 1: Embezzlement + Tax fraud (2017-2020) → False evidence

○ PRE-PETITION PHASE 2: False evidence → False arbitration testimony (2021-2022)

○ PRE-PETITION PHASE 3: False testimony → Interim Order No. 4 (January 6, 2022)

○ PRE-PETITION PHASE 4: Interim Order No. 4 → Bank fraud, trade

secret theft, wire fraud (Jan-March 2022)

- o PRE-PETITION PHASE 5: Identity theft + perjury using Plaintiffs' names (2022-2023) → $12 million judgments (August 15, 2023)

- o PRE-PETITION PHASE 6: Stolen business → Talentcrowd operations generating $40-50M (Feb 2022-Feb 25, 2024)

- o [BANKRUPTCY FILED: February 26, 2024 - CRITICAL DATE]

- o POST-PETITION PHASE 1: Fraudulent judgments → Conversion order via false oaths (May 9, 2024) - FIRST POST-PETITION PREDICATE ACT

- o POST-PETITION PHASE 2: Conversion → Fraudulent settlements via forged consent (Sept-Dec 2024) - SECOND POST-PETITION PREDICATE ACT SERIES

- o POST-PETITION PHASE 3: Settlements → Fraudulent sale to Davis (April-Aug 14, 2025) - THIRD POST-PETITION PREDICATE ACT SERIES

- o POST-PETITION PHASE 4: Sale → GBQ acquisition (February 2025) → Continued exploitation generating $12-16M (Feb-Dec 2025) - 300+ POST-PETITION TRADE SECRET VIOLATIONS + 200 POST-PETITION MONEY LAUNDERING VIOLATIONS

575.    The same false statement ("Davis is the managing member of TopDevz") was transmitted via interstate wire facilities to dozens of different persons and entities over eight years, spanning from pre-petition through POST-PETITION periods, but always with the same purpose (advancing the takeover), always targeting the same victims (Rajaee, Mobile Monster, TopDevz), and always as part of the same enterprise.

576.    The convergence continues seamlessly from pre-petition to POST-PETITION periods:

- o Same victims (Rajaee, Mobile Monster) throughout;

- o Same false narrative (Davis is manager) repeated in both periods;

- o Same criminal objective (steal TopDevz) pursued in both periods;

- o Same enterprise participants (Davis, attorneys, Talentcrowd parties) in

both periods, with GBQ joining POST-PETITION;

- o The February 26, 2024 bankruptcy filing did not interrupt the scheme— it became a tool exploited by the enterprise through POST-PETITION bankruptcy fraud.

577.    This convergence satisfies the Ninth Circuit's requirement that RICO patterns demonstrate a unified scheme rather than scattered unrelated crimes, and the perfect convergence spanning both pre-petition and POST-PETITION periods demonstrates a single continuous enterprise evolving over time but maintaining consistent objectives, victims, and methods.

## E. RELATIONSHIP Among Predicate Acts (Pre-Petition and POST-PETITION)

578.    All predicate acts—both pre-petition and POST-PETITION—are "related" as required by 18 U.S.C. § 1961(5) because they:

**a. Share common purposes across both periods:**

- o Unlawfully seizing control of TopDevz from Rajaee;

- o Stripping Rajaee of his 51% ownership interest;

- o Destroying Mobile Monster's business relationship with TopDevz;

- o Stealing and exploiting trade secrets valued at tens of millions of dollars;

- o Laundering criminal proceeds through legitimate-appearing business operations (Talentcrowd, GBQ);

- o Concealing the criminal activity from courts, arbitrators, and government agencies;

- o Enriching Defendants through specified unlawful activity;

- o Obstructing investigation and prosecution of the crimes;

- o POST-PETITION addition: Extinguishing civil liability through bankruptcy fraud;

- o POST-PETITION addition: Perpetuating the scheme through GBQ's acquisition and continued operations.

/ / /

**b. Involve the same participants across both periods:**

- o The Defendants acting in concert through the criminal enterprise;

- o Davis, Carpenter, Kirk, Scalia, Lintz, Frye, Garcia, Bailey participated in both pre-petition and POST-PETITION acts;

- o Hays joined for POST-PETITION period;

- o GBQ joined for POST-PETITION period;

- o Coordinated conduct evidenced by synchronized timing, shared communications, financial transactions, recruitment pattern, and unified false narrative.

**c. Target the same victims throughout both periods:**

- o Rajaee injured by both pre-petition acts (loss of business, fraudulent judgment through identity theft and perjury) and POST-PETITION acts (bankruptcy fraud preventing recovery, continued loss of salary, ongoing harm from judgment);

- o Mobile Monster injured by both pre-petition acts (loss of commission revenue 2022-Feb 2024) and POST-PETITION acts (GBQ's continued exploitation Feb 2024-Dec 2025 preventing revenue restoration, ongoing loss of $116,000+ monthly);

- o Same victims consistently targeted throughout eight years across both periods.

**d. Employ the same methods in both periods:**

- o Transmission of false information via interstate wire facilities (emails, wire transfers, court electronic filing systems);

- o Falsification of documents (tax returns, stock certificates, unanimous consent, court declarations);

- o Use of Rajaee's, Mobile Monster's, and TopDevz's identity without authorization (tax returns, bank accounts, 1099-NEC, perjured declarations);

- o Systematic abuse of legal proceedings to provide legitimacy to criminal conduct;

- ○ Concealment of evidence and underlying crimes from authorities;
- ○ Corporate acquisitions to launder and perpetuate stolen business (GBQ's purchase of Talentcrowd);
- ○ The methods are identical in pre-petition and POST-PETITION periods.

**e. Result in the same type of injury across both periods:**

- ○ Destruction of Plaintiffs' property rights and business interests;
- ○ Unjust enrichment of Defendants;
- ○ Generation of fraudulent judgments and orders;
- ○ Obstruction of justice;
- ○ Ongoing financial losses (Mobile Monster loses $116,000 monthly as GBQ continues POST-PETITION exploitation).

**f. Are part of a single, unified scheme spanning both periods:**

- ○ All predicate acts—pre-petition and POST-PETITION—were designed to accomplish the common goal of transferring Rajaee's 51% ownership and TopDevz's $30 million business to Davis and co-conspirators;
- ○ Each predicate act built upon and facilitated the others across the petition date;
- ○ Pre-petition acts (embezzlement, tax fraud) created false documentary evidence;
- ○ Pre-petition false evidence enabled false testimony and perjured declarations using Plaintiffs' identities;
- ○ Pre-petition false testimony procured Interim Order No. 4 and arbitration awards;
- ○ Pre-petition orders were exploited to commit trade secret theft, wire fraud, bank fraud;
- ○ Pre-petition stolen business was laundered through Talentcrowd;
- ○ Pre-petition judgments forced Rajaee into bankruptcy;

- POST-PETITION bankruptcy fraud (conversion, settlements, sale) was designed to extinguish challenges arising from pre-petition acts;

- POST-PETITION GBQ acquisition perpetuates and expands the stolen business established through pre-petition acts;

- The bankruptcy filing on February 26, 2024 was not an interruption—it was exploited as a tool by the enterprise to eliminate liability;

- Seamless progression from pre-petition to POST-PETITION demonstrates unity of scheme.

## F. CONTINUITY of Racketeering Activity (Pre-Petition and POST-PETITION)

**Closed-Ended Continuity (Past Conduct Over Substantial Period):**

579. The racketeering activity occurred repeatedly over an extended period spanning over eight years (May 2017 through December 2025), including:

- Pre-petition period: May 2017 - February 25, 2024 (almost 7 years, over 600 acts)

- POST-PETITION period: February 26, 2024 - December 2025 (22 months, over 580 acts)

- Total: Over 8 years, over 750 acts

580. The activity involved over 750 separate criminal acts, including over 250 wire frauds, 4 bank frauds, 18 identity thefts, over 400 trade secret thefts, over 350 money laundering violations, 10 tax frauds, 12 obstructions, and 30 bankruptcy frauds.

581. The racketeering was not isolated or sporadic—it was part of the regular way Defendants conduct business affairs, with criminal activity occurring continuously across multiple years, seamlessly spanning the petition date, and continuing through December 2025 with GBQ's ongoing operations.

582. The extended duration (over 8 years) combined with the multiplicity of acts (750+) firmly establishes closed-ended continuity.

**Open-Ended Continuity (Threat of Continuing Activity):**

583. The racketeering activity poses a threat of continued criminal activity

into the future because:

**a. Ongoing violations through December 2025 and continuing:**

- GBQ Partners continues to operate Talentcrowd using Plaintiffs' stolen trade secrets as of the filing of this complaint (ongoing POST-PETITION violations of § 1832);

- Defendants continue to transmit fraudulent documents via courts' electronic filing systems through December 2025 (ongoing POST-PETITION violations of § 1343);

- Monetary transactions in criminally derived property continue as GBQ generates revenue from stolen assets (ongoing POST-PETITION violations of § 1957);

- Defendants continue to benefit financially from the stolen business, generating continuing incentive for violations.

**b. GBQ's business model depends on continued racketeering:**

- GBQ cannot operate Talentcrowd without the stolen trade secrets (the 2.5 million record database and recruiting methodologies are essential to its business model);

- Every day of GBQ's Talentcrowd operations constitutes continuing trade secret theft under § 1832;

- Generating revenue from stolen assets constitutes continuing money laundering under § 1957;

- GBQ's retention of Lintz and Frye proves its operations require the stolen assets (otherwise GBQ would have replaced them with its own personnel);

- GBQ cannot cease the violations without shutting down the entire Talentcrowd business;

- Defending the fraudulently procured orders requires continuing wire fraud under § 1343.

**c. Defendants have shown no inclination to cease illegal conduct:**

- Despite discovery and exposure of the crimes in August 2023,

128

Defendants persisted;

- o Despite explicit warnings from Rajaee about "criminal activity and fraud," Defendants proceeded;

- o Despite FBI investigation, IRS investigation, and California Attorney General investigation, Defendants continue;

- o Davis immediately moved to dismiss the arbitration appeal after purchasing it, demonstrating intent to permanently conceal rather than remedy;

- o GBQ acquired and continues operating the stolen business in 2025, demonstrating the enterprise's expansion rather than cessation;

- o Defendants filed sanctions motions and sought arrest warrants against Rajaee for exposing the crimes, demonstrating continued cover-up efforts;

- o GBQ generates $50,000+ daily from stolen assets with no indication of ceasing operations.

**d. Defendants have demonstrated willingness to expand the conspiracy:**

- o Recruited Kirk in 2022 when additional legal representation was needed;

- o Recruited Hays in 2023-2024 when bankruptcy expertise was needed;

- o Bailey recruited in June 2022 to provide legal cover for Talentcrowd;

- o Recruited GBQ in 2025 to acquire, legitimize, and continue the stolen business under a reputable corporate identity;

- o This pattern suggests Defendants will continue recruiting participants as needed to perpetuate the scheme.

**e. The nature of the enterprise ensures continuing violations:**

- o The enterprise is not a single fraud with defined endpoint;

- o It is an ongoing business operation (Talentcrowd under GBQ ownership) built entirely on stolen assets;

- o Continued profitability requires continued exploitation of stolen trade secrets (§ 1832);

- o Continued operations require continued money laundering (§ 1957);

- o Defending against exposure requires continued wire fraud through court filings (§ 1343);

- o GBQ's substantial investment in acquiring Talentcrowd (estimated $10-20 million based on business value) ensures GBQ will continue exploiting the stolen assets indefinitely to recoup its investment and generate returns;

- o GBQ's integration of Talentcrowd into its multi-state operations demonstrates long-term commitment to continuing the scheme.

584.    Federal courts have held that open-ended continuity is established when the predicate acts are part of regular business operations, when the criminal activity is ongoing at the time of suit, or when the nature of the predicate acts inherently carries a threat of repetition.

585.    All three factors are present here:

- o The predicate acts (particularly trade secret theft, wire fraud through court filings, and money laundering) are part of Defendants' regular business operations;

- o Criminal activity is ongoing as of December 2025 (GBQ's daily use of stolen database, ongoing money laundering transactions);

- o The nature of the predicate acts (operating a business using stolen assets) inherently requires continuous violations.

586.    GBQ's acquisition of Talentcrowd in 2025 demonstrates the enterprise's longevity and threat of indefinite continuation:

- o Rather than dissolving or ceasing operations when exposed, the stolen business was sold to a larger, more established entity;

- o GBQ invested substantial capital to acquire the business (estimated $10-20 million), demonstrating intent for long-term operations spanning years or decades;

- o GBQ integrated Talentcrowd into its multi-state professional services operations, expanding the geographic scope and legitimacy;

- o This acquisition proves the enterprise will continue indefinitely absent

court intervention—GBQ has every economic incentive to continue exploiting the $15-20 million annual revenue stream from stolen assets.

## VIII. CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## Violation of 18 U.S.C. § 1962(a) Use of Income from Racketeering Activity (By All Plaintiffs Against All Defendants)

587.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 586 as though fully set forth herein.

588.   18 U.S.C. § 1962(a) provides: "It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

589.   Elements of Section 1962(a):

- o  (1) Receipt of income derived from a pattern of racketeering activity;

- o  (2) Use or investment of such income or proceeds;

- o  (3) In acquisition of interest in, or establishment or operation of, an enterprise;

- o  (4) The enterprise is engaged in or affects interstate or foreign commerce;

- o  (5) Plaintiff was injured in business or property by reason of the violation.

590.   Defendants have received income derived, directly and indirectly, from a pattern of racketeering activity, including income from both pre-petition predicate acts (May 2017-February 25, 2024) and POST-PETITION predicate acts (February 26, 2024-December 2025).

## Income Received by Each Defendant from Racketeering:

591.   Defendant Tyler Brandon Davis received:

- o  $750,000 from embezzlement of Porter partnership funds (pre-petition

wire fraud violations § 1343, identity theft §§ 1028/1028A, tax fraud §§ 7201/7206) transmitted via three interstate wire transfers (May 3, May 24, November 22, 2017);

o $37,240 from PPP loan fraud and money laundering (pre-petition bank fraud § 1344, wire fraud § 1343, money laundering §§ 1956/1957) via wire transfer December 3, 2020;

o Millions in distributions from TopDevz operations during 2022-2023 funded by wire fraud scheme, trade secret exploitation, and operation of fraudulent JPMorgan Chase account (pre-petition §§ 1343, 1832, 1344, 1957);

o Ownership interest in TopDevz purportedly valued at $18-30 million obtained through the pattern of racketeering activity;

o Ownership or beneficial interest in Talentcrowd generating over $40-50 million in cumulative revenue (2022-2025) from exploitation of stolen trade secrets (pre-petition and POST-PETITION § 1832 violations);

o Proceeds from fraudulent bankruptcy settlements and sale totaling $300,000 paid to estate but eliminating $75 million in claims against Davis (POST-PETITION bankruptcy fraud §§ 152, 157);

o All such income is derived from specified unlawful activity constituting racketeering under 18 U.S.C. § 1961(1).

592.    Attorney Defendants received:

o Carpenter: Over $196,768 in legal fees paid from TopDevz's fraudulent JPMorgan Chase account containing criminally derived property (pre-petition § 1957 violations), plus additional fees from Davis and TopDevz funded by proceeds of wire fraud, bank fraud, and trade secret theft;

o Kirk: Over $30,000 in legal fees from TopDevz's fraudulent JPMorgan account (pre-petition § 1957), plus additional fees from Davis funded by racketeering proceeds;

o Scalia: Hundreds of thousands of dollars in legal fees from Davis and TopDevz funded by the embezzled $750,000, PPP fraud proceeds, and

TopDevz operations using stolen trade secrets (pre-petition racketeering proceeds);

o Bailey: Over $4,135 in legal fees from TopDevz's fraudulent JPMorgan account (pre-petition § 1957), plus substantial additional fees from Talentcrowd operations funded by trade secret exploitation (pre-petition § 1832), plus fees from representing Talentcrowd parties in POST-PETITION bankruptcy settlements;

o Hays: Legal fees from Davis and TopDevz funded by racketeering proceeds, plus fees for orchestrating the POST-PETITION bankruptcy fraud schemes generating $300,000 in settlements/sale proceeds for Davis;

o Total attorney fees from racketeering: Over $1 million;

o All such fees constitute income derived from racketeering activity.

593.    Lintz, Frye, and Garcia received:

o Lintz: $722,335.83 in direct payments from TopDevz's criminally derived JPMorgan account (pre-petition § 1957 violations), plus substantial salary and distributions as founder and principal of Talentcrowd from 2022-2025 funded by trade secret exploitation (pre-petition § 1832), plus ongoing compensation from GBQ Partners following the acquisition (POST-PETITION);

o Frye: Salary and distributions as CEO of Talentcrowd from 2022-2025 funded by daily exploitation of stolen trade secrets generating $40-50 million cumulative (pre-petition § 1832), plus ongoing compensation as CEO under GBQ Partners from February 2025-December 2025 funded by GBQ's POST-PETITION trade secret exploitation generating $12-16 million;

o Garcia: Salary and distributions as CAO of Talentcrowd from 2022-2025 funded by trade secret exploitation (pre-petition § 1832), plus ongoing compensation under GBQ Partners (POST-PETITION § 1832);

o All such compensation constitutes income derived from racketeering activity spanning both periods.

594.    Defendant GBQ Partners LLC received:

- Ongoing revenue of $15-20 million annually from exploitation of Plaintiffs' stolen trade secrets through Talentcrowd operations (POST-PETITION § 1832 violations);

- Approximately $12-16 million from February-December 2025 alone (10-month POST-PETITION period);

- All revenue is derived from specified unlawful activity (trade secret theft under § 1832);

- Net profits estimated at $2.4-4.8 million (20-30% margin) for the February-December 2025 POST-PETITION period;

- Equity value and goodwill in the Talentcrowd business derived from exploitation of stolen assets;

- All such income constitutes proceeds derived from POST-PETITION racketeering activity.

595.    Entity Defendants received:

- Talentcrowd: Over $40-50 million in cumulative revenue from February 2022-February 2025 from stolen trade secrets (pre-petition § 1832) and wire fraud (pre-petition § 1343);

- Porter: Concealed income from embezzlement and PPP fraud;

- Mason: Laundered funds from PPP fraud.

**Use and Investment of Racketeering Income in Enterprises:**

596.    Defendants have used and invested, directly and indirectly, part of such income and the proceeds of such income in the acquisition of interests in, and the establishment and operation of, TopDevz, Talentcrowd, and GBQ's Talentcrowd operations, which are enterprises engaged in activities affecting interstate and foreign commerce.

597.    Specifically:

**a. Davis used criminally derived income:**

- Davis used the criminally derived $787,240 (embezzled $750,000 + laundered $37,240 from pre-petition violations) to acquire his

purported ownership interest in TopDevz, in violation of § 1962(a);

○ Davis used proceeds of wire fraud (§ 1343), bank fraud (§ 1344), and trade secret theft (§ 1832) flowing through TopDevz's fraudulent JPMorgan account to fund and operate TopDevz during 2022-2023 (pre-petition), in violation of § 1962(a);

○ Davis used proceeds of racketeering to pay attorney Defendants over $1 million to maintain his fraudulent control through legal proceedings spanning both periods, in violation of § 1962(a);

○ Davis used proceeds from TopDevz operations (funded by trade secret theft and wire fraud) to establish and operate Talentcrowd through $838,554 in wire transfers and coordination with Lintz (pre-petition), in violation of § 1962(a).

**b. Lintz, Frye, and Garcia used criminally derived income:**

○ Lintz used the $722,335 received from TopDevz's criminally derived JPMorgan account (pre-petition § 1957) plus proceeds of trade secret theft to establish and operate Talentcrowd as an ongoing business enterprise, in violation of § 1962(a);

○ Frye and Garcia used salary and compensation derived from trade secret exploitation to operate and expand Talentcrowd's business from 2022-2025 (pre-petition), in violation of § 1962(a);

○ All three continue to use compensation from GBQ (derived from POST-PETITION trade secret theft) to operate Talentcrowd under GBQ's ownership (POST-PETITION), in violation of § 1962(a).

**c. GBQ Partners used criminally derived income (POST-PETITION):**

○ GBQ used proceeds from acquiring Talentcrowd (which proceeds were themselves derived from $40-50 million in revenue generated through pre-petition trade secret theft and wire fraud from 2022-2025) to operate and expand the stolen business, in violation of § 1962(a);

○ GBQ uses daily revenue derived from ongoing POST-PETITION trade secret theft (violations generating $50,000+ daily) to continue operating Talentcrowd as an ongoing business enterprise, in violation of § 1962(a);

- GBQ reinvests proceeds of POST-PETITION racketeering activity (the $12-16 million generated February-December 2025 through POST-PETITION § 1832 violations) into continued operations of the enterprise, in violation of § 1962(a);

- GBQ's entire Talentcrowd business operation is funded by and dependent upon income derived from POST-PETITION racketeering activity (theft of Plaintiffs' trade secrets occurring daily after February 26, 2024), in violation of § 1962(a).

**d. Attorney Defendants reinvested criminally derived income:**

- Attorney Defendants used their criminally derived legal fees (received as proceeds of wire fraud, bank fraud, trade secret theft, and money laundering through TopDevz's JPMorgan account in pre-petition period, plus fees in POST-PETITION period) to continue their representation and furtherance of the enterprise, providing ongoing legal services to advance the racketeering scheme in both periods, in violation of § 1962(a);

- The attorney fees were directly reinvested in the enterprise through continued legal work concealing the crimes and maintaining Davis's fraudulent position.

**The Enterprises Affect Interstate Commerce:**

598.    TopDevz, Talentcrowd, and GBQ's Talentcrowd operations are enterprises engaged in activities affecting interstate and foreign commerce:

- They provide software development services to clients located in multiple states (California, Arizona, Texas, New York, Nebraska, Colorado, and others);

- They employ contractors located throughout the United States and internationally;

- They conduct wire transfers and banking transactions across state lines through FDIC-insured financial institutions;

- TopDevz generated approximately $30 million in revenue from interstate business operations (2017-2021);

- Talentcrowd generated approximately $40-50 million in revenue from

136

interstate business operations (2022-2025);

o  GBQ generates approximately $15-20 million annually from multi-state operations (2025-present);

o  Total cumulative revenue from interstate commerce: Over $90 million.

**Injury to Plaintiffs:**

599.    Plaintiffs have been injured in their business and property by reason of Defendants' violations of 18 U.S.C. § 1962(a):

**Ashkan Rajaee's injuries to business and property directly caused by § 1962(a) violations:**

o  Loss of 51% ownership interest valued at $9-15 million: But for Davis's use of racketeering income ($787,240 in criminally derived funds from pre-petition violations) to acquire his interest in TopDevz, Davis would have had no ownership position and could not have challenged Rajaee's control. The use of racketeering income to acquire the enterprise directly caused the loss of Rajaee's business property.

o  Loss of salary and employment income 2022-2025 of $2.0-2.5 million: But for Defendants' use of racketeering income to operate TopDevz through the fraudulent JPMorgan account (pre-petition) and to establish Talentcrowd using stolen assets (pre-petition), and but for GBQ's use of POST-PETITION racketeering income to continue operating Talentcrowd, TopDevz would have continued operations under Rajaee's management paying his employment income. The use of racketeering income spanning both periods to operate the enterprises directly caused the termination of Rajaee's business income.

o  Loss of business interests and commercial relationships valued at $9.3 million: But for Davis's use of racketeering income to pay attorney Defendants over $1 million in fees from criminally derived funds (pre-petition § 1957 violations) to procure the judgment through identity theft and perjury, and but for Defendants' weaponization of that judgment to strip business control, force bankruptcy, destroy commercial operations, sever revenue streams, eliminate ability to operate in business capacity, and deprive legal authorization to manage the business, Rajaee would retain his business interests. Plaintiff does

not seek recovery for reputational harm, emotional distress, or the personal obligation to pay the judgment. Plaintiff seeks recovery for lost business interests, lost employment capacity, destroyed commercial relationships, and lost ability to operate and earn income in a business capacity that resulted because the racketeering defendants procured and weaponized the judgment. The use of racketeering income to procure and weaponize the judgment as a tool to accomplish business takeover directly caused $9.3 million in injury to Rajaee's business and property interests.

o  Legal fees of $2.5-5.0 million: Necessitated by Defendants' use of racketeering income to fund aggressive legal campaigns against Rajaee's business interests, forcing him to incur business expenses to defend his ownership rights and commercial interests.

o  Subtotal: $22.8-31.8 million in direct damages to business and property

o  Trebled: $68.4-95.4 million

**Mobile Monster's injuries to business and property directly caused by § 1962(a) violations:**

o  Loss of commission revenue of $5.6 million (2022-2025): But for Davis's and Lintz's use of pre-petition racketeering income to establish and operate Talentcrowd using stolen assets, and but for GBQ's use of POST-PETITION racketeering income (proceeds of ongoing trade secret theft) to continue operating Talentcrowd, TopDevz would have continued operations and Mobile Monster would have received its contractual 7% commissions. The use of racketeering income spanning both periods to establish and operate Talentcrowd/GBQ directly caused Mobile Monster's loss of business revenue.

o  Continuing loss of $116,000+ monthly (POST-PETITION injury): As GBQ continues to use POST-PETITION racketeering income (proceeds of daily trade secret theft violations occurring after February 26, 2024) to operate Talentcrowd, Mobile Monster continues losing contractual business revenue each month. GBQ's POST-PETITION use of racketeering income to operate the stolen business directly causes ongoing injury to Mobile Monster's business income—each month of GBQ's operations (funded by POST-PETITION § 1832 violations) =

$116,000 injury to Mobile Monster's business.

o   Loss of business interests and commercial relationships valued at $3.0 million: But for Defendants' use of pre-petition racketeering income to fund the legal proceedings and identity theft scheme using Mobile Monster's corporate name, the judgment against Mobile Monster would not exist. Defendants weaponized this fraudulent judgment to destroy Mobile Monster's commercial relationships with TopDevz and U.S. clients, eliminate Mobile Monster's ability to expand U.S. operations, sever Mobile Monster's contractual revenue stream, and strip Mobile Monster's business property interest in the TopDevz commission arrangement. Mobile Monster does not seek recovery for reputational harm or emotional distress. Mobile Monster seeks recovery for lost business interests, destroyed contractual relationships, eliminated commercial opportunities, and lost business revenue that resulted because the racketeering defendants procured and weaponized the judgment. The use of pre-petition racketeering income to procure and weaponize the judgment directly caused $3.0 million in injury to Mobile Monster's business and property interests.

o   Subtotal: $8.6 million in direct damages to business and property

o   Trebled: $25.8 million

600.    But for Defendants' use of racketeering income to acquire and operate TopDevz, Talentcrowd, and GBQ's Talentcrowd operations, Plaintiffs would not have suffered these injuries.

601.    Causation is direct and proximate:

o   Davis could not have acquired any interest in TopDevz without the criminally derived $787,240 (embezzlement and PPP fraud proceeds from pre-petition violations)—without this racketeering income, he had no financial capacity;

o   Talentcrowd could not have been established without Davis's investment of pre-petition racketeering proceeds ($838,554 transferred from criminally derived JPMorgan account) and without the stolen trade secrets (proceeds of pre-petition § 1832 violations);

o   Talentcrowd could not have operated and generated $40-50 million

without ongoing use of stolen trade secrets, which are themselves proceeds of racketeering activity;

o   GBQ could not generate its current $15-20 million annually without the stolen database and methodologies acquired through Talentcrowd—the entire revenue stream derives from use of criminally derived assets;

o   GBQ's daily operations require use of POST-PETITION racketeering income (each day's revenue of $50,000+ comes from POST-PETITION trade secret theft);

o   The attorney Defendants would not have participated in the enterprise but for the promise and payment of legal fees from criminally derived TopDevz funds (over $1 million paid, constituting their "income" from racketeering that they reinvested through continued representation spanning both periods);

o   Each Plaintiff's injury is the direct and proximate result of Defendants' use of racketeering income spanning pre-petition and POST-PETITION periods to acquire and operate the enterprises.

602.   The chain of causation is unbroken from pre-petition through POST-PETITION:

o   Pre-petition racketeering income (embezzlement, PPP fraud) → Davis's acquisition of TopDevz interest → Davis's false claims of control → Trade secret theft → Talentcrowd establishment using pre-petition racketeering proceeds → Talentcrowd operations generating proceeds from stolen assets → [Feb 26, 2024 petition date] → POST-PETITION bankruptcy fraud using fraudulent judgments → POST-PETITION settlements/sale → GBQ's acquisition using proceeds from pre-petition theft → GBQ's continued use of POST-PETITION racketeering income (daily trade secret theft generating $50,000+) → Ongoing injury to Plaintiffs

603.   GBQ's specific liability under § 1962(a) based on POST-PETITION racketeering:

o   GBQ acquired Talentcrowd (an enterprise engaged in interstate commerce) using proceeds that were themselves derived from pre-petition racketeering activity (Talentcrowd's $40-50 million in revenue

from trade secret theft and wire fraud);

- o GBQ uses income derived from ongoing POST-PETITION racketeering activity (daily trade secret theft after February 26, 2024 generating $50,000+) to operate the Talentcrown enterprise; - GBQ reinvests proceeds of POST-PETITION racketeering (the $12-16 million generated February-December 2025) into continued operations; - But for GBQ's use of POST-PETITION racketeering income, Mobile Monster would be receiving its commission revenue; - GBQ's POST-PETITION use of racketeering income directly causes ongoing injury to both Plaintiffs.

604.    Combined injury to Plaintiffs: $31.4-40.4 million compensatory; $94.2-121.2 million trebled.

605.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover three times their actual damages, plus costs of suit and reasonable attorney fees.

## SECOND CLAIM FOR RELIEF

## Violation of 18 U.S.C. § 1962(b) Acquisition and Control of Enterprise Through Racketeering

## (By All Plaintiffs Against All Defendants)

606.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 605 as though fully set forth herein.

607.    18 U.S.C. § 1962(b) provides: "It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

608.    Elements of Section 1962(b):

- o (1) A pattern of racketeering activity;

- o (2) Defendant acquired or maintained interest in or control of an enterprise;

- o (3) Through the pattern of racketeering activity;

o  (4) The enterprise is engaged in or affects interstate or foreign commerce;

o  (5) Plaintiff was injured in business or property by reason of the violation.

609.    Defendants have engaged in a pattern of racketeering activity consisting of over 750 separate predicate acts spanning over eight years (May 2017-December 2025), including over 600 pre-petition predicate acts (May 2017-February 25, 2024) and over 580 post-petition predicate acts (February 26, 2024-December 2025), as detailed in paragraphs 469-571 above.

610.    Defendants have acquired and maintained, directly and indirectly, an interest in and control of TopDevz, Talentcrowd, and GBQ's Talentcrowd operations (enterprises engaged in activities affecting interstate and foreign commerce) through the pattern of racketeering activity spanning both pre-petition and post-petition periods.

**Davis's Acquisition and Maintenance of Control Through Racketeering:**

611.    Davis acquired and maintained control of TopDevz through a pattern of racketeering activity spanning pre-petition and post-petition periods:

**Pre-Petition Racketeering Used to Acquire Control:**

o  Wire fraud (§ 1343): Three wire transfers of embezzled $750,000 (May, May, November 2017) falsely represented as Davis's "personal investment" to induce formation of company and obtain 49% ownership interest; wire transfer of $37,240 PPP proceeds (December 2020) falsely represented as personal capital contribution; wire fraud campaign to clients transferring business to Davis's control (January-March 2022);

o  Identity theft (§§ 1028, 1028A): Using Rajaee's identity to file false TopDevz tax returns (2017-2020) creating false documentary evidence showing Davis contributed $787,240 and entitled to majority ownership; using Rajaee's and TopDevz's identity in perjured declarations to deceive courts that Davis had authority (November 2, December 29, 2022; June 26, 2023) in connection with California felonies including perjury (Cal. Pen. Code § 118a) and conspiracy (Cal. Pen. Code §§ 182(3), (4), (5));

o   Tax fraud (§§ 7201, 7206): Filing false Porter and TopDevz tax returns under penalty of perjury (2017-2020) to create false ownership documentation and evade taxation on embezzled funds;

o   Bank fraud (§ 1344): PPP loan fraud (April 2020) generating $328,300 used to fund operations; seizure of Wells Fargo account (January 2022) providing access to TopDevz operating capital; opening fraudulent JPMorgan account (January 2022) to control cash flow;

o   Trade secret theft (§ 1832): Ordering mass download of 2.5 million record database and all operational data (January 2022) to gain complete operational control of TopDevz's business assets;

o   Money laundering (§§ 1956, 1957): Using TopDevz's fraudulent JPMorgan account to make hundreds of transactions in criminally derived property totaling $15 million (2022-2023), maintaining financial control of the enterprise;

o   Obstruction (§ 1512): Seizing servers and destroying evidence (January-May 2022) that would expose the criminal scheme and threaten Davis's control.

**Post-Petition Racketeering Used to Maintain Control:**

o   Bankruptcy fraud (§§ 152, 157): Filing false oaths to procure conversion (April-May 2024), forging unanimous consent for settlements (October 2024), settling claims for $200,000 (September-December 2024), and fraudulently purchasing remaining interests for $100,000 (April-August 2025) to eliminate all challenges to Davis's control through systematic post-petition bankruptcy fraud (30 POST-PETITION violations);

o   Wire fraud (§ 1343): Transmitting false declarations via bankruptcy court's electronic filing system (April 2024-August 2025) to maintain the false narrative that Davis has legitimate control (POST-PETITION violations);

o   Money laundering (§ 1957): Using criminally derived funds to pay Trustee $200,000 (December 2024, March 2025) to complete the transfer of control (POST-PETITION violations).

612.    Without the pattern of racketeering activity spanning both periods,

Davis could not have acquired or maintained any interest in or control of TopDevz:

- o The initial acquisition required the embezzled $750,000 and fraudulent $37,240 (pre-petition wire fraud, bank fraud)—Davis had no legitimate funds;

- o Maintaining control required the false tax returns to create ownership documentation (pre-petition tax fraud, identity theft);

- o Expanding control required the false testimony and perjured declarations using Plaintiffs' identities to obtain arbitration orders (pre-petition identity theft connected to California felonies, wire fraud);

- o Seizing operational control required the bank fraud, trade secret theft, and wire fraud campaign (pre-petition violations);

- o Completing the transfer required the post-petition bankruptcy fraud to extinguish challenges (POST-PETITION violations of §§ 152, 157);

- o Every stage of acquisition and maintenance was accomplished "through" racketeering, not legitimate business processes.

**Lintz, Frye, and Garcia's Acquisition of Talentcrowd Through Racketeering:**

613.    Lintz, Frye, and Garcia acquired and maintain control of Talentcrowd through racketeering spanning both periods:

**Pre-Petition Racketeering:**

- o Trade secret theft (§ 1832): Stealing the 2.5 million record proprietary database, client lists, contractor databases, and methodologies (January 2022) that form the foundation of Talentcrowd's business—without these stolen assets, Talentcrowd could not exist;

- o Wire fraud (§ 1343): Transmitting fraudulent emails to TopDevz clients (January-March 2022) inducing them to terminate TopDevz contracts and engage Talentcrowd, transferring the client base;

- o Money laundering (§§ 1956, 1957): Receiving $838,554 from TopDevz's criminally derived JPMorgan account (March 2022-January 2023) to fund Talentcrowd's establishment and operations, plus Lintz receiving $722,335;

144

- o  Ongoing trade secret exploitation (§ 1832): Continuing to use stolen assets to generate over $40-50 million cumulative revenue (February 2022-February 2025), maintaining control through the value created by exploitation.

**Post-Petition Racketeering:**

- o  Continued trade secret theft (§ 1832): Ongoing daily exploitation of stolen database under GBQ's ownership (February-December 2025, 300+ POST-PETITION violations), maintaining operational control;

- o  Money laundering (§ 1957): Conducting hundreds of transactions over $10,000 in criminally derived property through GBQ's operations (200 POST-PETITION violations).

614.    Without the pattern of racketeering activity, Lintz, Frye, and Garcia could not have acquired or maintained any interest in Talentcrowd:

- o  Talentcrowd had "no external funding" (Lintz's admission)—it was built entirely on stolen TopDevz assets acquired through pre-petition § 1832 violations;

- o  The $12 million in year-one revenue was impossible without the stolen 2.5 million record database and established client relationships;

- o  Their continued employment and equity interests depend entirely on the stolen assets;

- o  GBQ retained them specifically because they control access to the stolen database and continuing POST-PETITION exploitation requires their participation.

**GBQ's Acquisition of Control Through Racketeering:**

615.    GBQ Partners acquired and maintains control of Talentcrowd and its stolen assets through post-petition racketeering:

**Post-Petition Racketeering:**

- o  Acquisition of business built on trade secret theft: GBQ purchased Talentcrowd knowing it was built on stolen assets (constructive knowledge through due diligence revealing pending § 1832 litigation), constituting receipt of proceeds of racketeering activity;

- o   Continued trade secret theft (§ 1832): GBQ's ongoing daily exploitation of stolen database from February 2025-December 2025 (300+ post-petition violations) to maintain and expand operational control;

- o   Money laundering (§ 1957): Each revenue transaction over $10,000 derived from stolen assets (estimated 200+ post-petition transactions) constitutes money laundering, and these transactions fund GBQ's continued control;

- o   Aiding and abetting: GBQ's knowing acquisition and operation of business dependent on stolen assets constitutes conspiracy under § 1832(a)(5).

616.   Without the pattern of post-petition racketeering activity, GBQ could not acquire or maintain control:

- o   GBQ acquired a business that generates $15-20 million annually, but this revenue is possible only through continued exploitation of stolen trade secrets (POST-PETITION § 1832 violations);

- o   GBQ retained Lintz and Frye because they alone have access to and knowledge of the stolen database;

- o   GBQ cannot operate Talentcrowd without committing ongoing POST-PETITION § 1832 violations;

- o   GBQ's control is maintained "through" racketeering—every day of operations after February 26, 2024 requires POST-PETITION trade secret theft.

**Attorney Defendants Aided Acquisition and Maintenance of Control:**

617.   Attorney Defendants aided, abetted, and conspired in the acquisition and maintenance of control by:

- o   Transmitting hundreds of fraudulent documents via interstate wire facilities (courts' electronic filing systems) falsely legitimizing Davis's purported authority (pre-petition § 1343 violations);

- o   Assembling and filing Davis's three perjured declarations using Plaintiffs' identities to procure the $12 million judgments that forced Rajaee into bankruptcy and enabled the post-petition schemes (pre-petition §§ 1028(a)(7), 1028A, 1343, plus California Penal Code

violations including perjury § 118a, conspiracy §§ 182(3)-(5), subornation § 127);

- Participating in the post-petition bankruptcy fraud scheme to eliminate challenges to Davis's control (post-petition §§ 152, 157, 1343—30 violations);

- Filing false declarations in bankruptcy court maintaining the false narrative (post-petition violations);

- Receiving millions of dollars in fees from criminally derived TopDevz funds, creating financial stake in the scheme's success (pre-petition § 1957 violations);

- Each attorney's racketeering activity directly facilitated Davis's acquisition and maintenance of control.

**Injury to Plaintiffs:**

618.    Plaintiffs have been injured in their business and property by reason of Defendants' violations of 18 U.S.C. § 1962(b):

- Rajaee: His 51% ownership interest and control was the very interest Defendants acquired through the pattern of racketeering activity spanning both periods, directly causing his $22.8-31.8 million in damages (trebled: $68.4-95.4 million);

- Mobile Monster: Its business relationship with TopDevz was destroyed by Defendants' acquisition of TopDevz through pre-petition racketeering, and its commission revenue was transferred to Talentcrowd and then to GBQ through racketeering spanning both periods, directly causing its $8.6 million in damages (trebled: $25.8 million), with ongoing monthly losses of $116,000+ as GBQ maintains control through post-petition racketeering;

- Total: $31.4-40.4 million compensatory; $94.2-121.2 million trebled.

619.    But for Defendants' pattern of racketeering activity spanning both periods:

- Davis could not have acquired or maintained any interest in or control of TopDevz (no legitimate funds, no false ownership documentation, no fraudulent judgments to force bankruptcy, no post-petition

bankruptcy fraud to extinguish challenges);

o  Talentcrowd could not have been established or operated (no stolen database worth tens of millions, no stolen client relationships, no funding from criminally derived JPMorgan account);

o  GBQ could not have acquired a business generating $15-20 million annually (the business would not exist without the pre-petition stolen trade secrets) and could not operate it without committing ongoing POST-PETITION § 1832 violations.

620.    Causation is particularly clear for GBQ's POST-PETITION conduct:

o  GBQ's "acquisition" is not merely a passive purchase—it requires active participation in POST-PETITION racketeering;

o  Every day GBQ operates Talentcrowd after February 26, 2024, GBQ commits POST-PETITION trade secret theft under § 1832;

o  GBQ "maintains" control "through" ongoing POST-PETITION racketeering (violations occurring daily after February 26, 2024);

o  GBQ's control is inseparable from its commission of POST-PETITION predicate acts;

o  Mobile Monster's ongoing injury (loss of $116,000 monthly commission revenue) is directly caused by GBQ's maintenance of control through POST-PETITION racketeering.

621.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover three times their actual damages, plus costs of suit and reasonable attorney fees.

**THIRD CLAIM FOR RELIEF**

**Violation of 18 U.S.C. § 1962(c) Conducting Enterprise Affairs Through Racketeering**

**(By All Plaintiffs Against All Defendants)**

622.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 621 as though fully set forth herein.

623.    18 U.S.C. § 1962(c) provides: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of

which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

624.    Elements of Section 1962(c):

o  (1) Defendant is a "person";

o  (2) The enterprise exists;

o  (3) The enterprise is engaged in or affects interstate or foreign commerce;

o  (4) Defendant was employed by or associated with the enterprise;

o  (5) Defendant conducted or participated in the conduct of the enterprise's affairs;

o  (6) Through a pattern of racketeering activity;

o  (7) Plaintiff was injured in business or property by reason of the violation.

625.    Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3), capable of holding legal or beneficial interests in property.

626.    The enterprise exists as an association-in-fact of all Defendants as described in paragraphs 450-457 above, consisting of individuals (Davis, Carpenter, Kirk, Scalia, Lintz, Frye, Garcia, Bailey, Hays, Wood) and entities (GBQ Partners, Talentcrowd, Porter, Mason, TopDevz) who functioned as a continuing unit with defined roles and common purposes.

627.    The enterprise is engaged in activities affecting interstate and foreign commerce as described in paragraph 454 above, through multi-state software development services, interstate wire communications, FDIC-insured banking transactions, contracts with clients in multiple states, and revenues exceeding $90 million cumulative from interstate business operations.

628.    Defendants were employed by or associated with the enterprise at all relevant times, working in coordination to accomplish the common purposes of unlawfully seizing TopDevz, stealing and exploiting trade secrets, laundering criminal proceeds, and enriching themselves.

629.    Defendants conducted and participated, directly and indirectly, in the

conduct of the enterprise's affairs through a pattern of racketeering activity spanning pre-petition and post-petition periods.

**The Enterprise's "Affairs" Conducted Through Racketeering:**

630.　　The enterprise's "affairs" include its regular business operations and decision-making, which Defendants conducted entirely through commission of over 750 predicate acts rather than through legitimate business activities.

631.　　Specifically, the enterprise's affairs conducted through racketeering include:

**Pre-Petition Affairs (May 2017-February 25, 2024):**

- o　Acquisition and initial operation of TopDevz (through embezzlement, tax fraud, identity theft generating the $787,240 and false ownership documentation);

- o　Procurement of false arbitration orders (through false testimony, falsified tax returns, perjury, identity theft connected to California felonies);

- o　Seizure of operational control (through bank fraud seizing Wells Fargo account, bank fraud opening JPMorgan account, trade secret theft, wire fraud campaign to clients);

- o　Establishment and operation of Talentcrowd (through trade secret theft providing the assets, wire fraud transferring the clients, money laundering funding the operations with $838,554 from criminally derived JPMorgan account);

- o　Procurement of $12 million fraudulent judgments (through identity theft using Plaintiffs' names in connection with perjury under Cal. Pen. Code § 118a and conspiracy under Cal. Pen. Code §§ 182(3)-(5), wire fraud transmitting perjured declarations);

- o　Destruction of evidence (through obstruction under § 1512 to conceal crimes and prevent challenges).

**Post-Petition Affairs (February 26, 2024-December 2025):**

- o　Elimination of civil liability (through post-petition bankruptcy fraud—false oaths to procure conversion, forged documents for settlements,

fraudulent sale scheme—totaling 30 post-petition violations of §§ 152, 157, 1343);

- Transfer of ownership to Davis (through post-petition bankruptcy fraud scheme selling estate interests for $100,000 to bury claims);

- GBQ's acquisition and operation of Talentcrowd (through post-petition trade secret theft—300+ days of daily exploitation February-December 2025—and post-petition money laundering—200+ transactions over $10,000 in criminally derived property);

- Defense of fraudulently obtained positions (through ongoing post-petition wire fraud transmitting false documents via courts' electronic filing systems).

632.    Each Defendant played specific, essential roles in conducting the enterprise's affairs through racketeering:

**Tyler Brandon Davis (Principal):**

- Pre-petition conduct: Committed wire fraud (3 wire transfers of embezzled funds, wire transfer of PPP proceeds, coordinated client email campaign, forged termination letters—Pre-Petition Acts #1-4, #6-120); bank fraud (PPP fraud, Wells Fargo seizure, JPMorgan account opening—Pre-Petition Acts #1-3); identity theft (false tax returns, perjured declarations using Plaintiffs' identities connected to California felonies—Pre-Petition Acts #1-9, #1A-9A); tax fraud (false Porter and TopDevz returns—Pre-Petition Acts #1-5A); ordered trade secret theft (directed mass downloading—Pre-Petition Acts #1-11);

- Post-petition conduct: Participated in bankruptcy fraud (filed false $10M claim, participated in settlement and sale schemes—POST-PETITION Acts #2-30); committed money laundering (paid $200,000 to Trustee from criminally derived funds—POST-PETITION Acts #1-2); benefited from GBQ's ongoing POST-PETITION exploitation;

- Total participation: Over 200 predicate acts across both periods.

**Attorney Defendants (Legal Cover):**

- Carpenter (pre-petition and post-petition): Wire fraud (Wells Fargo email, forged certificates email, dozens of court filings—Pre-Petition

Acts #5, #101, #122-200); bank fraud (Wells Fargo seizure—Pre-Petition Act #2); money laundering (received $196,768 from criminally derived JPMorgan account—Pre-Petition Acts); assembled and filed Davis's perjured declarations using identity theft to commit California felonies including subornation of perjury (Cal. Pen. Code § 127).

o   Kirk (pre-petition): Wire fraud (dozens of court filings representing TopDevz without authority—Pre-Petition Acts included in #122-250); forgery under Cal. Pen. Code § 470 (forging TopDevz's legal representation); money laundering (received $30,000 from criminally derived account—Pre-Petition Act); assembled and filed perjured declarations.

o   Scalia (pre-petition): Wire fraud (court filings throughout arbitration and confirmation); presented over 600 pages of falsified tax returns knowing they were fraudulent; presented Davis's false testimony knowing it was perjury; conspired to maintain prohibited arbitration (Cal. Pen. Code § 182(3)); received hundreds of thousands in fees from criminally derived funds.

o   Bailey (pre-petition and post-petition): Wire fraud (court filings for Talentcrowd parties—pre-petition); money laundering (received $4,135 plus additional fees from criminally derived Talentcrowd revenues—Pre-Petition Act); represented Talentcrowd in fraudulent bankruptcy settlements (post-petition).

o   Hays (post-petition only): Bankruptcy fraud (filed false oaths April-May 2024, orchestrated conversion, settlements, and sale—POST-PETITION Acts #1-30); wire fraud (transmitted false declarations via bankruptcy court electronic filing system—POST-PETITION Acts #1-8).

**Lintz, Frye, Garcia (Operational Executors):**

o   Pre-petition conduct: Trade secret theft (downloaded 3,784 files, downloaded Zoho database, uploaded to topdevz.io—Pre-Petition Acts #1-12); wire fraud (emails to contractors and clients—Pre-Petition Acts included in #6-120); obstruction (server seizure, Jira deletions—Pre-Petition Acts #1-2); money laundering (Lintz received $722,335, all three received Talentcrowd distributions from criminally derived

revenues—Pre-Petition Acts); ongoing trade secret exploitation (730+ days February 2022-February 25, 2024—Pre-Petition Acts #13-100);

o Post-petition conduct: Continued trade secret theft under GBQ ownership (300+ days February-December 2025—POST-PETITION Acts #101-400); facilitated GBQ's money laundering (conducting business generating 200+ transactions over $10,000 in criminally derived property—POST-PETITION Acts #3-202);

o Total participation: Over 400 predicate acts across both periods, now serving as operational managers for GBQ's ongoing POST-PETITION violations.

**GBQ Partners (Successor and Continuing POST-PETITION Participant):**

o Post-petition conduct only: Trade secret theft (daily exploitation of stolen database, February-December 2025, 300+ days—POST-PETITION Acts #101-400); money laundering (approximately 200 transactions over $10,000 in property derived from § 1832 violations—POST-PETITION Acts #3-202); aiding and abetting (acquired Talentcrowd knowing about theft, retained Lintz/Frye/Garcia to continue exploitation); receipt of stolen property (acquired $40-50M business built on pre-petition theft);

o Total participation: Over 500 post-petition predicate acts;

o GBQ's role: Provide financial resources and legitimacy to continue the stolen business under reputable corporate identity; generate ongoing proceeds from POST-PETITION racketeering ($12-16 million February-December 2025); expand geographic and financial scope; shield original thieves through established firm structure; conduct the enterprise's operational affairs entirely through POST-PETITION racketeering.

**Wood (Intelligence and Obstruction):**

o Pre-petition obstruction (§ 1512): Email deletions (Pre-Petition Acts #3-10); facilitated other acts through intelligence gathering.

**Entity Defendants (Instrumentalities):**

o Talentcrowd: Primary money laundering vehicle (Pre-Petition Acts

153

#26-50, hundreds of POST-PETITION transactions under GBQ);

- o Porter: Source of embezzlement and PPP fraud (Pre-Petition Acts #1-3, Bank Fraud Act #1);

- o Mason: Intermediary for money laundering (Pre-Petition Act #4).

633. The racketeering activity was not merely incidental to the enterprise's affairs—it was the primary means by which the affairs were conducted.

634. The enterprise could not have functioned without the racketeering activity:

- o TopDevz could not have been acquired by Davis without embezzlement and tax fraud (pre-petition);

- o Operational control could not have been seized without bank fraud, trade secret theft, and wire fraud (pre-petition);

- o Talentcrowd could not have been established without trade secret theft and wire fraud (pre-petition);

- o Talentcrowd could not have operated generating $40-50M without ongoing trade secret exploitation and money laundering (pre-petition);

- o Challenges could not have been eliminated without post-petition bankruptcy fraud (POST-PETITION);

- o GBQ's Talentcrowd operations cannot function without ongoing post-petition trade secret theft—every day of business after February 26, 2024 requires commission of POST-PETITION § 1832 violations;

- o Every aspect of the enterprise's affairs was conducted "through" racketeering, not merely "associated with" it.

635. GBQ's participation is essential to the continuing enterprise because:

- o GBQ now controls the operational entity (Talentcrowd) that exploits the stolen assets;

- o GBQ generates the revenue ($15-20M annually) that perpetuates the scheme;

- o GBQ commits the ongoing post-petition predicate acts (trade secret theft, money laundering);

- o  GBQ provides legitimacy and resources to continue operations that would otherwise be exposed as criminal;

- o  Without GBQ's POST-PETITION racketeering, the enterprise would have ceased in 2025—GBQ's POST-PETITION conduct is what keeps the enterprise alive.

**Injury to Plaintiffs:**

636.    Plaintiffs have been injured in their business and property by reason of Defendants' violations of 18 U.S.C. § 1962(c):

**Ashkan Rajaee's injuries to business and property directly caused by § 1962(c) violations:**

- o  Loss of 51% ownership interest ($9-15M): Directly caused by Defendants conducting the enterprise's affairs (acquisition and control of TopDevz) through racketeering (embezzlement, tax fraud, identity theft, perjury, bankruptcy fraud) rather than legitimate business processes, destroying the value of Rajaee's business property.

- o  Loss of salary and employment income ($2.0-2.5M): Directly caused by Defendants conducting the enterprise's operational affairs (seizing TopDevz control, establishing Talentcrowd, operating Talentcrowd through GBQ) through trade secret theft, wire fraud, and bank fraud spanning both periods rather than legitimate business transition, eliminating Rajaee's employment income and business earning capacity.

- o  Loss of business interests and commercial relationships ($9.3M): Directly caused by Defendants conducting the enterprise's affairs through perjury using Rajaee's identity in connection with California felonies (§§ 118a, 182), identity theft (§ 1028(a)(7)), and wire fraud to procure the judgment, then weaponizing that judgment to: strip Rajaee of business control over TopDevz, trigger bankruptcy consequences that extinguished his business interests, destroy ongoing commercial operations, sever revenue streams and contractual relationships, eliminate ability to operate or earn income in a business capacity, and deprive legal authorization to manage the business. Plaintiff does not seek recovery for reputational harm, emotional distress, or the personal obligation to pay the judgment. Plaintiff seeks recovery for lost

155

business interests, lost employment capacity, destroyed commercial relationships, lost ability to operate and earn income in a business capacity, and forced dissolution of business assets that resulted because the racketeering defendants procured and weaponized the judgment as a tool to accomplish the business takeover.

o   Legal fees ($2.5-5.0M): Necessitated by Defendants conducting the enterprise's affairs through over 750 criminal acts spanning both periods targeting Rajaee's business and property interests, requiring extensive legal defense to protect ownership rights and commercial interests;

o   Subtotal: $22.8-31.8 million in damages to business and property (trebled: $68.4-95.4 million)

**Mobile Monster's injuries to business and property directly caused by § 1962(c) violations:**

o   Loss of commission revenue ($5.6M): Directly caused by Defendants conducting the enterprise's affairs (transferring TopDevz's business to Talentcrowd, now operated by GBQ) through trade secret theft, wire fraud, and money laundering spanning both periods rather than legitimate business operations, destroying Mobile Monster's contractual revenue stream and business relationship.

o   Ongoing loss of business revenue ($116,000+ monthly): Directly caused by GBQ's conduct of Talentcrowd's affairs through post-petition trade secret theft (§ 1832) and money laundering (§ 1957) rather than legitimate operations—each month of GBQ's operations after February 26, 2024 constitutes conducting enterprise affairs through POST-PETITION racketeering causing $116,000 injury to Mobile Monster's business income;

o   Loss of business interests and commercial relationships ($3.0M): Directly caused by Defendants conducting the enterprise's affairs through identity theft using Mobile Monster's corporate name and perjury to procure the judgment, then weaponizing that judgment to destroy Mobile Monster's commercial relationships, eliminate U.S. expansion opportunities, sever contractual revenue streams, and strip business property interests. Mobile Monster does not seek recovery for

reputational harm or emotional distress. Mobile Monster seeks recovery for lost business interests, destroyed contractual relationships, eliminated commercial opportunities, and lost business revenue.

o   Subtotal: $8.6 million in damages to business and property (trebled: $25.8 million)

637.   But for Defendants' conduct of the enterprise's affairs through racketeering spanning both periods, Plaintiffs would not have been injured:

o   If Davis had used legitimate means to acquire interest in TopDevz (personal investment, not embezzlement), Rajaee's ownership would not have been displaced;

o   If Defendants had used legitimate means to operate TopDevz (lawful management succession, not bank fraud and trade secret theft), business would have continued under Rajaee;

o   If Defendants had used legitimate means in litigation (truthful testimony, not perjury using Plaintiffs' identities in connection with California felonies), no judgments would have been entered;

o   If Lintz/Frye/Garcia had used legitimate means to establish Talentcrowd (their own database and clients, not stolen assets), Mobile Monster's commission revenue would not have been diverted;

o   If Hays had used legitimate means in bankruptcy (truthful oaths, not POST-PETITION false declarations), the bankruptcy would not have been converted and claims would not have been extinguished;

o   If GBQ used legitimate means to operate Talentcrowd (its own database and methodologies, not stolen trade secrets), Mobile Monster would be receiving its commission revenue from restored TopDevz operations;

o   Every aspect was accomplished through racketeering, not legitimate business.

638.   The causation is particularly direct for GBQ's post-petition conduct:

o   GBQ conducts Talentcrowd's affairs (daily business operations generating $50,000+) entirely "through" POST-PETITION racketeering;

- ○ Each day of operations after February 26, 2024 = POST-PETITION trade secret theft (§ 1832);

- ○ Each client payment over $10,000 after February 26, 2024 = POST-PETITION money laundering (§ 1957);

- ○ There is no separation between GBQ's "affairs" and the POST-PETITION racketeering—they are one and the same;

- ○ Mobile Monster's ongoing injury is the direct result of GBQ conducting Talentcrowd's affairs through POST-PETITION racketeering (daily violations after February 26, 2024) rather than ceasing use of stolen assets.

639.    Total injury to Plaintiffs: $31.4-40.4 million compensatory; $94.2-121.2 million trebled.

640.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover three times their actual damages, plus costs of suit and reasonable attorney fees.

**FOURTH CLAIM FOR RELIEF**

**Violation of 18 U.S.C. § 1962(d)**

**RICO Conspiracy**

**(By All Plaintiffs Against All Defendants)**

641.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 640 as though fully set forth herein.

642.    18 U.S.C. § 1962(d) provides: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

643.    Elements of Section 1962(d):

- ○ (1) Defendant agreed to violate RICO (§§ 1962(a), (b), or (c));

- ○ (2) Defendant knew the general nature and scope of the conspiracy;

- ○ (3) Defendant intended to participate in the conspiracy;

- ○ (4) Overt acts were committed in furtherance;

- ○ (5) Plaintiff was injured in business or property by reason of the

conspiracy.

644.    Each Defendant agreed to the overall objectives of the enterprise (unlawfully seizing TopDevz, stealing trade secrets, laundering proceeds, eliminating challenges through bankruptcy fraud, continuing exploitation through GBQ) and participated in the conspiracy through overt acts in furtherance of the scheme.

645.    A RICO conspiracy does not require that each defendant agreed to commit or personally committed each predicate act, only that each defendant agreed to participate in the enterprise and to the commission of at least two predicate acts by someone in furtherance of the scheme.

**Evidence of the Conspiracy:**

646.    The conspiracy is evidenced by multiple indicia spanning pre-petition and post-petition periods:

**a. Synchronized timing of criminal activities demonstrating advance planning:**

**Pre-petition coordination:**

- o   Talentcrowd incorporated February 8, 2022, precisely 33 days after Interim Order No. 4 (demonstrating pre-planning);

- o   Trade secret theft (January 6-14), Wells Fargo seizure (January 7), JPMorgan account opening (January 19), wire fraud email campaign (January 20-31), forged certificates (January 21), server destruction (January 15), Talentcrowd formation (February 8), termination letters (February-March), Talentcrowd client contracts (March)—all within compressed 8-week window;

- o   This precise coordination across multiple participants demonstrates advance agreement and planning.

**Post-petition coordination:**

- o   Conversion motion filed April 8, 2024 → Conversion order May 9, 2024 → Settlement negotiations summer 2024 → Settlements approved December 10, 2024 → Sale motion April 2, 2025 → Sale approved July 30, 2025 → Sale closed August 14, 2025 → GBQ's acquisition February 2025;

○ Sequential POST-PETITION coordination demonstrates continuing agreement across post-petition period.

**b. Shared communications among co-conspirators:**

○ February 5, 2021: Carpenter email to Scalia and Davis acknowledging dissolution is in exclusive Superior Court jurisdiction yet agreeing to proceed in arbitration;

○ January 2022: Emails among Davis, Carpenter, Lintz, Frye, Garcia coordinating the takeover;

○ GBQ's negotiations with Lintz and Frye regarding acquisition while litigation pending (demonstrating GBQ's knowing entry into conspiracy);

○ Coordinated legal filings across multiple jurisdictions advancing same false narrative spanning both periods;

○ Communications between Hays and Davis coordinating POST-PETITION bankruptcy fraud schemes;

○ These communications demonstrate agreement and coordination across eight years.

**c. Consistent false narrative advanced by all participants across eight years:**

○ "Davis is the managing member of TopDevz" - this central lie was repeated by:

▪ Davis in testimony and declarations (2021-2023—pre-petition);

▪ Carpenter in court filings and bank communications (2022-2024—pre-petition and POST-PETITION);

▪ Kirk in court filings representing TopDevz (2022-2023—pre-petition);

▪ Scalia in arbitration papers (2021-2022—pre-petition);

▪ Hays in bankruptcy filings (2024-2025—POST-PETITION);

▪ Bailey in Talentcrowd defense (2022-2024—pre-petition and POST-PETITION);

○ Same lie, told by six different attorneys plus Davis, to dozens of

different tribunals and entities, spanning pre-petition and POST-PETITION periods spanning eight years;

- o  This uniformity of false representations across multiple participants and both periods demonstrates agreement to advance the same criminal objective.

**d. Financial transactions demonstrating conspiracy and shared benefits:**

**Pre-petition financial connections:**

- o  TopDevz JPMorgan account → Cummins & White: $196,768 (Pre-Petition § 1957 Acts)

- o  TopDevz JPMorgan account → Kirk & Toberty: $30,000 (Pre-Petition § 1957 Act)

- o  TopDevz JPMorgan account → Purdy & Bailey: $4,135 (Pre-Petition § 1957 Act)

- o  TopDevz JPMorgan account → Talentcrowd: $838,554 (Pre-Petition § 1957 Acts)

- o  TopDevz JPMorgan account → Lintz: $722,335 (Pre-Petition § 1957 Acts)

**Post-petition financial connections:**

- o  Davis → Trustee: $200,000 (POST-PETITION § 1957 Acts #1-2)

- o  GBQ → Talentcrowd sellers: Undisclosed millions

- o  GBQ → Lintz/Frye/Garcia: Ongoing compensation from POST-PETITION revenues

- o  GBQ's POST-PETITION revenues ($12-16M) → ongoing proceeds shared among conspirators

- o  These financial flows demonstrate conspiracy spanning both periods: Davis paid co-conspirators from criminally derived funds; conspirators accepted knowing payments came from crimes; GBQ paid millions to acquire and continue the stolen business; all shared financially in the scheme's success across eight years.

/ / /

**e. Recruitment pattern demonstrating conscious expansion:**

- o Carpenter recruited Kirk (friend from church) in late 2022 when additional legal representation needed;

- o Davis recruited Hays in 2023-2024 when bankruptcy expertise needed for POST-PETITION schemes;

- o Bailey recruited in June 2022 to provide legal cover for Talentcrowd;

- o GBQ recruited into enterprise in 2025 to acquire, legitimize, and continue the stolen business under reputable corporate identity in POST-PETITION period;

- o This demonstrates ongoing agreement to expand the conspiracy as circumstances require, spanning both periods.

**f. Express admissions of coordination and agreement:**

- o Lintz: "with the express authorization of Davis in his capacity as the Manager of TopDevz, organized Talentcrowd" (judicial admission of conspiracy);

- o Davis: "I instructed her [Garcia] to download as much information as humanly possible" (admission of directing trade secret theft);

- o Carpenter: "We contend that dissolution is within exclusive Superior Court jurisdiction" (using "we" demonstrates agreement among Davis, Carpenter, and Scalia);

- o GBQ's press release: "the combined firm will operate as one team behind the scenes" (admission of agreement to continue unified operations in POST-PETITION period);

- o These admissions establish express agreement and coordination spanning both periods.

**g. GBQ's knowing participation in ongoing POST-PETITION conspiracy:**

- o GBQ acquired Talentcrowd with actual or constructive knowledge of pending litigation alleging the business was built on stolen assets;

- o GBQ retained Lintz, Frye, and Garcia—the individuals accused of committing the theft—to continue operating the business,

demonstrating agreement that they would continue exploiting the stolen assets through POST-PETITION violations;

- o GBQ continues using the stolen database rather than ceasing use, developing legitimate alternatives, or firing Lintz/Frye/Garcia, demonstrating ongoing agreement to benefit from the POST-PETITION conspiracy;

- o GBQ generates $50,000+ daily from stolen assets (POST-PETITION violations), demonstrating agreement to perpetuate the racketeering rather than end it;

- o GBQ's substantial investment in acquiring Talentcrowd demonstrates long-term commitment to the conspiracy;

- o GBQ's conduct shows agreement to perpetuate the scheme through POST-PETITION racketeering rather than remedy it—this is conscious participation in the ongoing RICO conspiracy.

**Overt Acts in Furtherance of Conspiracy:**

647.    Overt acts in furtherance of the RICO conspiracy include all 750+ predicate acts detailed above, including:

**Pre-petition overt acts:**

- o Wire transfers of embezzled funds (May, May, November 2017);

- o False tax returns (2017-2020);

- o PPP loan fraud (April 2020);

- o False testimony in arbitration (2021-2022);

- o Trade secret theft (January 6-14, 2022);

- o Bank fraud (Wells Fargo seizure January 7, JPMorgan opening January 19, 2022);

- o Wire fraud campaign to clients (January 20-31, 2022);

- o Evidence destruction (January-May 2022);

- o Perjured declarations using identity theft connected to California felonies (November 2, December 29, 2022; June 26, 2023);

- Procurement of $12 million judgments (May 12, 2023, confirmed August 15, 2023);

- Talentcrowd operations generating $40-50 million (February 2022-February 25, 2024);

- Money laundering through JPMorgan account ($15 million, 2022-2023);

- Over 600 pre-petition overt acts total.

**Post-petition overt acts:**

- Hays's false oaths to procure conversion (April 8, April 29, 2024);

- Conversion order (May 9, 2024)—FIRST POST-PETITION PREDICATE ACT;

- Davis's false $10 million bankruptcy claim (2024);

- Forged unanimous consent (October 14, 2024);

- Settlement schemes (September-December 2024)—SECOND POST-PETITION PREDICATE ACT SERIES;

- Davis's settlement payments (December 13, 2024);

- Sale scheme (April-August 2025)—THIRD POST-PETITION PREDICATE ACT SERIES;

- Davis's purchase payment (March 2025);

- GBQ's acquisition of Talentcrowd (February 2025);

- GBQ's retention of Lintz, Frye, Garcia (February 2025);

- GBQ's daily exploitation of stolen trade secrets (February-December 2025, 300+ POST-PETITION days);

- GBQ's 200+ monetary transactions over $10,000 in criminally derived property (February-December 2025—POST-PETITION);

- Over 580 post-petition overt acts total.

648.    Each overt act was committed in furtherance of the conspiracy's objectives:

- To transfer TopDevz's $30 million business from Rajaee to Davis and co-conspirators;

- To steal and exploit Plaintiffs' trade secrets worth tens of millions;

- To eliminate Mobile Monster's commission revenue and transfer it to Talentcrowd/GBQ;

- To conceal the underlying crimes through false legal proceedings;

- To enrich all participants;

- To eliminate challenges through POST-PETITION bankruptcy fraud;

- To perpetuate the scheme through GBQ's acquisition and continued POST-PETITION operations.

**GBQ's Liability for RICO Conspiracy:**

649.   GBQ Partners LLC is liable for RICO conspiracy under § 1962(d) because:

- GBQ agreed to perpetuate the enterprise by acquiring and continuing Talentcrowd's operations using stolen assets rather than ceasing the illegal activity or conducting legitimate due diligence remediation;

- GBQ had knowledge of the underlying misconduct through due diligence revealing pending litigation, trade secret theft allegations, suspicious circumstances, and red flags that Talentcrowd was built on disputed assets;

- GBQ committed numerous overt acts in furtherance of the conspiracy: (i) acquiring Talentcrowd knowing about the theft; (ii) retaining Lintz, Frye, and Garcia—the accused thieves—demonstrating agreement they would continue exploiting stolen assets through POST-PETITION violations; (iii) daily exploitation of stolen database (300+ post-petition § 1832 violations); (iv) conducting 200+ transactions over $10,000 in criminally derived property (post-petition § 1957 violations); (v) generating $12-16 million in revenue from stolen assets through POST-PETITION violations rather than ceasing operations;

- GBQ benefits massively from the conspiracy (millions in revenue from stolen assets generated through POST-PETITION violations) and

shares in the scheme's success;

- ○ GBQ's acquisition was not a passive purchase—it was active recruitment into the ongoing conspiracy because GBQ knew about the disputes, retained the thieves to commit POST-PETITION violations, and continues committing POST-PETITION predicate acts;

- ○ Under RICO conspiracy law, acquiring a business built on racketeering with knowledge and intent to continue the illegal operations through POST-PETITION racketeering constitutes joining the conspiracy;

- ○ GBQ's agreement to the POST-PETITION conspiracy is demonstrated by its actions: retaining Lintz/Frye/Garcia (agreement to continue their methods and commit POST-PETITION violations), continuing to use the stolen database daily after February 26, 2024 (agreement to perpetuate POST-PETITION theft), generating millions from stolen assets through POST-PETITION violations (agreement to benefit from POST-PETITION racketeering), refusing to cease operations despite ongoing litigation (agreement to defy legal challenges through continued POST-PETITION crimes).

650.    The conspiracy spans pre-petition and post-petition periods seamlessly:

- ○ Pre-petition conspirators (Davis, attorneys, Lintz, Frye, Garcia) established the foundation through initial crimes;

- ○ Hays joined the conspiracy in the post-petition period to execute bankruptcy fraud;

- ○ GBQ joined the conspiracy in the post-petition period to acquire and continue the stolen business through POST-PETITION racketeering;

- ○ The conspiracy evolved but the core agreement remained constant: steal and exploit Plaintiffs' business for conspirators' enrichment, spanning both periods.

**Injury to Plaintiffs:**

651.    Plaintiffs have been injured in their business and property by reason of Defendants' RICO conspiracy:

- ○ Rajaee: $22.8-31.8 million in direct damages (trebled: $68.4-95.4 million);

- Mobile Monster: $8.6 million in direct damages (trebled: $25.8 million), with ongoing injury of $116,000+ monthly as the conspiracy continues through GBQ's POST-PETITION operations;

- Total: $31.4-40.4 million compensatory; $94.2-121.2 million trebled.

652.　But for the RICO conspiracy spanning both periods:

- The enterprise would not have formed or functioned;

- No single defendant could have accomplished the objectives alone;

- Davis's embezzlement alone would not have succeeded without attorney Defendants providing legal cover;

- The trade secret theft alone would not have generated $50+ million without the wire fraud campaign transferring clients;

- The pre-petition crimes would not have succeeded without the POST-PETITION bankruptcy fraud to eliminate challenges;

- The stolen business would not continue generating millions without GBQ's acquisition, resources, and ongoing participation in the POST-PETITION conspiracy;

- The conspiracy was essential to the scheme's success across both periods, and Plaintiffs' injuries directly resulted from the coordinated conduct of all conspirators.

653.　GBQ's POST-PETITION conspiracy liability is particularly clear:

- GBQ could not claim ignorance—due diligence revealed the litigation;

- GBQ could not claim passive investment—it retained the accused thieves as operators;

- GBQ could not claim cessation—it continues exploiting stolen assets daily through POST-PETITION violations;

- GBQ could not claim no agreement—its retention of Lintz/Frye and continued use of stolen database through POST-PETITION violations demonstrate express agreement to perpetuate the conspiracy;

- GBQ's POST-PETITION participation perpetuates Mobile Monster's injury (each month GBQ operates through POST-PETITION

racketeering = $116,000 lost commission to Mobile Monster).

654.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover three times their actual damages, plus costs of suit and reasonable attorney fees.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Ashkan Rajaee and Mobile Monster, Inc. respectfully request that this Court enter judgment in their favor and against Defendants as follows:

### A. Monetary Damages

1. An award of compensatory damages for Plaintiffs' direct injuries to business and property in an amount to be proven at trial, but not less than:

**Plaintiff Ashkan Rajaee: $22,800,000 minimum, comprising:**

- o Loss of 51% ownership interest in TopDevz (business property): $9,000,000-$15,000,000 (based on TopDevz's valuation of $18-30 million, reduced to zero by Defendants' racketeering);

- o Loss of salary and employment income (business earning capacity): $2,000,000-$2,500,000 (employment income at $200,000-$500,000 annually for 48 months, terminated by Defendants' takeover);

- o Loss of business interests and commercial relationships from weaponization of fraudulent judgment: $9,373,566.64 — Defendants engaged in a pattern of racketeering to procure a sham judgment through wire fraud, identity theft using Rajaee's name in connection with California felonies (perjury under Cal. Pen. Code § 118a, conspiracy under Cal. Pen. Code §§ 182(3)-(5)), and tax fraud. That judgment was then weaponized to: strip Plaintiff of business control over TopDevz, trigger bankruptcy consequences that extinguished business interests, destroy ongoing commercial operations, sever revenue streams and contractual relationships, eliminate ability to operate or earn income in a business capacity, deprive legal authorization to manage the business (L-1A visa destruction), and destroy professional standing and ability to attract clients and investors. Plaintiff does not seek recovery for reputational harm, emotional distress, or the personal obligation to pay the judgment. Plaintiff seeks recovery for lost business interests, lost employment capacity,

destroyed commercial relationships, and lost ability to operate and earn income in a business capacity that resulted because the racketeering defendants procured and weaponized the judgment.

- o Legal fees and costs to defend business interests: $2,500,000-$5,000,000 (business expenses incurred to protect ownership rights and commercial interests);

**Plaintiff Mobile Monster, Inc.: $8,600,000 minimum, comprising:**

- o Loss of contractual commission revenue (business income): $5,600,000 (7% commission on TopDevz revenues at approximately $1.4 million annually for 48 months, lost due to destruction of business relationship);

- o Loss of business interests and commercial relationships from weaponization of fraudulent judgment: $3,000,000 — Defendants engaged in a pattern of racketeering to procure a sham judgment using Mobile Monster's corporate identity. That judgment was then weaponized to: destroy Mobile Monster's commercial relationships with TopDevz and U.S. clients, eliminate Mobile Monster's ability to expand U.S. operations, sever Mobile Monster's contractual revenue stream, and strip Mobile Monster's business property interest in the TopDevz commission arrangement. Mobile Monster does not seek recovery for reputational harm or emotional distress. Mobile Monster seeks recovery for lost business interests, destroyed contractual relationships, eliminated commercial opportunities, and lost business revenue.

- o Ongoing loss of business revenue: $116,000+ monthly as GBQ continues operations through post-petition racketeering.

**Total Minimum Compensatory Damages to Business and Property: $31,400,000**

1. MANDATORY TREBLING of all compensatory damages pursuant to 18 U.S.C. § 1964(c), for a total of $94,200,000 MINIMUM (three times $31,400,000), as required by federal RICO statute for all persons injured in their business or property by reason of violations of 18 U.S.C. § 1962;

2. Pre-judgment interest at the maximum rate allowed by law from the date each

injury was sustained through the date of judgment;

3. Post-judgment interest at the federal statutory rate from the date of judgment until paid in full;

4. Costs of suit pursuant to 18 U.S.C. § 1964(c), including:

   o Filing fees and service of process costs;

   o Deposition costs and court reporter fees;

   o Expert witness fees and costs;

   o Document production and discovery costs;

   o Trial exhibit preparation costs;

   o All other costs of litigation authorized by law;

5. Reasonable attorney fees pursuant to 18 U.S.C. § 1964(c) for prosecution of this action;

## B. Disgorgement of All Proceeds of Racketeering Activity

7. An order for complete disgorgement and restitution of all proceeds, profits, revenues, and benefits obtained by Defendants through the pattern of racketeering activity spanning pre-petition and post-petition periods, including but not limited to:

**From Defendant GBQ Partners LLC (POST-PETITION Proceeds):**

   o All revenues and gross receipts generated from Talentcrowd operations from the acquisition date (February 2025) through the present, conservatively estimated at $12,000,000-$16,000,000 for the February-December 2025 post-petition period based on $15-20 million annual revenue run rate;

   o All net profits derived from post-petition exploitation of Plaintiffs' stolen trade secrets, estimated at 20-30% profit margin on revenues ($2.4-4.8 million in net profits from POST-PETITION violations);

   o The value GBQ obtained through acquisition of Talentcrowd, conservatively estimated at $10,000,000-$20,000,000 based on the $40-50 million in cumulative revenue that Talentcrowd generated using stolen assets from February 2022-February 2025 prior to GBQ's

acquisition (pre-petition revenues that created the value GBQ purchased);

○ All compensation, salaries, bonuses, equity distributions, and benefits paid to Joshua Lintz, Amanda Frye, and Melissa Garcia since GBQ's acquisition (February 2025-present) for facilitating post-petition violations;

○ All accounts receivable and work-in-progress as of the date of judgment representing future revenues from contracts obtained using stolen assets through POST-PETITION violations;

○ All goodwill, client relationships, and intangible business value associated with the Talentcrowd name and operations (derived from Plaintiffs' stolen assets);

○ Any proceeds received by GBQ or its principals from any resale, transfer, or further disposition of the Talentcrowd business or assets;

○ All property, real or personal, purchased with proceeds from Talentcrowd's POST-PETITION operations (February-December 2025).

**From Defendant Talentcrowd, LLC and its principals (Lintz, Frye, Garcia) - Pre-Petition Proceeds:**

○ All revenues and gross receipts generated from Talentcrowd operations from formation (February 8, 2022) through sale to GBQ (February 2025), conservatively estimated at $40,000,000-$50,000,000 based on:

  ▪ Year one (2022-2023): $12 million (evidenced by Frye's statement of "90k hours of service" at $115-135/hour billing rates);

  ▪ Year two (2023-2024): $15 million (estimated based on continued pre-petition operations);

  ▪ Year three (2024-February 2025): $13-23 million (estimated based on continued pre-petition operations);

○ All net profits from these pre-petition operations (estimated at $8-15 million over the three-year period);

- o  All consideration received from sale to GBQ Partners (amount to be determined through discovery and accounting);

- o  All salary, bonuses, distributions, and equity payments received by Lintz, Frye, and Garcia from Talentcrowd operations prior to GBQ acquisition (Lintz alone received $722,335.83 from TopDevz account, plus millions more from Talentcrowd operations);

- o  All property purchased with Talentcrowd proceeds by Lintz, Frye, Garcia, or their family members.

**From Defendant Tyler Brandon Davis:**

- o  The embezzled $750,000 from Porter Consulting (three wire transfers May-November 2017—pre-petition);

- o  The laundered $37,240 from PPP loan fraud (pre-petition);

- o  All distributions and payments received from TopDevz's fraudulent JPMorgan Chase account (2022-2023—pre-petition);

- o  All proceeds received from Talentcrowd operations or from sale to GBQ;

- o  The $100,000 paid to Trustee as fraudulent settlement payment (December 2024—POST-PETITION);

- o  The $100,000 paid to Trustee as fraudulent purchase payment (March 2025—POST-PETITION);

- o  All ownership interests purportedly acquired in TopDevz through racketeering;

- o  All value derived from the fraudulent bankruptcy sale.

**From Attorney Defendants (Carpenter, Kirk, Scalia, Bailey, Hays):**

- o  All legal fees received from criminally derived funds, specifically:

  - ▪  Scott R. Carpenter and Cummins & White, LLP: $196,768 (from TopDevz JPMorgan account—pre-petition);

  - ▪  J. Douglas Kirk and Kirk & Toberty: $30,000+ (from TopDevz JPMorgan account—pre-petition);

  - ▪  Joseph W. Scalia: Hundreds of thousands of dollars (amount to

172

be determined through discovery—pre-petition);

- Micah L. Bailey and Purdy & Bailey, LLP: $4,135 from TopDevz account plus additional fees from Talentcrowd pre-petition operations, plus fees from POST-PETITION bankruptcy work;

- D. Edward Hays: All fees received from Davis, TopDevz, or bankruptcy-related work (amount to be determined through discovery—POST-PETITION);

  - All property purchased with these criminally derived fees.

8. Complete accounting and tracing of all financial transactions involving:

  - GBQ Partners LLC (POST-PETITION): Purchase price paid for Talentcrowd; all revenues from Talentcrowd operations February 2025-present; all payments to Lintz, Frye, Garcia; complete client list and contract values; all accounts receivable; complete forensic accounting of database usage and trade secret exploitation demonstrating POST-PETITION violations;

  - Talentcrowd, LLC (Pre-Petition): All revenues from formation (February 8, 2022) through GBQ acquisition (February 2025); all expenses and distributions; proceeds from sale to GBQ; complete client list and revenue by client; complete contractor list and payments;

  - TopDevz, LLC: All transactions from January 1, 2017 through present; complete JPMorgan Chase account transaction history (January 2022-January 2023, approximately $15 million—pre-petition); Wells Fargo account history;

  - Porter Consulting, LLC: The $750,000 in wire transfers (May, May, November 2017—pre-petition); the $328,300 PPP loan and all disbursements; the $37,240 wire transfer to Mason;

  - Mason Building & Design, LLC: The $37,240 check to TopDevz and reimbursement from Porter;

  - All Defendants: Complete tracing of all proceeds of racketeering activity from initial pre-petition crimes through present disposition through GBQ's current POST-PETITION operations.

## C. Permanent Injunctive Relief to Prevent Ongoing Federal Crimes

9.  A permanent injunction pursuant to 18 U.S.C. § 1964(a) and 18 U.S.C. § 1832(b) (which expressly authorizes injunctive relief for trade secret violations), ordering that:

**a. Immediate cessation of trade secret theft (preventing ongoing POST-PETITION violations of 18 U.S.C. § 1832):**

Defendants GBQ Partners LLC, Talentcrowd, LLC, Joshua Paul Lintz, Amanda Frye, and Melissa Garcia, and all persons, entities, officers, directors, employees, agents, successors, and assigns acting in concert or participation with them, are PERMANENTLY ENJOINED from:

- o Using, accessing, exploiting, disclosing, transferring, selling, licensing, or benefiting from in any manner whatsoever Plaintiffs' trade secrets and confidential proprietary information, including:

    - The proprietary database containing approximately 2.5 million contact records with over 40 attributes per record;

    - Any and all recruiting methodologies, sourcing techniques, validation processes, and business intelligence systems developed by Plaintiffs;

    - Any and all client lists, client relationship histories, client preferences, and client contact information stolen from Plaintiffs;

    - Any and all contractor lists, contractor databases, skills assessments, performance ratings, and contractor contact information stolen from Plaintiffs;

    - Any and all financial data, accounting information, operational procedures, business plans, or strategic information stolen from Plaintiffs;

    - Any derivative works, compilations, databases, or systems based upon or incorporating Plaintiffs' stolen information;

- o GBQ Partners shall immediately cease and desist all Talentcrowd operations that depend upon, utilize, or derive value from Plaintiffs' stolen trade secrets, which includes substantially all current

Talentcrowd operations;

- Within ten (10) days of this Court's order, Defendants shall:

  - Destroy or return all copies of Plaintiffs' confidential information in any form (electronic, paper, cloud storage, backup systems, employee devices);

  - Certify in writing under penalty of perjury that all such information has been destroyed or returned;

  - Provide sworn declarations from GBQ's officers, Lintz, Frye, and Garcia certifying compliance;

- Within thirty (30) days of this Court's order:

  - Provide complete forensic access to GBQ's and Talentcrowd's computer systems, databases, and records to allow Plaintiffs' experts to verify destruction and non-use of stolen information;

  - Provide detailed accounting of all revenue generated from use of stolen trade secrets from February 8, 2022 through present, itemized by client and time period, specifically including GBQ's POST-PETITION revenues from February 2025-present;

  - Identify all clients currently being serviced and certify whether those relationships were derived from Plaintiffs' stolen client lists;

  - Identify all contractors in current database and certify whether they were sourced through Plaintiffs' stolen recruiting database.

**b. Prohibition against using Plaintiffs' identities and names without authorization:**

Defendants Tyler Brandon Davis, Scott R. Carpenter, J. Douglas Kirk, Joseph W. Scalia, D. Edward Hays, and all persons acting in concert with them, are PERMANENTLY ENJOINED from:

- Transmitting via any interstate wire facility (including but not limited to courts' electronic filing systems, email, telephone, internet) any documents, statements, declarations, pleadings, or communications that falsely represent:

175

- That Davis is, was, or ever became the "managing member" or "manager" of TopDevz, LLC;

- That Davis has or had authority to act on behalf of TopDevz, LLC;

- That Rajaee was lawfully removed as Manager of TopDevz;

- That the arbitration proceedings had jurisdiction to effect dissolution or removal of Manager;

- That Kirk had authority to represent TopDevz;

- That TopDevz authorized or joined any petition, claim, or proceeding initiated by Davis;

○ Using, filing, or presenting in any judicial, administrative, or arbitral proceeding Davis's three perjured declarations dated November 2, 2022, December 29, 2022, and June 26, 2023 (which used Plaintiffs' identities to commit California felonies);

○ Using TopDevz's name, taxpayer identification number, or other identifying information without express written authorization from Rajaee as lawful Manager;

○ Filing any documents in any proceeding purportedly on behalf of TopDevz without Rajaee's express written authorization.

**c. Restraining order preventing future RICO violations:**

All Defendants are PERMANENTLY ENJOINED from:

○ Further violations of 18 U.S.C. § 1343 (wire fraud);

○ Further violations of 18 U.S.C. § 1344 (bank fraud);

○ Further violations of 18 U.S.C. § 1832 (theft of trade secrets);

○ Further violations of 18 U.S.C. §§ 1028 and 1028A (identity theft and aggravated identity theft);

○ Further violations of 18 U.S.C. § 1512 (obstruction of justice);

○ Further violations of 18 U.S.C. §§ 1956 and 1957 (money laundering);

○ Further violations of 18 U.S.C. §§ 152 and 157 (bankruptcy fraud);

176

- Further violations of 26 U.S.C. §§ 7201 and 7206 (tax evasion and filing false returns);

- Destroying, concealing, altering, or tampering with any documents, records, electronic data, or other evidence relating to the matters alleged in this complaint;

- Engaging in any monetary transactions with each other involving property derived from specified unlawful activity;

- Transferring, selling, conveying, encumbering, or dissipating any assets traceable to proceeds of racketeering activity pending full satisfaction of judgment;

- Intimidating, threatening, harassing, or retaliating against Plaintiffs, any witnesses, or any persons who provided evidence regarding the racketeering activity.

**d. Specific injunctive relief against GBQ Partners LLC:**

Defendant GBQ Partners LLC is PERMANENTLY ENJOINED from:

- Operating any business using Plaintiffs' stolen trade secrets under any name (including Talentcrowd, GBQ Talent Solutions, or any other designation);

- Employing, contracting with, or engaging Joshua Paul Lintz, Amanda Frye, or Melissa Garcia in any capacity relating to:

  - IT staffing or recruiting services;

  - Software development contractor placement;

  - Use of any databases, methodologies, or systems derived from or related to TopDevz or the stolen assets;

  - Any business operations that would utilize or benefit from the individuals' knowledge of Plaintiffs' stolen trade secrets or that would constitute POST-PETITION violations;

- Transferring, selling, or disposing of the Talentcrowd business, assets, client contracts, or goodwill to any third party pending resolution of this action and full disgorgement of POST-PETITION proceeds;

- o Making any distributions, dividends, or payments to GBQ's members, shareholders, or principals from revenues or proceeds derived from Talentcrowd operations (which revenues are derived from POST-PETITION § 1832 and § 1957 violations);

- o Continuing any client relationships that were originally TopDevz clients and were transferred to Talentcrowd through the January-March 2022 wire fraud campaign.

## D. Constructive Trust Over Criminally Derived Property

10. Imposition of a constructive trust in favor of Plaintiffs Ashkan Rajaee and Mobile Monster, Inc. as equitable owners, over the following property, with Defendants holding merely legal title as trustees for Plaintiffs' benefit:

### a. GBQ Partners' Talentcrowd operations and assets (POST-PETITION):

- The entire Talentcrowd business unit or division as operated by GBQ Partners;

- All client contracts, statements of work, and accounts receivable associated with Talentcrowd operations;

- All revenues generated from Talentcrowd operations from February 2025 through the date of final judgment (estimated at $1.5-2.0 million monthly from POST-PETITION violations);

- All databases, software systems, operational infrastructure, and technology assets acquired from Talentcrowd;

- All intellectual property, methodologies, processes, and know-how associated with Talentcrowd (stolen from Plaintiffs);

- All goodwill and going concern value of the Talentcrowd business (derived from stolen assets);

- Any proceeds held by GBQ from Talentcrowd operations in bank accounts, investments, or other property;

### b. Original Talentcrowd assets and proceeds (Pre-Petition):

- Talentcrowd, LLC entity (if still existing separate from GBQ);

- All proceeds from the sale of Talentcrowd to GBQ Partners (to be determined

through accounting);

- Any retained assets, accounts receivable, or property held by Talentcrowd, Lintz, Frye, or Garcia;

**c. TopDevz-related assets:**

- Any ownership interests, membership certificates, or rights in TopDevz, LLC purportedly held by Davis (acquired through violations of 18 U.S.C. §§ 1343, 1344, 1028, 1028A, 7201, 7206);

- Any property purportedly transferred from TopDevz to Davis pursuant to the fraudulent bankruptcy sale (POST-PETITION fraud);

**d. Attorney fees paid from criminally derived funds:**

- All legal fees held in trust accounts or operating accounts of Cummins & White, LLP; Kirk & Toberty; Law Offices of Joseph W. Scalia, APC; Purdy & Bailey, LLP; and Marshack Hays LLP that were paid from TopDevz's fraudulent JPMorgan Chase account or from other proceeds of racketeering activity;

- Any property purchased by attorney Defendants with such fees;

**e. Other criminally derived property:**

- All real property, personal property, vehicles, investment accounts, bank accounts, retirement accounts, and other assets purchased by any Defendant with proceeds traceable to the pattern of racketeering activity spanning both periods;

- All accounts receivable, contract rights, and intangible property derived from exploitation of Plaintiffs' stolen trade secrets.

**E. Forfeiture of Property Used in or Derived from RICO Violations**

11. Pursuant to 18 U.S.C. § 1963 (criminal forfeiture provisions applicable to civil RICO actions) and this Court's equitable powers under 18 U.S.C. § 1964, an order for civil forfeiture of:

**a. Business interests acquired through racketeering:**

- GBQ Partners' entire ownership interest in the Talentcrowd business, as this interest was acquired using proceeds traceable to racketeering activity (GBQ

179

paid for Talentcrowd with knowledge it was built on stolen assets obtained through pre-petition violations, making the acquisition proceeds of specified unlawful activity, and GBQ maintains this interest through ongoing POST-PETITION violations);

- Davis's purported ownership interests in TopDevz, LLC (acquired through embezzlement, PPP fraud, identity theft, tax fraud, wire fraud, bank fraud, and maintained through POST-PETITION bankruptcy fraud);

- Lintz's, Frye's, and Garcia's ownership interests in Talentcrowd (acquired through trade secret theft, wire fraud, and money laundering);

**b. Monetary proceeds subject to forfeiture:**

- The $200,000 paid by Davis to the Trustee in bankruptcy settlements (December 2024 and March 2025), representing POST-PETITION proceeds of specified unlawful activity under 18 U.S.C. § 1957;

- The $787,240 in fraudulent capital contributions (embezzlement and PPP fraud—pre-petition);

- All attorney fees paid from TopDevz's JPMorgan Chase account (over $1 million total—pre-petition);

**c. Property used to facilitate RICO violations:**

- The TopDevz JPMorgan Chase bank account (account ending in 0516) and all funds therein or traceable thereto;

- Computer systems, servers, and electronic storage devices containing Plaintiffs' stolen trade secrets currently used by GBQ;

- The "topdevz.io" domain and related electronic infrastructure used to commit wire fraud;

- Corporate entities used as instrumentalities: Porter Consulting, LLC; Mason Building & Design, LLC (to the extent necessary to trace and recover proceeds).

**F. Preliminary Injunctive Relief (Pending Final Judgment)**

12. Pending entry of final judgment in this action, Plaintiffs request:

a. Preliminary injunction with identical scope to the permanent injunction requested

above, particularly:

- Immediate order enjoining GBQ Partners from continuing to exploit Plaintiffs' stolen trade secrets through any Talentcrowd operations (preventing continuing POST-PETITION violations of 18 U.S.C. § 1832 causing irreparable harm of $50,000+ daily to Plaintiffs);

- Order requiring GBQ to cease operations depending on stolen assets pending trial;

**b. Preservation of assets pending judgment:**

- Order requiring GBQ Partners to deposit all gross revenues from Talentcrowd operations into a court-supervised escrow account or trust account pending final judgment (preventing dissipation of POST-PETITION proceeds while case proceeds);

- Asset freeze on all Defendants' property traceable to racketeering activity, including GBQ's Talentcrowd assets, bank accounts, and accounts receivable;

- Order prohibiting Defendants from transferring, selling, encumbering, or dissipating any assets pending final judgment;

**c. Expedited discovery:**

- Order permitting expedited discovery on the narrow issues of: (i) GBQ's revenues from Talentcrowd operations February 2025-present (POST-PETITION proceeds); (ii) GBQ's purchase price and terms for acquiring Talentcrowd; (iii) GBQ's due diligence findings; (iv) current use of Plaintiffs' stolen database and trade secrets demonstrating POST-PETITION violations; (v) identification and location of proceeds of racketeering activity from both periods;

- Order requiring GBQ to produce complete financial records for Talentcrowd operations within 30 days.

**G. Appointment of Receiver or Special Master**

13. In the alternative, or in addition to the relief requested above, appointment of a receiver or special master with authority to:

- Take possession and control of GBQ's Talentcrowd operations pending final resolution of this action;

- Manage the business to preserve asset value while preventing ongoing POST-PETITION trade secret violations (potentially by developing legitimate replacement database and methodologies);

- Trace all proceeds of racketeering activity through GBQ's and other Defendants' financial records spanning both periods;

- Prevent dissipation of criminally derived assets;

- Provide regular accountings to the Court and parties;

- Ensure compliance with any preliminary injunction orders.

## H. Enforcement Mechanisms

14. To ensure compliance with any injunctive relief granted:

- Authority for Plaintiffs to conduct reasonable monitoring and inspection of Defendants' compliance, including forensic examination of computer systems;

- Civil contempt sanctions for any violations of injunctive orders, including:

  o Monetary sanctions of $10,000 per day for each day of continued use of stolen trade secrets (each day = POST-PETITION § 1832 violation);

  o Monetary sanctions of $5,000 per violation for each false statement transmitted via wire facilities;

  o Coercive incarceration if necessary to compel compliance;

- Appointment of a special master to monitor compliance with trade secret injunction, with costs charged to Defendants;

- Criminal contempt referrals to the U.S. Attorney's Office for willful violations of federal court orders.

## I. Referrals to Governmental and Professional Authorities

15. Referral of attorney Defendants to the State Bar of California for investigation and disciplinary proceedings based on:

- Violations of California Rules of Professional Conduct;

- Commission of federal crimes (18 U.S.C. §§ 1343, 1344, 1832, 1028, 1028A, 1512, 1956, 1957, 152, 157);

- Commission of California state felonies (Pen. Code §§ 118a (perjury), 127 (subornation of perjury), 182 (conspiracy), 470 (forgery), 530.5 (identity theft));

- Breach of duties as officers of the court;

- Requesting permanent disbarment or suspension from practice of:

  o Scott R. Carpenter (State Bar No. 144259);

  o J. Douglas Kirk;

  o Joseph W. Scalia;

  o Micah L. Bailey (State Bar No. 248384);

  o D. Edward Hays (State Bar No. 162507).

16. Referral of the criminal conduct to appropriate federal and state law enforcement and regulatory authorities for criminal investigation and prosecution, including:

- Federal Bureau of Investigation - for investigation of the criminal enterprise and all predicate acts under 18 U.S.C. §§ 1961-1968 (RICO), 1343 (wire fraud), 1344 (bank fraud), 1028 and 1028A (identity theft), 1832 (theft of trade secrets), 1512 (obstruction), 1956 and 1957 (money laundering), 152 and 157 (bankruptcy fraud);

- Internal Revenue Service Criminal Investigation Division - for investigation of tax evasion (26 U.S.C. § 7201), filing false returns (26 U.S.C. § 7206), and identity theft related to tax fraud;

- United States Department of Justice, Criminal Division - for criminal prosecution under all applicable federal statutes;

- United States Attorney's Office, Southern District of California - for prosecution of bankruptcy fraud, wire fraud, and other crimes affecting this District, particularly the POST-PETITION bankruptcy fraud scheme;

- Small Business Administration Office of Inspector General - for investigation of PPP loan fraud (SBA Loan No. 5058697106);

- California Attorney General's Office, Bureau of Investigation - for investigation of violations of California Penal Code including §§ 118a

(perjury), 127 (subornation of perjury), 182 (criminal conspiracy), 470 (forgery), and 530.5 (identity theft);

- Ohio Attorney General's Office - for investigation of GBQ Partners LLC's role in receiving stolen property, conducting business operations using stolen trade secrets in violation of Ohio law, and committing POST-PETITION violations;

- Canada Revenue Agency and Royal Canadian Mounted Police - for investigation of crimes affecting Canadian entities (Mobile Monster, Inc.) and residents.

## J. General Relief

17. Such other and further relief as this Court deems just, proper, and equitable under the circumstances, including:

- Any additional equitable remedies necessary to fully compensate Plaintiffs for injuries caused by the pattern of racketeering activity spanning both pre-petition and post-petition periods;

- Any relief necessary to prevent unjust enrichment of Defendants from proceeds of racketeering;

- Any relief necessary to deter future racketeering activity by these or other Defendants;

- Any relief authorized under 18 U.S.C. § 1964 or other applicable federal or state law;

- But specifically NOT seeking this Court to void, reverse, or review any state court judgments (those issues are being addressed through Plaintiffs' pending appeals in California Court of Appeal).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## X. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims and issues so triable pursuant to Federal Rule of Civil Procedure 38 and 18 U.S.C. § 1964(c).

Dated: January 6, 2026              Respectfully submitted,

                                    IVIE McNEILL WYATT PURCELL & DIGGS


                          By: /s/ Marie B. Maurice
                                    Marie B. Maurice, Esq.
                                    Attorneys for Plaintiffs
                                    ASHKAN RAJAEE and MOBILE MONSTER, INC.